# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**STEPHAN SCHURMANN,**

      **Petitioner,**

**v.**                                   **CASE NO. 3:15cv224-MCR/CJK**

**JUBILIE ANQUI,**

      **Respondent.**

_____/

## ORDER

On May 18, 2015, Petitioner Stephan Schurmann filed a Verified Petition for the Return of Minor Child pursuant The Convention on the Civil Aspects of International Child Abduction, October 25, 1980[1] ("Hague Convention" or "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.* (formerly numbered as 42 U.S.C. § 11601, *et seq.*) alleging that his minor child, D.S.S., was being wrongfully retained in the United States by his mother, Respondent Jubilie Anqui.  On May 19, 2015, the Court entered a Temporary Restraining Order prohibiting Respondent from removing D.S.S. from the Court's jurisdiction, and a Preliminary Injunction to this effect was entered following a hearing on May 28, 2015.[2]  The Court expedited the proceedings, as contemplated by the Convention, and held a final hearing on the Verified Petition on Tuesday, June 9, 2015.  Petitioner appeared at the hearing by video conference from Spain, and his counsel attended in person; Respondent appeared in person, represented by counsel.

---

[1] T.I.A.S. No. 11, 670 at 1, 19 I.L.M. 1501 (1986).

[2] Petitioner appeared at the hearing through counsel.  Respondent appeared without the benefit of counsel and did not oppose the injunctive relief requested.  Based on the allegations of the Verified Petition and Respondent's consent, the Court entered a Preliminary Injunction, prohibiting Respondent from removing D.S.S. from the jurisdiction during the pendency of this case and requiring her to surrender the child's passport and travel papers to the Court pending the conclusion of these proceedings.

In rendering final judgment following a non-jury trial, the Court must make specific findings of fact and state its conclusions of law separately. Fed. R. Civ. P. 52(a).  The rule "does not require a finding on every contention raised by the parties," but requires the Court to provide sufficient detail demonstrating that care was taken in ascertaining and analyzing the facts necessary to the decision.  *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987).  Now, in accordance with the requirements of Rule 52, having heard and considered all of the evidence and arguments presented, the Court finds that final judgment should be entered in favor of the Respondent, as supported by the following findings of fact and conclusions of law.[3]

**Findings of Fact**

Petitioner/Father is a citizen of Germany and Respondent/Mother is a citizen of the Philippines.  They were married in Costa Rica on March 18, 2007.  Respondent moved to Spain with Petitioner in 2007 and obtained a temporary residence visa in 2008.[4]  Their son, D.S.S., was born in Spain in August 2008 and is a German citizen due to the citizenship of his father (doc. 1, p. 3).[5]  The family lived in Spain from the time D.S.S. was born until he was almost two years old.  During their time in Spain, the family lived in three different

---

[3]  The Court has carefully conducted an individualized assessment of each witness and assigned the appropriate weight to the testimony based on the Court's credibility determinations.  *See* 9C Wright & Miller, *Federal Practice and Procedure*: Civil 2d § 2585 (1995) ("Credibility involves more than a witness' demeanor and comprehends an overall evaluation of testimony in light of its rationality or internal consistency  and the manner in which it hangs together with other evidence.").  In general, the Court finds Respondent Jubilie Anqui to be a more credible witness than Petitioner Stephan Schurmann and thus credits her testimony over his where their testimony conflicts.  For instance, the record shows that Petitioner repeatedly made statements in his sworn affidavit that proved at a minimum to be flagrant exaggerations.  Petitioner filed a sworn statement to the Ministry of Spain to initiate Hague Convention proceedings wherein he grossly misrepresented that the Respondent was engaging in the occupation of "prostitute" and alleged she had concealed the minor child from him since August 2014, not December 2014, as he alleged in his Verified Petition to this Court, which the record proves to be untrue as to either date.  Moreover, he sent threatening electronic mail to the state court judge who presided over the parties' custody dispute and stated he would "destroy her lousy career;" he also used derogatory and disparaging language to address the judge and to describe Respondent (doc. 17 and Respondent's Trial Ex. 20 & 21).  Petitioner's vindictive and irrational behavior suggests that Petitioner has acted in this legal proceeding, in large part, out of spite and animosity towards Respondent, leaving the undersigned with an overall negative impression of his credibility.

[4]  The record does not reflect whether or not Petitioner lived in Spain prior to this.

[5]  D.S.S.'s German citizenship is not disputed by Respondent.  There is nothing in the record showing that he is a citizen of Spain.

rental properties.  In April 2010, they sold everything,[6] which apparently amounted to a car, a television, and a dryer, and moved to the Phillippines for a business opportunity.[7]  They did not maintain a home in Spain after leaving, had no extended family there, and never discussed returning.

The family stayed in the Phillippines for approximately six months.[8]  They left in October 2010 and moved to the United States to pursue another business opportunity. The family moved to the United States on a temporary E-2 Investor Visa, which was valid for two years.[9]  Petitioner testified that the family moved to Birmingham, Alabama, because he purchased a construction business there, which he said he intended to sell "quickly" for a profit.  According to Respondent, because it was a construction business, she and Petitioner discussed building a home in Alabama that would serve both as a model home for the business and a home for the family.  D.S.S. was only two years old at the time. Private emails between the parties reflect that they also had jointly hoped the move to the

---

[6]  Petitioner testified he left some of his belongings in the garage of "private friends" and has since retrieved those items for his current rental property in Marbella, Spain.  He states he is currently working from home.

[7]  Petitioner did not mention living in the Phillippines after leaving Spain in his Verified Petition but admitted during the hearing that the family moved there from Spain.  Petitioner states he, his wife, and D.S.S. are still residents of Spain because he never "gave up his residency status or domicile" there.  Respondent testified, however, that her temporary resident visa, as well as Petitioner's, was only valid for five years and even then, only if they continuously remained in the country for that time period.  According to Respondent, their residence visas expired six months after they left Spain, which would have been October 2010. Coincidentally, this is when they moved to the United States.

[8]  Petitioner testified that he and Respondent never intended to stay in the Phillippines or apply for permanent residence there.  According to Respondent, the couple never had any intention of returning to Spain after they left for the Phillippines.

[9]  An E-2 Investor Visa is a non-immigrant, temporary visa, which enables a person to work in the United States "solely to develop and direct the operations of an enterprise in which he or she has invested or of an enterprise of which he or she is actively in the process of investing a substantial amount of capital." 8 U.S.C.A. § 1101 (a)(15)(E). The person may remain in the United States indefinitely as long as the qualifying investment or trade continues. *See* 1 Manual of Foreign Investment in the U.S. § 12:6 (3d ed.). *See infra* note 10.

United States would provide D.S.S. with better educational opportunities in the future.[10]
Petitioner's construction business failed in July 2011, but the family stayed in the United
States instead of returning to Spain, and Petitioner subsequently set up a similar business
under a different name.  A year later, the family remained in the United States but had
moved to Alabaster, Alabama, to be closer to the new factory.  They rented a two-bedroom
apartment in Alabaster for about six months.  There were no discussions of returning to
Spain.

Although Petitioner's and Respondent's visas were set to expire in August 2012,
they hoped to have them renewed for another two years.  In an attempt to remain in the
United States, Petitioner hired two different immigration lawyers to assist him in renewing
the E-2 Investor Visa.[11]   According to Petitioner, he only attempted to renew his E-2
Investor Visa so that he would have sufficient time to sell equipment from his failed
construction businesses and recoup a portion of the funds he had invested before returning
to Europe.  Respondent, however, stated she and Petitioner had agreed to stay in the
United States and planned to apply for legal permanent residency once Petitioner had
invested $500,000 in the business.[12]  In any event, the renewal was denied for unknown
reasons, but Petitioner did not return to Europe with his family, and another year passed.

---

[10]  In an email Petitioner sent to Respondent in March 2014, he referenced their move to the United
States and acknowledged it had been to "setup our factory in USA, which we hoped would also give [D.S.S.]
a better educational level when he would have to go to school."  (See Doc. 17, at 10; Respondent's Trial Ex.
20).  D.S.S. was only two years old at the time they moved to the United States with hopes of better
educational opportunities for him, which suggests that the parents intended to remain in the country on a
permanent basis.

[11]  Petitioner testified that both of his immigration attorneys "disappeared" after being paid.  He stated
his first attorney had her license revoked, then disappeared, and his second attorney wrote one letter on his
behalf to attempt to renew his E-2 Investor Visa, and then changed his telephone numbers and disappeared
as well.

[12]  Respondent did not expound on this monetary requirement.  Consistent with her testimony,
however, the law reflects that a foreign national entrepreneur may become a permanent resident of the United
States by engaging in a new commercial enterprise with a minimum investment of $1 million or, in specially
targeted employment areas, at least $500,000.  8 U.S.C. § 1153(b)(5)(C), see also 8 U.S.C. § 1186(b)(d)
(stating investors can convert a two- year conditional status to permanent resident status if certain criteria are
met).

The family moved to Destin, Florida, at the end of 2012 because, after visiting the area, the parents felt it would be a good place for D.S.S. to live.  Despite Petitioner's later assertion that he intended to return to Europe with Respondent and D.S.S., the record reflects that the family made a home in Destin,[13] where D.S.S. now attends school, plays soccer, and participates in jujitsu.  D.S.S. speaks only English; neither he nor his parents speak Spanish, and he has no extended family or friends in Spain.[14]

By March 2014, the couple was having escalating marital difficulties.  The best evidence of this is an erratic and bizarre email from Petitioner to Respondent, in which Petitioner announced his intent to end their marriage.[15]  Petitioner testified that they later reconciled, but according to Respondent, Petitioner made her sleep on the floor of D.S.S.'s room and would not allow her to sleep on their bed or even the couch.  In August 2014, struggling with financial and marital difficulties, Petitioner and Respondent decided that Respondent and D.S.S. would move from the family's Destin apartment into the home of local friends while Petitioner traveled to Pennsylvania in connection with his work.[16]  However, according to Respondent, Petitioner left her and D.S.S. with no support,[17] so they instead moved into the nearby apartment of another man with whom she was then involved in a relationship.  Petitioner was unaware that Respondent and D.S.S. had moved in with this individual instead of their friends.  Petitioner said Respondent "concealed" D.S.S. from

---

[13]  Although Petitioner took steps to travel with his family to Italy in July 2013, it was only to change his name, and ultimately, neither he nor his family went.

[14]  Although Petitioner has since moved to Spain and lives there now, D.S.S. had no family in Spain at the time of the alleged wrongful retention.

[15]  The letter was highly inflammatory and psychologically abusive to Respondent.  (Doc. 17, 9-13; Respondent's Trial Ex. 20).  Petitioner admitted during a divorce proceeding in Okaloosa County that he sent the letter.

[16]  Petitioner testified that he went to Pennsylvania to meet with a business contact.  The record reflects that he remained there until December 2014.

[17]  According to the Respondent, Petitioner effectively abandoned them, and has not provided any financial support for her or D.S.S. since August 2014, except for two $500.00 support payments as required by the state court in the divorce proceedings she filed in December 2014.  Petitioner also sent D.S.S. a PowerPoint presentation and a $50 Wal-mart gift card for his birthday in August 2014.

him during this time, though he admits he spoke with D.S.S. by telephone daily while he was in Pennsylvania.

According to Petitioner, he went to Pennsylvania on a business trip looking for a way to move his business and family back to Europe.  There is no evidence, however, that the couple had ever discussed moving the family to Spain.  While in Pennsylvania, Petitioner gave a limited power of attorney to Respondent so she could obtain medical treatment for D.S.S. in his absence, if necessary.  Apparently also concerned that Respondent might attempt to take D.S.S. to the Philippines while he was away, Petitioner set forth in the power of attorney his own intent to return "to Europe" with Respondent and D.S.S. and stated he did not consent to D.S.S. becoming a resident of the Philippines or remaining in the United States as an illegal resident.[18]  (Petitioner's Trial Ex. 4).  Respondent and D.S.S. stayed at Respondent's boyfriend's residence in Destin while Petitioner was in Pennsylvania, and remained there after Petitioner returned to Destin.

Petitioner returned to Destin from Pennsylvania on December 13, 2014, and quickly learned that Respondent and D.S.S. had moved in with Respondent's boyfriend.  Respondent initially allowed D.S.S. to stay with Petitioner in his hotel room but later, after being denied contact with her son, she notified the police, who then retrieved D.S.S. from Petitioner in the middle of the night on December 15.  The next day, Respondent and her boyfriend took D.S.S. to Alabama for three days without Petitioner's consent.  On December 17, Petitioner sought a state court injunction against Respondent to prohibit D.S.S. from living with her.  A temporary injunction issued on December 18, which, in part, prohibited the removal of the child from the court's jurisdiction.[19]  Respondent immediately returned to Destin with D.S.S., and on December 19, 2014, she initiated divorce

---

[18]  This document clearly expressed only Petitioner's unilateral intent; if this were the couple's *shared* intent, there would have been no reason for him to articulate his position in this manner.

[19]  Petitioner's motion for an injunction in part accused Respondent of having engaged in sexual relations in front of the child.  This allegation of abuse was never substantiated.

proceedings in the Okaloosa County, Florida, Circuit Court.[20]  The same day, Petitioner said he "panicked" and took D.S.S. to the German embassy in Miami, obtained a German passport,[21] and booked a flight for them to Germany, "with the end result [of] going to Spain," as he explained at the hearing.[22]  Petitioner returned to Destin with D.S.S. without boarding the flight, however, after being informed by his attorney that he was prohibited by a court order from taking the child out of the state court's jurisdiction.  On January 12, 2015, Petitioner filed a Counter-Petition for divorce in the Okaloosa County Circuit Court, requesting a custody determination and permission to take D.S.S. to Germany with him because he had a job offer there.  On January 28, the state court issued an order establishing a temporary time-sharing schedule, giving Petitioner and Respondent equal custody rights throughout the divorce proceedings and ordering that D.S.S.'s passport be held by the Petitioner's attorney until the conclusion of the proceedings.

Petitioner left the United States voluntarily on February 20, 2015, before resolution of the divorce proceedings or the custody dispute.[23]  Petitioner said he understood before leaving the United States that he would not be allowed to re-enter the country for ten years because he had overstayed his E-2 Investor Visa.  He explained that he nonetheless "voluntarily deported" himself after feeling that a deputy at D.S.S.'s school had threatened him with deportation following an incident at the school during which Petitioner was not allowed to pick up D.S.S., which Petitioner testified was contrary to the state court's time-

---

[20]  In her state court petition, Respondent alleged that Petitioner committed acts of domestic violence towards her and was also mentally and verbally abusive.  The record reveals Petitioner had a great deal of animosity towards Respondent.  She did not allege Petitioner committed acts of violence or abuse against D.S.S. but she feared he might take D.S.S. away because Petitioner had previously stated he would take D.S.S. and not return if Respondent remained with her boyfriend.  Petitioner also stated he would not sign divorce papers unless he was given 100% custody of D.S.S.  Thus, Respondent filed for divorce so the state court could determine the custody of the child.

[21]  It is not clear whether Petitioner's passport was expired at this point and had to be renewed at the German embassy.  Petitioner testified it "only took him 30 minutes" to get his passport.

[22]  Petitioner testified he booked a flight to Germany with the intention of ending up in Spain, which the Court does not find credible in light of Petitioner's subsequent representation to the state court that he wanted to go to Germany because he had a job offer in Germany.

[23]  After Petitioner left the United States, he sent threatening emails to the state court judge.

sharing order.[24]

On April 13, 2015, Petitioner submitted a sworn statement to the Ministry of Justice in Madrid, Spain, for the return of D.S.S. to Spain, claiming the minor child has been a habitual resident of Spain since his birth.  On May 18, 2015, he filed the instant action, alleging that the Respondent has wrongfully retained D.S.S. in the United States since December 2014, and requesting that D.S.S. be returned to Spain for a custody determination.[25]

**Conclusions of Law**

The Hague Convention establishes dual goals of (a) securing the prompt return of children wrongfully removed to or retained in any Contracting State, and (b) ensuring that rights of custody and access of Contracting States are respected in other Contracting States.  Convention, art. 1; *Lops v. Lops*, 140 F.3d 927, 935 (11th Cir. 1998).  The Convention has been ratified by the United States as well as Spain,[26] and has been implemented by Congress through ICARA.  *See* 22 U.S.C. § 9001, *et seq.* (formerly numbered as 42 U.S.C. § 11601, *et seq.*).  Petitions for the return of a child under the Convention are to be expeditiously resolved.  *See* Convention, art. 11; 22 U.S.C. § 9003; *Lops*, 140 F.3d at 936.  "A court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute." *Lops*, 140 F.3d at 935; *see also Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014) (stating the court only decides "as a gatekeeper which of the contracting states is

---

[24]  Petitioner was arrested at D.S.S.'s school on February 2, 2015, for trespassing and causing a disturbance.  He was released from jail three days later, and those charges are still pending.  The Court notes that portions of Petitioner's sworn statement in his Hague Petition suggest that Respondent had initiated deportation proceedings, but this is not true.

[25]  Petitioner testified that he believed Respondent was subject to criminal penalties in both Germany and Spain for having withheld D.S.S. in the United States.  His comments were threatening in nature, as he stated that in either country, Respondent would "step into the trap and . . . have to deal with the consequences," and he accused her attorney of having "broken 25 different laws" for which "they will come and haunt you."

[26]  See Hague Abduction Convention Country List.
Text available at: http://travel.state.gov/abduction/resources/congressreport/congressreport_1487.html

the proper forum in which the issue of custody should be decided"); Convention, art. 16.
Upon proof that a child has been wrongfully removed or retained within the meaning of the
Convention, the child must be returned to the country of habitual residence in order to
restore the pre-wrongful removal or retention status quo and "deter parents from crossing
borders in search of a more sympathetic forum for child custody proceedings." *Baran v.*
*Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008); *see also* 22 U.S.C. § 9001(a)(4).

The first question courts must ask in these cases is whether the removal or retention
was wrongful within the meaning of the Convention. *Baran*, 526 F.3d at 1344. It is a
petitioner's burden to establish by a preponderance of the evidence that a child has been
wrongfully removed or retained outside the boundaries of the child's country of habitual
residence and that the petitioner has rights of access. 22 U.S.C. § 9003(e)(1) (formerly
numbered 42 U.S.C. § 11603(e)(1)). Article 3 of the Convention provides that "the removal
or retention of a child is considered to be wrongful where" it constitutes a breach of another
person's custody rights that were actually being exercised at the time of the removal or
retention. Convention, art. 3; *Lops*, 140 F.3d at 935. Thus, a petitioner must prove (1) that
at the time of removal or retention, the child habitually resided in the country from which
the child was removed; (2) that the removal or retention constituted a breach of the
petitioner's custody rights in the country from which the child was removed;[27] and (3) that
the petitioner had been actually exercising those custody rights at the time of removal. *See*
Convention, art. 3; *Seaman*, 766 F.3d at 1257; *Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th
Cir. 2004).

If the removal or retention is deemed to be wrongful, the child must be returned
"forthwith," unless the respondent establishes that an exception to Convention applies.
*Baran*, 526 F.3d at 1344. To do so, a respondent must prove by clear and convincing

---

[27] *See also Seaman*, 766 F.3d at 1257 (stating that the second element requires proof that the
removal or retention was a breach of the petitioner's custody rights and also was without the petitioner's
consent). As an aside, the Court notes that the Convention and ICARA conversely include consent as an
affirmative defense for the respondent to prove. *See* Convention, art. 13a; 22 U.S.C. § 9003(e)(2).

evidence that the child is in grave risk of harm (Article 13b[28]) or that the removal contravenes human rights principles (Article 20[29]); or, the respondent must prove by a preponderance of the evidence that the petitioner consented (Article 13a[30]) or that the child is well settled in the new country (Article 12[31]).  *See* 22 U.S.C. § 9003(e)(2) (formerly 42 U.S.C. § 11603(e)(2)).  According to the Eleventh Circuit, these are affirmative defenses, which must be narrowly construed, and which, "even if proven, do not automatically preclude an order of return."  *Baran*, 526 F.3d at 1345.

To prove wrongful retention in this case, Petitioner must first establish that Spain was D.S.S.'s place of habitual residence, a term that is not defined in the Convention or ICARA.  The text of the Convention, however, directs the court to the point in time "immediately before the removal or retention."  Convention, art. 3.  In the Eleventh Circuit, two fact-specific inquiries guide the Court's determination of habitual residence: (1) whether, at the time of the retention, the parents shared a settled mutual intention to abandon the former country of residence, which can be reasonably inferred from the circumstances; or (2) where a shared parental intent cannot be found based on the facts or circumstances, whether the objective circumstances demonstrate there has been an actual change in geography coupled with the passage of an appreciable period of time sufficient for the child's acclimatization in the new country to the extent that "'returning the

---

[28] Article 13b requires proof of "a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Convention, art. 13b.

[29] "The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Convention, art. 20.

[30] Article 13a requires proof that "the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention;" and Article 13 also provides that a court may refuse to order the child's return if the child has attained an age of maturity and objects to being returned.

[31] Article 12 provides that if a child has been wrongfully removed or retained for a period of less than one year, the child shall be ordered returned "forthwith," and "[t]he judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment."  *See also Seaman*, 766 F.3d at 1257.

child to the original forum now would be tantamount to taking the child out of the family and social environment in which its life has developed'."  *See Ruiz*, 392 F.3d at 1253 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)).  Cases interpreting the Convention explain that where a child has "a well-established habitual residence, simple consent to [his] presence in another forum is not usually enough to shift [habitual residence] there." *Mozes*, 239 F.3d at 1081.  On the other hand, "it is not necessary to have [a] settled intention [to abandon the prior residence] at the time of departure, as it could develop during the course of a stay originally intended to be temporary." *Ruiz*, 392 F.3d at 1252. Also, there is no bright line rule regarding the length of the absence, but it "makes sense to regard the intentions of the parents as affecting the length of time" that is sufficient to show a change in the child's habitual residence.  *Mozes*, 239 F.3d at 1079-80.

The Court finds that Petitioner has failed to establish by a preponderance of the evidence that Spain was D.S.S.'s place of habitual residence at the time of the alleged wrongful retention.  Immediately before the alleged wrongful retention, the family lived in Florida, and they had lived in the United States for the previous four years.  Moreover, the evidence reflects that at the time of D.S.S.'s removal from Spain in April 2010, both parents shared a settled mutual intent to abandon Spain as their place of habitual residence.  The undisputed evidence shows that the parents are not citizens of Spain, and they sold most of their belongings and left Spain in April 2010 for a business opportunity in the Phillippines.  The family had no remaining connections to Spain at that time.  When they moved to the Phillippines, they allowed Respondent's temporary Spanish residence card to expire, and instead of returning to Spain after six months, the family made the United States their home in October 2010.  Although they came to the United States in 2010 on a temporary two-year E-2 Investor Visa, the circumstances establish that they intended to renew their visas for another two years and were hopeful of growing the business and obtaining permanent residency.  Petitioner's conduct confirms this.  When his initial business in the United States failed in 2011, he set up another similar business under a different name, also in the United States. Both parents were acutely aware that their visas were to set to expire in August 2012.  Petitioner made several attempts at renewal by hiring

two different immigration attorneys so that the family could remain in the United States for a longer period of time.  Petitioner and Respondent each testified that they moved to Destin in 2012 because it was a better environment for D.S.S., with possible educational and societal advantages for him.  An email from Petitioner to Respondent in March 2014 is consistent with this intent.  Over two years after moving to Destin, the family continued to reside in Destin, although Petitioner left temporarily for Pennsylvania in August 2014. The record reflects that Petitioner's intent regarding their residence in the United States changed at that time, as reflected by his statement in his power of attorney that he wanted the family to return to Europe (not necessarily Spain).  Nonetheless, he left Respondent and D.S.S. in Destin.  Respondent did not share Petitioner's change of intent and testified that she wanted them to carry on with their original plans to stay in the United States.

The record is clear that the parents never discussed returning to Spain.  Though Petitioner testified he always intended that they would return to "Europe," his words and actions are to the contrary.  Any intent to return to Spain is contradicted by his repetitive actions of attempting to succeed in business ventures in the United States and staying even when they failed.  Also, when he attempted to leave with D.S.S. in December 2014, he was headed for Germany, not Spain, because, as he informed the state court judge, he had a job offer in Germany.  The parties had long contemplated divorce, had lived together in Florida for over two years, and in January 2015, Petitioner filed his own counter divorce suit in Florida, in which he asked the Florida state court to determine the parties' custody rights.  His request of the state court speaks volumes about his understanding, consistent with the parties' shared mutual intent, that the United States had become D.S.S.'s habitual residence.[32]  Only after the state court denied Petitioner's request to take D.S.S. to

_____

[32] Moreover, even if the parents' last shared intent could be considered ambiguous in this case, the Court alternatively finds that the objective factors regarding D.S.S.'s stay in Florida and his lack of any connection to Spain at the time of the alleged wrongful retention plainly demonstrates that D.S.S.'s habitual residence changed.  Since the family moved, first to the Philippines and then to the United States, the family has never returned to Spain, even for a visit, or discussed returning to Spain.  Respondent has no residency status in Spain, and D.S.S. has continuously resided with Respondent since birth.  The record reflects that all of D.S.S.'s friends are located in Destin, and his immediate family was all in Destin at the time of the alleged retention.  By contrast, D.S.S. had no friends or family in Spain at that time, and none of D.S.S.'s belongings were left in Spain.  Also, D.S.S. reads, writes, and speaks only English; neither he nor his parents

Germany did he leave the United States, voluntarily giving up his custody rights under the state court order.[33]  Thus, his subsequent return to Spain appears to have been an attempt to manipulate the custody battle forum, contrary to the principles of the Hague Convention.

Petitioner argues that D.S.S. cannot be a habitual resident of a country in which he has no legal immigration status, relying on *In re Ahumada*, 323 F. Supp. 2d 1303 (S.D. Fla. 2004) and *Kijowska v. Haines*, 463 F.3d 583 (7th Cir. 2006).  This argument overstates the holding of these cases, which are also factually distinguishable.  In *Ahumada*, the court found there was no "mutual shared intent for the child to remain in the United States" because the mother had unilaterally taken the child to the United States, contrary to here, where the parties came together as a family from the Philippines (not Spain).  The child's immigration status was only one consideration in *Ahumada*, not a deciding factor in the analysis.  *See Ahumada*, 323 F. Supp. 2d at 1311.  In *Kijowska*, the court determined that the parties did not have a shared intent to abandon their previous residence because they were estranged from the outset, and the parents never lived as a family and never had any intention to marry or any shared intention about the child's residence, *see Kijowska*, 463 F. 3d at 587-88, again contrary to the facts here, where the entire family, including D.S.S., moved to the United States with no intent to return to Spain, and the parents' marital difficulties arose after they had lived in the United States for two years.  The Court finds that, at least in this case, Respondent and D.S.S.'s immigration status is simply not relevant to the determination of D.S.S.'s habitual residence at the time of the alleged wrongful retention.  Respondent's and D.S.S.'s "precarious immigration status does not preclude [them] from becoming [ ] habitual resident[s] under the Hague Convention." *Mozes*, 239 F.3d at 1082, n. 45 (citing E.M. Clive, *The Concept of Habitual Residence*,

---

speak Spanish.  Requiring D.S.S. to return to Spain now "'would be tantamount to taking the child out of the family and social environment in which [his] life has developed.'"  *See Ruiz*, 392 F.3d at 1253 (quoting *Mozes*, 239 F.3d at 1081).

[33]  There was no imminent threat of deportation at the time, and Petitioner left knowing he would not be able to return to the United States for a period of ten years.

1997 Jurid. Rev. 137, 147).[34]

Petitioner has failed to prove that D.S.S. is being wrongfully retained in the United States within the meaning of the Hague Convention.  Consequently, it is unnecessary to address Respondent's affirmative defenses.  The purpose of the Hague Convention is to prevent a parent from "seeking a more sympathetic forum for child custody proceedings," which is exactly what Petitioner is attempting to do. *See Baran*, 526 F. 3d at 1344. Considering the totality of the facts and circumstances, the Court finds that the parents shared an intent to abandon their residence in Spain and ultimately intended, and did in fact, take up a new residence in the United States.  Thus, Petitioner has failed to prove a wrongful retention occurred.

Accordingly, on consideration of the evidence presented, the Verified Petition, the Convention, ICARA, and the arguments of the parties, it is ORDERED as follows:

1.      The Verified Petition is **DENIED**.

2.      The Clerk is directed to enter judgment accordingly, to return the passport and travel papers currently held by the Court, and close the file.

3.      Costs are taxed against Petitioner.


**DONE AND ORDERED on this 5th day of August, 2015.**


*M. Casey Rodgers*

**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[34] Courts have noted that immigration status may be relevant to the well-settled child affirmative defense, but that defense is not at issue in this case. *See also In re Ahumada,* 323 F. Supp. 2d 1303 (2004); *In re Sasson*, 327 F. Supp. 2d 489, 500 (D.N.J. 2004); *In re Lozano*, 809 F. Supp. 2d 197, 232 (S.D. N.Y. 2011).