**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| *STEPHAN SCHURMANN,* ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| ) | Case No. 3:15cv224/MCR |
| ) | |
| vs. ) | Pensacola, Florida |
| ) | June 9, 2015 |
| ) | 8:37 a.m. |
| ) | |
| *JUBILIE ANQUI,* ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

TRANSCRIPT OF **EVIDENTIARY HEARING**
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE
(Pages 1-107)

**APPEARANCES**

FOR THE PETITIONER:       ***DANIEL E. NORDBY, ESQUIRE***
                          Shutts & Bowen, LLP
                          215 S Monroe Street, Suite 804
                          Tallahassee, Florida  32301


FOR THE RESPONDENT:       ***JAMES M. LEVY, ESQUIRE***
                          James Levy, PA
                          225 Main Street, Suite 6
                          Destin, Florida  32541

*P R O C E E D I N G S*

*(Court called to order; parties present with counsel.)*

08:20:34

08:32:03   **THE COURT:**   Good morning.  As you all know, we are

08:37:08   here this morning for the final hearing on the petition of

08:37:13   Mr. Stephan Schurmann versus Jubilie Anqui under the Hague

08:37:25   Convention as well as the International Child Abduction

08:37:25   Remedies Act.

08:37:28        And Mr. Schurmann is seeking the return of the

08:37:32   parties' son to Spain.  And I say the return.  He would like

08:37:40   the child transported or taken to Spain to be with him.

08:37:43        All right.  So the petition, as I said, is

08:37:48   Mr. Schurmann's petition.  He is here by video from Spain.

08:37:50        Mr. Schurmann, welcome.

08:37:55        And he is represented in this action by Mr. Nordby,

08:37:57   who is here, Daniel Nordby.  And Ms. Anqui is represented by

08:38:04   Mr. Levy, who I understand -- James Levy, you have been

08:38:07   admitted formally to the Court; is that correct?

08:38:09        **MR. LEVY:**   Yes, Your Honor, on June 5th.

08:38:13        **THE COURT:**   Thank you.  And I appreciate you taking

08:38:14   the steps necessary to gain admission to the Court.

08:38:16        The Court is ready to proceed.  And so, Mr. Nordby,

08:38:19   I'm going to call on you.  This is your client's petition and

08:38:22   you'll proceed.  You do have the burden, the initial burden.

08:38:25        **MR. NORDBY:**   Thank you, Your Honor.

08:38:26        **THE COURT:**   While you're walking to the lectern, let

08:38:33    1    me ask --

08:38:33    2        Mr. Schurmann, are you hearing us fine?

08:38:33    3        *(No response.)*

08:38:45    4        **THE COURT:** Hello, Mr. Schurmann?

08:38:48    5        **MR. SCHURMANN:** Yes, I'm here.

08:38:50    6        **THE COURT:** Okay, very well. I just want to make sure

08:38:52    7    the electronics are still working.

08:38:55    8        **MR. SCHURMANN:** I can hear you loud and clear, ma'am.

08:38:57    9        **THE COURT:** Very well, thank you.

08:38:59   10        Mr. Nordby, go ahead.

08:39:01   11        **MR. NORDBY:** Thank you, Your Honor. May it please the

08:39:03   12    Court. My name is Daniel Nordby with the Shutts & Bowen law

08:39:07   13    firm in Tallahassee representing Stephan Schurmann in this

08:39:10   14    Hague Convention action.

08:39:13   15        And, as Your Honor noted in the introduction, the

08:39:17   16    Petitioner is asking this Court to order the return of his

08:39:21   17    son --

08:39:22   18        *(Sound system interruption.)*

08:39:22   19        **THE COURT:** It sounds like we're in an aquarium.

08:39:30   20        **MR. NORDBY:** I'll do my best.

08:39:32   21        **THE COURT:** I'm not going to hold you responsible, I

08:39:34   22    promise.

08:39:34   23        **MR. NORDBY:** Your Honor, we're asking the Court to

08:39:36   24    order the return of the parties' son to Spain so that the

08:39:38   25    Spanish courts can adjudicate the parties' respective custody

08:39:43  1    rights.

08:39:43  2         If I may just start with a very brief opening

08:39:46  3    statement about the evidence that we intend to present and then

08:39:49  4    I will call my first witness.

08:39:50  5         **THE COURT:**  All right.

08:39:53  6         **MR. NORDBY:**  Your Honor, the Hague Convention on the

08:39:54  7    civil aspects of international child abduction was enacted to

08:39:58  8    secure the prompt return of children wrongfully removed to or

08:40:02  9    retained in any contracting state and to ensure that the rights

08:40:05  10   of custody and of access under the law's one contracting state

08:40:10  11   are effectively respected in the other contracting states.  And

08:40:14  12   the central operating feature of the convention is the return

08:40:17  13   of the child to the venue of habitual residence.

08:40:21  14        We will present evidence today that the minor child

08:40:24  15   here was a habitual resident of Spain for purposes of the Hague

08:40:28  16   Convention.  He was born in Spain, and he lived there with his

08:40:31  17   parents as a legal resident of Spain before the family came to

08:40:35  18   the United States on a temporary investor visa.

08:40:40  19        The habitual residence of a young child under the case

08:40:43  20   law is determined by the parents' shared expectations and

08:40:47  21   cannot be changed without mutual agreement by the parents.

08:40:50  22   There's no evidence that will be presented that the parties

08:40:53  23   intended the United States to become the child's habitual

08:40:56  24   residence.

08:40:57  25        Indeed, the mother and the child presently have no

legal right to remain in the United States after overstaying their temporary visas.

The evidence will also show that the Respondent wrongfully retained the child in the United States after December 2014 in violation of Petitioner's custody rights under Spanish law.

The Petitioner was exercising and attempting to exercise his custody rights at the time of the wrongful retention. He promptly sought relief under the Hague Convention, including through the filing of a verified petition in this court. And he seeks to have the custody rights determined by the courts of Spain, which is a contracting country under the Hague Convention, as is the United States, of course.

After a petitioner establishes a prima facie case under the Hague Convention, a child who has been wrongfully retained must be promptly returned unless the respondent can establish an affirmative defense under the convention.

Only two affirmative defenses have been raised in the response that was filed Friday, and we submit that neither of them will be supported by the evidence or by the law.

I would be remiss -- and I'm already remiss in failing to thank the Court and the Court's staff for their efforts to assist me in securing the remote attendance of my client. I greatly appreciate that.

| | | |
|---|---|---|
| 08:42:20 | 1 | **THE COURT:**  I thank them as well.  Thank you. |
| 08:42:22 | 2 | **MR. NORDBY:**  Your Honor, I'd like to call my first |
| 08:42:26 | 3 | witness. |
| 08:42:26 | 4 | **THE COURT:**  Yes, sir, go ahead. |
| 08:42:29 | 5 | **MR. NORDBY:**  Stephan Schurmann. |
| 08:42:30 | 6 | **THE COURT:**  Mr. Schurmann, if you would rise, please, |
| 08:42:33 | 7 | to be sworn.  Raise your right hand, please. |
| 08:42:48 | 8 | **STEPHAN SCHURMANN, PETITIONER WITNESS, DULY SWORN** |
| 08:42:54 | 9 | **MADAM CLERK:**  Please state your full name and spell |
| 08:42:55 | 10 | your last name for the record. |
| 08:42:56 | 11 | **THE WITNESS:**  Stephan Schurmann, last name |
| 08:43:00 | 12 | S-c-h-u-r-m-a-n-n.  Date of birth -- |
| 08:43:08 | 13 | **THE COURT:**  That's fine, Mr. Schurmann.  Thank you. |
| 08:43:10 | 14 | You may be seated. |
| 08:43:11 | 15 | Mr. Nordby, you may proceed. |
| 08:43:16 | 16 | **MR. NORDBY:**  Thank you. |
| 08:43:17 | 17 | **DIRECT EXAMINATION** |
| 08:43:19 | 18 | **BY MR. NORBY:** |
| 08:43:20 | 19 | **Q.**  Mr. Schurmann, good morning -- or good afternoon where you |
| 08:43:23 | 20 | are. |
| 08:43:23 | 21 | **A.**  Good afternoon. |
| 08:43:23 | 22 | **Q.**  Mr. Schurmann, what is your country of citizenship? |
| 08:43:28 | 23 | **A.**  Germany. |
| 08:43:29 | 24 | **Q.**  And are you currently married? |
| 08:43:31 | 25 | **A.**  Yes. |

*Stephan Schurmann - Direct/Nordby*                                        7

| 08:43:32 | 1 | **Q.**  You're married to the Respondent in this case, Jubilie |
| 08:43:37 | 2 | Anqui? |
| 08:43:37 | 3 | **A.**  Yes, that's correct. |
| 08:43:38 | 4 | **Q.**  When were you married? |
| 08:43:41 | 5 | **A.**  On 18 of March 2007 in Costa Rica. |
| 08:43:47 | 6 | **Q.**  And what is your wife's nationality? |
| 08:43:52 | 7 | **A.**  Philippines. |
| 08:43:53 | 8 | **Q.**  You had a child with your wife? |
| 08:43:55 | 9 | **A.**  Yes, sir. |
| 08:43:57 | 10 | **Q.**  And your son's initials are D.S.S.; is that correct? |
| 08:44:05 | 11 | **A.**  Correct, yes, sir. |
| 08:44:05 | 12 | **Q.**  And he is the subject of this Hague Convention proceeding? |
| 08:44:12 | 13 | **A.**  Yes, sir. |
| 08:44:12 | 14 | **Q.**  Okay.  You verified a complaint in this case -- you signed |
| 08:44:18 | 15 | a complaint verifying that all of the facts in it were true. |
| 08:44:23 | 16 | Do you recall that? |
| 08:44:23 | 17 | **A.**  Absolutely. |
| 08:44:24 | 18 | **Q.**  And are those facts still true? |
| 08:44:27 | 19 | **A.**  Yes, they are. |
| 08:44:27 | 20 | **Q.**  Okay.  I'll be going through some of them, but I wanted to |
| 08:44:31 | 21 | confirm that at the outset. |
| 08:44:34 | 22 | Where was your son born? |
| 08:44:35 | 23 | **A.**  Spain. |
| 08:44:44 | 24 | **Q.**  And when was he born? |
| 08:44:46 | 25 | **A.**  I couldn't hear the question.  Would you please repeat it. |

| | | |
|---|---|---|
| 08:44:53 | 1 | **Q.**   Yes.  And I'll say as well, anytime you can't hear my |
| 08:44:56 | 2 | questions, please feel free to ask me to repeat them. |
| 08:45:02 | 3 | **A.**   Okay. |
| 08:45:02 | 4 | **Q.**   My question was:  When was your son born? |
| 08:45:06 | 5 | **THE COURT:**  Excuse me just a minute. |
| 08:45:08 | 6 | **THE WITNESS:**  On 22nd August 2008. |
| 08:45:11 | 7 | **THE COURT:**  Just a moment.  22nd August 2008, correct? |
| 08:45:15 | 8 | I've just been reminded by Ms. Simms that, as any of us speak |
| 08:45:19 | 9 | to Mr. Schurmann, you should look at that camera there on top |
| 08:45:27 | 10 | of the small monitor so he will see us speaking to him. |
| 08:45:27 | 11 | **BY MR. NORDBY:** |
| 08:45:33 | 12 | **Q.**   Mr. Schurmann, I've been reminded I need to look this way |
| 08:45:37 | 13 | so that I'm looking at you instead of away from you.  I |
| 08:45:42 | 14 | apologize for that. |
| 08:45:45 | 15 | **A.**   No problem. |
| 08:45:45 | 16 | **Q.**   I believe you just testified that your son was born in 2008 |
| 08:45:48 | 17 | in Spain; is that correct? |
| 08:45:50 | 18 | **A.**   Yes, the 22nd of August 2008 in Marbella, Spain. |
| 08:45:56 | 19 | **Q.**   How long did you and your wife and son live in Spain after |
| 08:46:00 | 20 | he was born? |
| 08:46:02 | 21 | **A.**   Until 2010, I believe March or April 2010. |
| 08:46:08 | 22 | **Q.**   Okay.  Were you a legal resident of Spain at the time? |
| 08:46:12 | 23 | **A.**   Yes, absolutely. |
| 08:46:14 | 24 | **Q.**   And was your wife a legal resident? |
| 08:46:18 | 25 | **A.**   Yes, correct. |

*Stephan Schurmann - Direct/Nordby*                    9

| | | |
|---|---|---|
| 08:46:19 | 1 | **Q.**   And your son as well? |
| 08:46:21 | 2 | **A.**   Yes, correct. |
| 08:46:23 | 3 | **Q.**   Okay.  I'm going to ask you to look at the document that I |
| 08:46:28 | 4 | emailed to you that is labeled Exhibit 1.  Could you take a |
| 08:46:33 | 5 | look at that. |
| 08:46:35 | 6 | **A.**   Yes, I have it right here in front of me. |
| 08:46:40 | 7 | **Q.**   Could you tell me what that is. |
| 08:46:47 | 8 | **A.**   Well, that is actually a registration which the -- which |
| 08:46:53 | 9 | I'd have to read it, let's see, registration with the |
| 08:46:56 | 10 | Government of Spain for our government insurance policies where |
| 08:47:01 | 11 | both my wife and myself and our child are insured under the |
| 08:47:05 | 12 | government insurance program. |
| 08:47:08 | 13 | **MR. NORDBY:**  I'd like to have this marked as |
| 08:47:10 | 14 | Petitioner's Exhibit 1. |
| 08:47:12 | 15 | **THE COURT:**  All right. |
| 08:47:14 | 16 | **MR. LEVY:**  Judge, I'm going to go ahead and object as |
| 08:47:16 | 17 | to foundation.  I don't believe it's interpreted as well. |
| 08:47:24 | 18 | **THE COURT:**  I'm sorry, I don't understand what your |
| 08:47:25 | 19 | objection is. |
| 08:47:27 | 20 | **MR. LEVY:**  He's saying it's an insurance policy and |
| 08:47:29 | 21 | I'm not -- |
| 08:47:31 | 22 | **THE COURT:**  Mr. Levy, you're admitted, so I know |
| 08:47:35 | 23 | you're familiar with our local rules, and they require you to |
| 08:47:38 | 24 | stand when you address the Court. |
| 08:47:40 | 25 | **MR. LEVY:**  I apologize, Your Honor. |

08:47:41  1    **THE COURT:**  That's all right.

08:47:42  2    **MR. LEVY:**  I'm looking at what's been submitted.  It's

08:47:46  3    not interpreted, and it's -- I guess he's stating that it's an

08:47:49  4    insurance policy.  And I just don't know if they've established

08:47:53  5    the proper foundation for that at this point.

08:47:56  6    **THE COURT:**  All right.  Mr. Nordby, it's in Spanish,

08:48:00  7    so I -- do you have -- is there any better way that you can

08:48:06  8    authenticate this or -- I see that it has a stamp, but it's not

08:48:12  9    a raised -- it's not the original.

08:48:18  10   **THE WITNESS:**  Mr. Nordby, may I explain it in more

08:48:21  11   detail?

08:48:22  12   **THE COURT:**  Excuse me, Mr. Schurmann.  You're witness

08:48:23  13   right now, and so you can only speak when a question is

08:48:27  14   directed to you.

08:48:29  15   **THE WITNESS:**  Okay.

08:48:30  16   **THE COURT:**  Thank you.

08:48:32  17   Mr. Nordby, I'm not familiar with a policy of

08:48:36  18   insurance issued by any country, and so I'm not sure that this

08:48:42  19   is what you purport it to be.  Is there any better way you can

08:48:47  20   verify that?

08:48:51  21   **MR. NORDBY:**  Your Honor, unfortunately, I don't know

08:48:53  22   that there is, so I may just have to -- I may just have to ask

08:48:58  23   him to testify as to some of this without the benefit of the

08:49:01  24   exhibit.

08:49:02  25   **THE COURT:**  All right.  The objection will be

08:49:03    1    sustained.

08:49:07    2    **BY MR. NORBY:**

08:49:08    3    **Q.**   Mr. Schurmann, did you, in fact, have health insurance as

08:49:10    4    to you and your family when you were living in Spain?

08:49:15    5    **A.**   Yes, we had it under the government-offered program, and we

08:49:19    6    had it as a private insurance.

08:49:21    7    **Q.**   Okay.  Thank you.

08:49:22    8            **THE COURT:**  I'm sorry, did he say that he had both

08:49:27    9    government issued insurance as well as private insurance?

08:49:31   10            **MR. NORDBY:**  Yes, that's what I understood him to say.

08:49:34   11            **THE COURT:**  Thank you.

08:49:36   12    **BY MR. NORBY:**

08:49:36   13    **Q.**   Mr. Schurmann, I'd like you to take a look at Exhibit 2, if

08:49:40   14    you would, the document that I've previously marked for you.

08:49:44   15    **A.**   Okay, I have it here.

08:49:46   16    **Q.**   And can you tell me what that is?

08:49:50   17    **A.**   That is from the minister of the -- (inaudible) -- for

08:49:55   18    self-employed entrepreneurs.  That is my Social Security

08:50:01   19    contribution to the government of Spain as a self-employed

08:50:04   20    entrepreneur.

08:50:05   21    **Q.**   And when you were in Spain, did you make Social Security

08:50:08   22    contributions as an entrepreneur?

08:50:12   23    **A.**   In Marbella, Spain.

08:50:17   24    **Q.**   Okay.  And I'd like you to look at the document marked No.

08:50:21   25    3 as well.

*Stephan Schurmann - Direct/Nordby*                                    12

08:50:24   1   **A.**   Okay.

08:50:24   2   **Q.**   Mr. Schurmann, could you tell me what this document

08:50:35   3   represents?

08:50:36   4   **A.**   Yes.  This is an official certificate from the government

08:50:39   5   of Spain that we are official residents with our NIE number,

08:50:48   6   and the NIE number will be similar like a Social Security

08:50:52   7   number in American terms.  So page number one is my NIE number,

08:50:57   8   and page number two is the NIE number of my wife, which is

08:51:02   9   obviously still valid and in existence.

08:51:04   10  **Q.**   And is that consistent with your testimony earlier that you

08:51:08   11  and your family were legal residents of Spain at the time you

08:51:12   12  resided there from approximately 2008 through 2010?

08:51:16   13  **A.**   Well, we actually are still residents because I never gave

08:51:23   14  up our domicile.  I always kept it because I knew the visit to

08:51:27   15  America was temporary only through the investor visa.

08:51:30   16  **Q.**   And Mr. Schurmann, we'll be talking about that.  I was just

08:51:34   17  asking you about those specific documents.

08:51:37   18  **A.**   Okay.

08:51:38   19  **Q.**   I'd like you to look now at the document I've marked No. 6,

08:51:48   20  if you would, please.

08:51:49   21  **A.**   Okay.  I have it here.

08:51:51   22  **Q.**   Mr. Schurmann, could you tell me what that document is.

08:51:57   23  **A.**   That's the official registration at the town hall in

08:52:02   24  Benahavis which confirms the residence of Family Schurmann,

08:52:07   25  including myself, my wife, and our son together with the NIE

*Stephan Schurmann - Direct/Nordby*                              13

| | | |
|---|---|---|
| 08:52:12 | 1 | numbers of the parents. |
| 08:52:19 | 2 | **Q.**   And finally, I'd like you to look at the document I've |
| 08:52:22 | 3 | marked No. 9 and sent to you. |
| 08:52:30 | 4 | **A.**   Okay. |
| 08:52:30 | 5 | **Q.**   Mr. Schurmann, could you tell me what that document is. |
| 08:52:37 | 6 | **A.**   That's a copy of a membership card for the private health |
| 08:52:40 | 7 | insurance for my son, and also I have one for myself. |
| 08:52:47 | 8 | **Q.**   So you said that at some point in the year 2010 you and |
| 08:52:56 | 9 | your family left Spain; is that correct? |
| 08:52:59 | 10 | **A.**   Yes, sir. |
| 08:53:02 | 11 | **Q.**   For what purpose did you leave? |
| 08:53:04 | 12 | **A.**   It was business purpose, to set up a master franchise for |
| 08:53:14 | 13 | the Sterling Group in the Philippines which was for the country |
| 08:53:17 | 14 | of the United States. |
| 08:53:17 | 15 | **Q.**   And when did you travel to the Philippines? |
| 08:53:20 | 16 | **A.**   I believe we traveled in -- wait a second.  I believe we |
| 08:53:29 | 17 | traveled in April 2010 to the Philippines.  We stayed there for |
| 08:53:35 | 18 | about six months until I had arranged all the legal paperwork |
| 08:53:38 | 19 | for the master franchise, and then we applied from there for |
| 08:53:43 | 20 | the E-2 investor visas to go to the United States. |
| 08:53:45 | 21 | **Q.**   What sort of travel documents did you have to travel from |
| 08:53:49 | 22 | Spain to the Philippines? |
| 08:53:53 | 23 | **A.**   I had my German passport, my son had his German passport, |
| 08:53:57 | 24 | and my wife had her Filipino passport. |
| 08:54:01 | 25 | **Q.**   Before traveling to the Philippines, did you apply for any |

08:54:04   1   sort of permanent residence in the Philippines?

08:54:06   2   **A.**   No, never.

08:54:08   3   **Q.**   Did you intend to remain permanently in the Philippines?

08:54:15   4   **A.**   Never.

08:54:16   5   **Q.**   At some point after you traveled to the Philippines, you

08:54:22   6   came to the United States.  When was that approximately?

08:54:26   7   **A.**   That was in October of 2010.

08:54:30   8   **Q.**   And why did you come to the United States?  Could you

08:54:33   9   explain some of the history of why you came here.

08:54:38   10   **A.**   Yes.  I purchased a master franchise for the United States

08:54:42   11   for a construction technology which was under the brand name

08:54:47   12   Plaswall Manufacturing.  And I paid a lot of money to the

08:54:53   13   franchisor.  And I believe six months later in June or July of

08:55:00   14   2011 I resigned from the master franchisor due to illegal

08:55:05   15   activities he involved himself in and due to completely lack of

08:55:08   16   support to help me set up the manufacturing plant in the United

08:55:10   17   States.  He took my money but he never came to help me, so it

08:55:13   18   was a total disaster.

08:55:16   19   **Q.**   What sort of visa did you secure when you came to the

08:55:21   20   United States?

08:55:23   21   **A.**   My visa was an E-2 investor visa, and my wife and my child

08:55:33   22   became as dependent spouse and dependent child on my E-2

08:55:38   23   investor visa, as I was the main applicant.

08:55:41   24   **Q.**   Is an E-2 investor visa, to your knowledge, valid

08:55:45   25   indefinitely or for a certain period of time?

08:55:48   1   **A.**   It's only limited to two years.

08:55:50   2   **Q.**   Did you intend to remain permanently in the United States

08:55:53   3   when you came here on an E-2 investor visa?

08:55:58   4   **A.**   No, sir, never.

08:55:59   5   **Q.**   So how long was that visa valid?

08:56:02   6   **A.**   It was valid, I believe, until August 2012.  Then after the

08:56:11   7   expiration I tried to renew it because I had already lost a

08:56:15   8   substantial amount of money, and I tried to sell my machinery

08:56:19   9   and equipment, wanted to renew the visa for another period.

08:56:22   10  That was rejected for unknown reasons.  And from that day

08:56:26   11  forward we became illegal, and by that time I had already

08:56:32   12  $750,000 lost in the United States due to my failed -- (lost

08:56:38   13  transmission) -- business activities.

08:56:40   14  **Q.**   You mentioned earlier that you intended to maintain some

08:56:45   15  presence in Spain after you left to go to the Philippines.

08:56:48   16  What contacts did you maintain with Spain after you came to the

08:56:51   17  United States on your investor visa?

08:56:55   18  **A.**   Well, I kept originally my domicile.  I never unascribed

08:57:00   19  myself.  Before I met my wife I was already a long-term

08:57:04   20  resident in Spain, and I brought her here, so I helped her with

08:57:09   21  all the legal documents.  And I never applied anywhere else for

08:57:13   22  legal residence because I knew my business trip was temporary.

08:57:19   23  **Q.**   Now, after you came to the United States, you and your

08:57:21   24  family lived in several different locations here; is that

08:57:24   25  correct?

*Stephan Schurmann - Direct/Nordby*                                    16

08:57:24   1    A.   Yes, sir.

08:57:26   2    Q.   What was the first place you lived in the United States

08:57:29   3    after coming here in October of 2010?

08:57:32   4    A.   The first place was Birmingham, Alabama, where we

08:57:39   5    established an ultra manufacturing implant for our concrete

08:57:44   6    technology.  That failed about a year later.  The franchisor,

08:57:48   7    after I resigned, started giving a -- or he presented a corrupt

08:57:53   8    association company over the Internet, destroyed the reputation

08:57:57   9    of my business, took from me more than $750,000.

08:58:01   10          I tried to set up a second company, Power Concrete, Inc.

08:58:05   11   He destroyed it, too.  So by that time I had very little money

08:58:11   12   left, so I tried, obviously, to recoup by selling my equipment

08:58:14   13   and going back to Europe.

08:58:18   14   Q.   Where did you move to after Birmingham?

08:58:21   15   A.   We went to Alabaster, Alabama.  We started getting short of

08:58:28   16   money, so we rented a temporary -- a small two bedroom

08:58:32   17   apartment, which was close to the existing factory, and I

08:58:37   18   believe we stayed there for six months.

08:58:40   19   Q.   And after Alabaster, Alabama, where did you and your family

08:58:46   20   move?

08:58:51   21   A.   I moved with them to Destin, Florida.  I had a business

08:58:54   22   trip there, and then I went with my wife and my son on a spring

08:58:57   23   break, which was somewhere at the end of 2012.

08:59:01   24          And both my wife and I enjoyed the area, and we said, *Look,*

08:59:05   25   *until we sort out everything with immigration and hopefully the*

| 08:59:09 | 1 | *extension will work for another two years, let's live here, at* |
| 08:59:12 | 2 | *least we'll have a better surrounding for our child close to* |
| 08:59:15 | 3 | *the beach*, because Alabaster was quite depressing. |
| 08:59:20 | 4 | **Q.**   And was it while you were in Destin that your temporary |
| 08:59:24 | 5 | visa expired? |
| 08:59:26 | 6 | **A.**   Yes, sir, it was expired.  I hired a second immigration |
| 08:59:29 | 7 | attorney, I paid him $2,500.  He wrote one letter to the USCIS, |
| 08:59:36 | 8 | never heard anything again from him. |
| 08:59:39 | 9 | **Q.**   You and your family did not immediately return to Spain |
| 08:59:43 | 10 | after your visa expired, did you? |
| 08:59:47 | 11 | **A.**   That's correct, sir. |
| 08:59:48 | 12 | **Q.**   Did you intend to remain in the United States permanently |
| 08:59:52 | 13 | with your wife and son at that point? |
| 08:59:56 | 14 | **A.**   No, sir, because I had officially no legal rights to ever |
| 09:00:00 | 15 | obtain a job.  I have no Social Security number.  I never |
| 09:00:03 | 16 | applied to become a green card holder.  I never applied for an |
| 09:00:08 | 17 | American driver's license.  I just said if I get extended one |
| 09:00:12 | 18 | more time I'll be able to sell my equipment to an investor, and |
| 09:00:16 | 19 | I will be able to recoup part of my money and then return back |
| 09:00:20 | 20 | home. |
| 09:00:20 | 21 | **Q.**   Did you apply at any time for immigration documents to |
| 09:00:22 | 22 | return to Europe? |
| 09:00:23 | 23 | **A.**   Yes, sir, I did. |
| 09:00:26 | 24 | **Q.**   Okay.  I'd like you to take a look at the document I marked |
| 09:00:31 | 25 | Exhibit 5, if you could. |

*Stephan Schurmann - Direct/Nordby*                    18

09:00:40    1    **A.**    Yes, I have it here.

09:00:45    2    **Q.**    Mr. Schurmann, could you tell me what this is.

09:00:49    3    **A.**    Yes.   This is actually a Schengen visa application on

09:00:55    4    behalf of my wife which I sponsored as her husband where she is

09:00:59    5    the dependent spouse of a European citizen.   And we signed the

09:01:03    6    application on July 11, 2013, showing our intent to go already

09:01:08    7    back to Europe because we were almost feeling like we were on a

09:01:12    8    sinking ship in the United States.   Everything starting working

09:01:15    9    against us.

09:01:16   10    **Q.**    Could you explain what a Schengen visa is?

09:01:21   11    **A.**    Yes.   A Schengen visa is a special visa application where

09:01:24   12    you can enter one country of the Schengen visa member

09:01:30   13    countries, and once you have the Schengen visa you can travel

09:01:33   14    in all the Schengen countries without applying for a separate

09:01:38   15    visa.

09:01:39   16    **Q.**    Now, Mr. Schurmann, as an EU citizen, did you require a

09:01:52   17    visa to return to Europe?

09:01:54   18    **A.**    No.   I can live in 27 European Union countries without any

09:01:59   19    permit due to the fact I'm a German citizen, and the same rules

09:02:02   20    apply for my son.

09:02:04   21    **Q.**    And so this visa application here was intended for your

09:02:09   22    wife; is that correct?

09:02:09   23    **A.**    Yes, that's correct, due to the fact that she's a Filipino

09:02:16   24    citizen, and she is a dependent spouse of a European citizen,

09:02:20   25    we needed to comply with the visa rules and regulations.

*Stephan Schurmann - Direct/Nordby*                              19

| | | |
|---|---|---|
| 09:02:24 | 1 | **Q.**   And what country were you seeking to enter with this visa? |
| 09:02:27 | 2 | **A.**   We signed actually with the Italian embassy in Florida. |
| 09:02:37 | 3 | Jubilie signed the application herself, and I gave a sort of |
| 09:02:40 | 4 | sponsor letter as her husband that I would be responsible |
| 09:02:43 | 5 | obviously for her travel expenses and for her financials in |
| 09:02:46 | 6 | order to bring her back to Europe. |
| 09:02:48 | 7 | **Q.**   What languages are present on this visa application? |
| 09:02:51 | 8 | **A.**   The language is English. |
| 09:02:56 | 9 | **Q.**   In addition to Italian? |
| 09:03:00 | 10 | **A.**   Yes, it's double language, which is Italian and second part |
| 09:03:09 | 11 | is English. |
| 09:03:11 | 12 | **Q.**   Thank you. |
| 09:03:12 | 13 | **MR. NORDBY:**  I offer this as Petitioner Exhibit No. 1. |
| 09:03:16 | 14 | **MR. LEVY:**  No objection, Your Honor. |
| 09:03:17 | 15 | **THE COURT:**  Did you say No. 1? |
| 09:03:20 | 16 | **MR. NORDBY:**  No. 2. |
| 09:03:22 | 17 | **THE COURT:**  We've marked the other ones -- although |
| 09:03:24 | 18 | they weren't admitted, we've marked them for the record, so |
| 09:03:28 | 19 | this would be, I believe -- we didn't have a 4 or 5. |
| 09:03:32 | 20 | **MADAM CLERK:**  I think he just referred to this as |
| 09:03:35 | 21 | No. 5. |
| 09:03:35 | 22 | **MR. NORDBY:**  Yes, No. 5, for identification purposes |
| 09:03:38 | 23 | it's No. 5. |
| 09:03:39 | 24 | **THE COURT:**  Well, are you seeking to admit it? |
| 09:03:42 | 25 | **MR. NORDBY:**  Yes, I am seeking to admit it. |

09:03:44  1        **THE COURT:**  It will be Petitioner No. 5.  That would

09:03:46  2   be admitted without objection.

09:03:49  3        (Petitioner Exhibit 5 admitted into evidence.)

09:03:56  4   **BY MR. NORBY:**

09:03:57  5   **Q.**   Mr. Schurmann, at some point in the year 2014 you traveled

09:04:00  6   to Pennsylvania; is that correct?

09:04:02  7   **A.**   Yes, sir.

09:04:09  8   **Q.**   Could you explain why.

09:04:11  9   **A.**   Well, we had -- in June, July we started running out of

09:04:14  10  money desperately.  I couldn't pay the rent anymore for our

09:04:18  11  local apartment in Destin, Florida.  And a business partner in

09:04:23  12  Pennsylvania offered me with some financials, and he said,

09:04:28  13  *Look, come up here with your family.  We're friends.  And I'll*

09:04:33  14  *help you to reestablish the business and relocate you back to*

09:04:36  15  *Europe.*

09:04:47  16  **Q.**   I'd like you to look at Exhibit No. 4, please.

09:04:50  17  **A.**   Yes, I have it here.

09:04:52  18  **Q.**   Mr. Schurmann, could you tell me what this document is.

09:04:54  19  **A.**   Yes.  This is a limited power of attorney which I notarized

09:04:58  20  in my first week when I was in Pennsylvania.  It's dated on the

09:05:03  21  4th August 2014, and I sent this to the address which my wife

09:05:09  22  gave me where she pretended to reside.

09:05:13  23  **Q.**   And what was the purpose of executing this limited power of

09:05:17  24  attorney?

09:05:20  25  **A.**   Well, it has various reasons.  The first one was,

09:05:22   1   obviously, if she needed to go to the doctors or anywhere else,

09:05:26   2   let's say, for emergency cases, then she has my authorization.

09:05:31   3   And then on page 2 it says very clearly that, "It is my

09:05:37   4   expressed intent to return with my wife and my son to Europe.

09:05:41   5   And I am not granting my Attorney-in-Fact the authority to

09:05:45   6   relocate the minor child to any other country outside the

09:05:49   7   European Union or take actions that will take the minor child's

09:05:53   8   status as a German citizen.  I do not consent" --

09:05:57   9          **THE COURT:**  He really needs to stop.

09:05:57   10  **BY MR. NORDBY:**

09:06:00   11  Q.   Mr. Schurmann, one thing I forgot to advise you at the

09:06:03   12  outset is there's a court reporter here transcribing what

09:06:07   13  you're saying, so please speak slowly to make her job easier.

09:06:09   14         **THE COURT:**  But wait.  Even more fundamental is the

09:06:13   15  problem that the exhibit is not yet admitted and he's reading

09:06:16   16  from it.

09:06:16   17         Any objection to the admission of the exhibit,

09:06:19   18  Mr. Levy?

09:06:20   19         **MR. LEVY:**  No objection, Your Honor.

09:06:21   20         **THE COURT:**  Thank you.  Petitioner's 4 is admitted.

09:06:25   21         (Petitioner Exhibit 4 admitted into evidence.)

09:06:30   22         **THE COURT:**  You may read from it, Mr. Schurmann, but

09:06:33   23  slowly, please.

09:06:34   24  **BY MR. NORBY:**

09:06:35   25  Q.   Mr. Schurmann, could you read slowly the sentences that you

| | | |
|---|---|---|
| 09:06:38 | 1 | read from paragraph 7 of this exhibit. |
| 09:06:40 | 2 | A.   Okay.  "It is my expressed intent to return with my wife |
| 09:06:44 | 3 | and my son to Europe at the conclusion of my business trip to |
| 09:06:49 | 4 | Pennsylvania.  I am not granting my Attorney-in-Fact the |
| 09:06:54 | 5 | authority to relocate the minor child to any other country |
| 09:06:58 | 6 | outside of the European Union or to take any actions that would |
| 09:07:03 | 7 | change the minor child's status as a German citizen.  I do not |
| 09:07:08 | 8 | consent to the minor child remaining as an illegal resident of |
| 09:07:12 | 9 | the United States, nor do I consent to him obtaining legal |
| 09:07:17 | 10 | residency and/or a second citizenship in the Philippines." |
| 09:07:23 | 11 | Q.   Mr. Schurmann, why did you execute this Limited Power of |
| 09:07:27 | 12 | Attorney when you were in Pennsylvania? |
| 09:07:30 | 13 | A.   Well, I did it for two reasons.  First, to give my wife |
| 09:07:37 | 14 | legal authority in case there was an emergency going to the |
| 09:07:40 | 15 | hospital where she needed my permission as a father and |
| 09:07:44 | 16 | obviously she had custody holder, and the second permission is |
| 09:07:48 | 17 | that she doesn't do anything which would jeopardize the future |
| 09:07:52 | 18 | of my son. |
| 09:07:53 | 19 | Q.   While you were in Pennsylvania, did you maintain contact |
| 09:08:02 | 20 | with your family? |
| 09:08:03 | 21 | A.   Yes, on a daily basis I called always back, I spoke with my |
| 09:08:09 | 22 | wife on a daily basis and with my son, D.S.S. |
| 09:08:19 | 23 | Q.   I'd like you to look at Exhibit 8, please. |
| 09:08:26 | 24 | A.   Yes, sir, I have it here. |
| 09:08:33 | 25 | Q.   I'd just ask you to identify what this is, and then I'll |

*Stephan Schurmann - Direct/Nordby*                                23

| | | |
|---|---|---|
| 09:08:36 | 1 | seek to have it admitted before I ask you more questions about |
| 09:08:39 | 2 | it.  Could you tell me what this is, please?  Mr. Schurmann, |
| 09:08:45 | 3 | could you tell me what this document is? |
| 09:08:48 | 4 | A.   I'm sorry.  I'm sorry.  I'm getting all emotional.  Give me |
| 09:09:01 | 5 | a minute.  I have to calm down. |
| 09:09:09 | 6 | I prepared this PowerPoint as a special present for my -- |
| 09:09:20 | 7 | for my son to show him how much I love him and how proud I am |
| 09:09:33 | 8 | of him, what a beautiful child he has become over the last six |
| 09:09:37 | 9 | years.  And I'm so, so sorry that I couldn't be with him |
| 09:09:41 | 10 | because I was 1200 miles away in Pennsylvania so I sent him |
| 09:09:44 | 11 | this to show him my appreciation and my love and that Daddy is |
| 09:09:49 | 12 | there for him and thinks about him.  And I attached a gift |
| 09:09:55 | 13 | certificate from Wal-Mart for $50 so he can buy himself a |
| 09:10:00 | 14 | birthday present. |
| 09:10:01 | 15 | Q.   Thank you, Mr. Schurmann. |
| 09:10:03 | 16 | MR. NORDBY:  I'd like to have this admitted as |
| 09:10:05 | 17 | Exhibit 8. |
| 09:10:09 | 18 | MR. LEVY:  No objection, Your Honor. |
| 09:10:10 | 19 | THE COURT:  Thank you, 8 is admitted. |
| 09:10:13 | 20 | (Petitioner Exhibit 8 admitted into evidence.) |
| 09:10:19 | 21 | BY MR. NORDBY: |
| 09:10:19 | 22 | Q.   You said you sent this to your son for his birthday.  When |
| 09:10:23 | 23 | is his birthday?  What month is his birthday? |
| 09:10:25 | 24 | A.   22nd August.  And that was 22nd August of 2014 when he |
| 09:10:32 | 25 | turned six years old. |

09:10:34   1   **Q.**   And you sent this to him while you were away in

09:10:37   2   Pennsylvania?

09:10:50   3   **A.**   Yes, sir.

09:10:50   4   **Q.**   And I'd like you now to look at No. 7, if you could.

09:10:56   5   **A.**   Yes, I have it right here, sir.

09:11:00   6   **Q.**   Mr. Schurmann, could you tell me just what this is.   What

09:11:05   7   is No. 7, so that I can have it admitted?

09:11:08   8   **A.**   This is a letter I received from my son which was sent on

09:11:13   9   the 7th October 2014 to my address in Pennsylvania, which is

09:11:21   10  actually the office address of my partner.   And D.S.S. wrote

09:11:27   11  me, "To Daddy, I" -- do you want me to read it?

09:11:32   12          **THE COURT:**   Not yet.

09:11:33   13          **MR. NORDBY:**   Just one second.   Let me seek to have it

09:11:37   14  admitted as Petitioner's No. 7.

09:11:40   15          **MR. LEVY:**   No objection.

09:11:41   16          **THE COURT:**   Thank you.   Petitioner's 7 is admitted.

09:11:44   17          (Petitioner's Exhibit 7 admitted into evidence).

09:11:47   18  BY MR. NORBY:

09:11:47   19  **Q.**   Mr. Schurmann, could you tell me what this represents?

09:11:50   20  **A.**   Well, D.S.S. wrote me a letter where he says, "Daddy, I" --

09:11:58   21  (witness crying) -- "I miss you -- I miss you so much.   I love

09:12:08   22  you, Daddy, really much.   You teach me cool stuff.   You help me

09:12:15   23  climb trees.   I'm standing on top of the building.   Love,

09:12:19   24  D.S.S."   Right here.

09:12:22   25  **Q.**   Thank you, Mr. Schurmann.   And the second page of this

09:12:31   1   document has a postage stamp, as you said, October 7th, 2014,

09:12:36   2   while you were in Pennsylvania?

09:12:40   3   **A.**   Yes, sir.

09:12:40   4   **Q.**   When did you return to Destin from Pennsylvania?

09:12:46   5   **A.**   On the 13 of December 2014.

09:12:52   6   **Q.**   Did you -- did you attempt to see your family when you

09:12:55   7   returned to Destin?

09:13:00   8   **A.**   Yes, the same day.

09:13:02   9   **Q.**   At some point your wife filed in the state courts of

09:13:12   10   Florida for a dissolution of marriage -- for a divorce and for

09:13:19   11   a timesharing custody plan.  Do you know what month that was?

09:13:28   12   **A.**   That was December 2014, the 19th to be exact.

09:13:33   13   **Q.**   Okay.  Did you consent to your son remaining in the United

09:13:37   14   States at that point?

09:13:38   15   **A.**   Never, sir.

09:13:41   16   **Q.**   Did you know before that time that your wife intended to

09:13:45   17   retain your son in the United States?

09:13:48   18   **A.**   Well, what I figured out after my return that she actually

09:13:53   19   concealed him under fake addresses which is shown on the

09:14:00   20   envelope of D.S.S.  This address is 270 Vinings Way Boulevard,

09:14:06   21   Unit 4103, which was an address she never lived.  According to

09:14:11   22   her own divorce petition, she lived at the address of her

09:14:15   23   boyfriend from August 2014 until December 17 and until today.

09:14:21   24   **Q.**   At some point after the divorce petition was filed, did you

09:14:26   25   become aware that a state court judge had ordered you not to

09:14:29    1    leave the country with your son?

09:14:31    2    A.    Yes, I found that out actually in the last minute, yes,

09:14:36    3    that's correct.

09:14:37    4    Q.    Okay.  Could you explain how that came about?

09:14:40    5    A.    Well, on the 15th of December I brought my son to school, I

09:14:52    6    prepared him lunch, I picked him up at school.  And on the 16th

09:14:58    7    -- or actually, on the 15th at 2 a.m. in the morning into the

09:15:04    8    night on the 16th, my wife called the police, demanded my son

09:15:09    9    back, and the police said, "Well, that's a private dispute,

09:15:13    10   Mr. Schurmann.  You better get yourself a lawyer," and I said,

09:15:16    11   "Okay."  So they forced me to hand over my son to the so-called

09:15:22    12   biological mother, and I said "I'm the biological father."

09:15:28    13   "Well, she told us you abandoned your family."  And I said,

09:15:31    14   "That's not true."

09:15:32    15        Anyways, on December 16th I went back to the school, tried

09:15:35    16   to pick up D.S.S. like I did the day before, and I realized she

09:15:39    17   took me off the school pick-up, I was refused to pick up my

09:15:42    18   son.  On the same afternoon she escaped with my son to an

09:15:46    19   unknown location in Alabama for three days.  I filed an

09:15:50    20   emergency injunction on the 17th, which was granted a hundred

09:15:54    21   percent to me for temporary custody, and then they returned

09:15:59    22   voluntary on the 19th and I was served with divorce papers.

09:16:03    23   Q.    Okay.  What did you do after you were served with divorce

09:16:08    24   papers?

09:16:09    25   A.    Well, first of all, I was in an extremely terrible state of

09:16:18   1   mind.  I was an emotional mess.  I was panicking that my son

09:16:23   2   was never coming back.  So I picked up my son that was at the

09:16:28   3   -- the next day he was at the hands of police officers, and I

09:16:31   4   picked him up at eleven p.m. in the night.  And I immediately

09:16:36   5   went with a pastor friend, who was with me, I went to his

09:16:42   6   house, we stayed over the night.

09:16:44   7        I went in the morning to the German embassy in Miami.  I

09:16:49   8   told them what happened, and they issued me a passport within

09:16:52   9   30 minutes, and they said, "Mr. Schurmann, you better get out

09:16:55   10  of the country to make sure you can have proper custody

09:16:59   11  proceedings in the United States."

09:17:00   12       So due to the fact I was panicking and freaking out and

09:17:03   13  trying to protect my son, I booked a flight to Germany with the

09:17:10   14  end result going to Spain.  And I received -- on the next

09:17:16   15  morning before I was trying to leave the country I received an

09:17:21   16  email from my lawyer, and he said, "There's an emergency

09:17:25   17  motion.  You are not allowed to leave the country."  And I

09:17:28   18  said, "Okay, I'll return."  So I went back to Destin, and I had

09:17:32   19  to return my son back to the mother.

09:17:35   20  Q.   So you returned to Okaloosa County after your attorney

09:17:40   21  called you?

09:17:41   22  A.   Yes, absolutely, sir, I turned around immediately.

09:17:45   23  Q.   Were you aware that there was a warrant issued requiring

09:17:50   24  you to surrender your child?

09:17:53   25  A.   No, I was not aware about an arrest warrant, but I found

| 09:17:57 | 1 | out about five days ago by looking into the court documents |
| 09:18:02 | 2 | which I was able to retrieve that there was an arrest warrant. |
| 09:18:07 | 3 | There were five different documents, and the arrest warrant was |
| 09:18:10 | 4 | issued for me to attempting leaving the country which was |
| 09:18:14 | 5 | around the 22nd of December 2014. |
| 09:18:18 | 6 | **Q.**  At some point you did leave the United States? |
| 09:18:21 | 7 | **A.**  Yes.  I left in February 2015, on the 20th to be exact. |
| 09:18:31 | 8 | **Q.**  And where did you go to, which country? |
| 09:18:34 | 9 | **A.**  I flew first to Germany, and then I continued going to |
| 09:18:41 | 10 | Spain. |
| 09:18:42 | 11 | **Q.**  Could you legally reenter the United States if you wanted |
| 09:18:44 | 12 | to do so now? |
| 09:18:45 | 13 | **A.**  Not in the next ten years.  I'm banned from reentering due |
| 09:18:52 | 14 | to overstaying my E-2 investor visa. |
| 09:18:56 | 15 | **Q.**  What legal efforts have you taken in Spain to secure your |
| 09:18:59 | 16 | son's return? |
| 09:19:01 | 17 | **A.**  I filed immediately a petition under the Hague Convention |
| 09:19:06 | 18 | which I submitted to the Central authority on the 13 of April |
| 09:19:12 | 19 | 2015, which was about four months after the wrongful retention. |
| 09:19:17 | 20 | And then I informed the Central authority in Washington, D.C. |
| 09:19:22 | 21 | about the same procedures.  They started communicating with me |
| 09:19:25 | 22 | back and forth, opened a case number, gave me a case number, |
| 09:19:28 | 23 | and I filed a few other things which I'm not disclosing at this |
| 09:19:36 | 24 | moment. |
| 09:19:38 | 25 | **THE COURT:**  I didn't hear what he just said.  Oh, he |

*Stephan Schurmann - Direct/Nordby*                                    29

| 09:19:41 | 1 | filed a few other things, okay. |
| 09:19:47 | 2 | **BY MR. NORBY:** |
| 09:19:47 | 3 | Q.   I'm going to ask you a couple of questions about some |
| 09:19:50 | 4 | allegations that were made in the response filed by your wife |
| 09:19:54 | 5 | last Friday.  Did you have an opportunity to read that |
| 09:19:57 | 6 | response? |
| 09:19:57 | 7 | A.   Uh-huh. |
| 09:20:00 | 8 | Q.   Okay. |
| 09:20:02 | 9 | A.   Absolutely. |
| 09:20:03 | 10 | Q.   There was a reference in the response to a letter that you |
| 09:20:07 | 11 | wrote to a state court judge who was handling the divorce |
| 09:20:12 | 12 | proceedings and the custody proceedings.  Do you recall that? |
| 09:20:15 | 13 | A.   Yes, sir, I do. |
| 09:20:19 | 14 | Q.   Could you explain the circumstances that led to that letter |
| 09:20:24 | 15 | or email being written? |
| 09:20:28 | 16 | A.   Well, I mentioned the original Hague petition which was |
| 09:20:34 | 17 | filed on the 13th of April and -- let me look into it quick. |
| 09:20:40 | 18 | That was on page 9 of 15 pages where I said "Judge Mary Koch |
| 09:20:49 | 19 | Polson has ignored her own laws which you can see below.  U.S. |
| 09:20:55 | 20 | federal law:  International Parental Child Abduction.  Persons |
| 09:20:58 | 21 | should not be permitted to obtain custody by virtue of wrongful |
| 09:20:59 | 22 | removal or retention." |
| 09:21:00 | 23 | And then, "Florida State law:  Deprive another person of |
| 09:21:05 | 24 | his right to custody under Florida Statute 787.03.  In the |
| 09:21:13 | 25 | absence of a court order determining rights of custody or |

09:21:17    1    visitation with any minor is a criminal offense."

09:21:21    2    Q.   And you're reading now, I think, from one of the exhibits

09:21:23    3    to the verified petition in this case?

09:21:25    4    A.   Yes, sir, I'm reading from my original Hague petition on

09:21:32    5    page 9.

09:21:34    6    Q.   Mr. Schurmann, looking back on that email today, what are

09:21:39    7    your feelings on that email that you wrote to the state court

09:21:42    8    judge?

09:21:43    9    A.   Well, when I wrote it, which was on the 27 of February

09:21:50   10    2015, after we had the family court here which was somewhere

09:21:54   11    around the 29 of January 2015.  I felt extremely mistreated by

09:22:02   12    a state judge ignoring her own laws, putting a child's future

09:22:08   13    into jeopardy.

09:22:09   14        And I remember being in the courtroom speaking after the

09:22:11   15    two-hour hearing with Judge Polson, and I said, "Your Honor,

09:22:15   16    you know by now we are all illegally in the country.  I have no

09:22:19   17    money.  I have no right to work.  I cannot sustain myself.  I

09:22:23   18    need to go back home.  I need to start working and rebuild the

09:22:26   19    life of our family."

09:22:28   20        She said, "Mr. Schurmann, you can leave anytime.  Your

09:22:31   21    child stays here."  So she took my child virtually hostage even

09:22:35   22    though these laws tell otherwise.  So I felt frustrated, upset,

09:22:41   23    panicking about the future of my child.

09:22:45   24    Q.   Okay.  I'm going to ask you about another allegation in the

09:22:49   25    response.  Mr. Schurmann, have you ever physically abused your

| 09:22:53 | 1 | son? |
|---|---|---|

**A.**   Never.

**Q.**   Have you ever psychologically abused your son?

**A.**   Never.

**Q.**   Is there any risk at all that you would do so if he were returned to you?

**A.**   Never.

(Witness crying.)

**Q.**   Mr. Schurmann, if your son is returned and the custody decisions are made by the Spanish courts, would you abide by those custody determinations?

**A.**   Absolutely.  I have no issues regarding shared custody. Whatever the Spanish court decides, I will be happy with it.  I believe that both parents should be in the life of a child.  He needs both of us to have a feeling of security and appreciation for both parents.

        **MR. NORDBY:**  Thank you, Mr. Schurmann.  I have no further questions.

        **THE COURT:**  All right.  Thank you.

        Mr. Levy?

        **MR. LEVY:**  Thank you, Your Honor.  Judge, may I approach?

        **THE COURT:**  Yes.

        **MR. LEVY:**  I've got premarked exhibits.  And I may not use or introduce all of them, but just for convenience.

| | | |
|---|---|---|
| 09:24:14 | 1 | **THE COURT:** That's fine.  I'll only look at those that |
| 09:24:17 | 2 | are admitted.  Thank you.  I appreciate the copies.  Thank you. |
| 09:24:19 | 3 | I'm assuming -- Mr. Nordby, have you seen these? |
| 09:24:36 | 4 | **MR. NORDBY:** I was provided a copy today.  Thank you, |
| 09:24:38 | 5 | Your Honor. |
| 09:24:38 | 6 | **THE COURT:** Mr. Levy, when you're ready for cross. |
| 09:24:41 | 7 | **CROSS-EXAMINATION** |
| 09:24:43 | 8 | **BY MR. LEVY:** |
| 09:24:44 | 9 | **Q.** Mr. Schurmann, where are you located right now?  What |
| 09:24:46 | 10 | office? |
| 09:24:47 | 11 | **A.** I'm sitting in the offices of Regus in Marbella. |
| 09:24:53 | 12 | **Q.** And I'm sorry, you said Bahia, the Regus office in Bahia? |
| 09:25:01 | 13 | **A.** In Marbella, Spain. |
| 09:25:07 | 14 | **Q.** And what is -- it is currently -- do you know what the time |
| 09:25:15 | 15 | difference between Pensacola, Florida and Marbella, Spain is? |
| 09:25:22 | 16 | **A.** Yes.  According to my information, it's seven hours, we are |
| 09:25:27 | 17 | seven hours ahead of Pensacola. |
| 09:25:33 | 18 | **Q.** Okay, sir.  And where are you currently living in Spain? |
| 09:25:46 | 19 | Sir, where do you live in Spain? |
| 09:25:48 | 20 | **A.** In Benahavis. |
| 09:25:53 | 21 | **Q.** Can you give me the full address? |
| 09:25:56 | 22 | **A.** Yeah, it's 29679 in Benahavis, Malaga, Spain. |
| 09:26:04 | 23 | **THE COURT:** Mr. Schurmann, could you please repeat |
| 09:26:07 | 24 | that slowly. |
| 09:26:11 | 25 | **THE WITNESS:** The address is Benahavis.  The zip code |

*Stephan Schurmann - Cross/Levy*                                    33

| | | |
|---|---|---|
| 09:26:16 | 1 | is 29679, Malaga, Spain. |
| 09:26:24 | 2 | **BY MR. LEVY:** |
| 09:26:24 | 3 | **Q.**   Do you own or rent that residence? |
| 09:26:26 | 4 | **A.**   Come again, please. |
| 09:26:29 | 5 | **Q.**   Do you own that residence that you're living in right now? |
| 09:26:34 | 6 | **A.**   It's rented. |
| 09:26:37 | 7 | **Q.**   And is that furnished or unfurnished? |
| 09:26:41 | 8 | **A.**   It's partially furnished and other furniture is my own. |
| 09:26:46 | 9 | **Q.**   And where did that furniture come from? |
| 09:26:50 | 10 | **A.**   It came out of storage where I put things in. |
| 09:26:57 | 11 | **Q.**   Okay.  And where were you storing that furniture? |
| 09:27:01 | 12 | **A.**   Can you repeat the question, please. |
| 09:27:05 | 13 | **Q.**   What -- what was the name of the company where you stored |
| 09:27:08 | 14 | that furniture? |
| 09:27:09 | 15 | **A.**   I stored it with some private friends in their garage. |
| 09:27:17 | 16 | **Q.**   Okay.  And where is your office located in Spain? |
| 09:27:24 | 17 | **A.**   Right now I'm working from home. |
| 09:27:30 | 18 | **Q.**   Okay, sir.  And did you -- did you at any time submit |
| 09:27:48 | 19 | yourself to the jurisdiction of a Florida court in a |
| 09:27:52 | 20 | dissolution of marriage action? |
| 09:27:54 | 21 | **A.**   Commit myself to a Florida court in what -- in what |
| 09:27:59 | 22 | relation? |
| 09:28:01 | 23 | **Q.**   Do you recall a divorce case that's pending in Okaloosa |
| 09:28:07 | 24 | County? |
| 09:28:07 | 25 | **A.**   Yes, sir, I do. |

| | | |
|---|---|---|
| 09:28:08 | 1 | **Q.**   Okay.  And do you recall reading your wife's petition for |
| 09:28:17 | 2 | divorce? |
| 09:28:19 | 3 | **A.**   Mr. Levy, we are talking about the Hague petition, not |
| 09:28:26 | 4 | about the divorce case. |
| 09:28:27 | 5 | **MR. LEVY:**  Your Honor, I'd ask you to instruct him to |
| 09:28:29 | 6 | answer the question. |
| 09:28:30 | 7 | **THE COURT:**  Mr. Schurmann, you're going to need to |
| 09:28:32 | 8 | answer the questions. |
| 09:28:33 | 9 | **THE WITNESS:**  Okay.  Yes, I recall the divorce |
| 09:28:37 | 10 | petition in Okaloosa County. |
| 09:28:41 | 11 | **BY MR. LEVY:** |
| 09:28:42 | 12 | **Q.**   Okay.  And do you recall if at that time you raised the |
| 09:28:47 | 13 | issue of being a resident of Spain? |
| 09:28:55 | 14 | **A.**   You mean at the time when the petition was filed? |
| 09:29:00 | 15 | **Q.**   At the time that you filed your response, did you raise the |
| 09:29:03 | 16 | issue that you're raising here today, that you're resident of |
| 09:29:09 | 17 | Spain? |
| 09:29:10 | 18 | **A.**   I told the Court that I'm illegal in the country, that I'm |
| 09:29:15 | 19 | not a legal resident of the United States.  That's in the |
| 09:29:22 | 20 | answer of my counter-petition very clearly expressed. |
| 09:29:28 | 21 | **Q.**   And did you request that the Court permit you to relocate |
| 09:29:31 | 22 | to Germany with your son? |
| 09:29:33 | 23 | **A.**   Yes, that's correct, sir. |
| 09:29:37 | 24 | **Q.**   Okay.  And why didn't you request the Court to relocate to |
| 09:29:42 | 25 | Spain? |

09:29:47   1   **A.**   No, I didn't ask that family court to relocate to Spain.  I

09:29:50   2   asked to relocate to Germany for various reasons.

09:29:55   3   **Q.**   Okay.  Did you indicate in your petition that you had a job

09:29:58   4   offer in Germany?

09:30:01   5   **A.**   Yes, at that time I had, sir.

09:30:04   6   **Q.**   Okay.  Was your petition under oath?

09:30:08   7   **A.**   Yes, sir.

09:30:09   8   **Q.**   Was everything you stated in that petition true?

09:30:13   9   **A.**   Yes, sir.

09:30:17   10            **THE COURT:**  And you're now referring, Mr. Levy, to the

09:30:20   11   counter-petition?

09:30:21   12            **MR. LEVY:**  Correct, Your Honor.  At this juncture I

09:30:25   13   would like to move into evidence Verified Counter-Petition for

09:30:32   14   Dissolution of Marriage.

09:30:33   15            **THE COURT:**  Is this your R-1?

09:30:35   16            **MR. LEVY:**  It's Respondent's Exhibit 12.

09:30:40   17            **THE COURT:**  Any objection?

09:30:43   18            **MR. NORDBY:**  Relevance, Your Honor.

09:30:44   19            **THE COURT:**  Overruled.  It's admitted.

09:30:46   20            (Respondent's Exhibit 12 admitted into evidence.)

09:30:55   21   **BY MR. LEVY:**

09:30:56   22   **Q.**   Okay.  And Mr. Schurmann, what was the nature of your

09:30:59   23   relationship in the spring of 2014 with Ms. Anqui?

09:31:14   24   **A.**   Well, we had some difficulties.  I wrote her a long letter

09:31:17   25   expressing my frustrations, and then later we reconciled.  She

09:31:23    1    apologized to me.  We apologized to each other, and we just

09:31:30    2    kept going forward.

09:31:37    3              MR. LEVY:  Mr. Nordby, I don't know if he has a copy

09:31:39    4    of it.  I would like to --

09:31:44    5    BY MR. LEVY:

09:31:45    6    Q.   Mr. Schurmann, you admitted in open court in Okaloosa

09:31:50    7    County at the temporary hearing that you had sent your wife

09:31:53    8    that letter that you just referred to, and on the top of it

09:31:58    9    it's entitled "Why Are Women Frigid."

09:32:04   10         Do you acknowledge writing a letter with the title of that

09:32:07   11    nature?

09:32:07   12              MR. NORDBY:  Your Honor, I object based on relevance,

09:32:11   13    and this is far outside the scope of the direct examination.

09:32:14   14              THE COURT:  I would agree with you as to scope.  I

09:32:17   15    would disagree with you as to relevance.

09:32:19   16              I think this is probably something you should seek to

09:32:21   17    admit in your case.  You would then need to call him in your

09:32:28   18    case.

09:32:29   19              MR. LEVY:  That's fine, I can address this on --

09:32:31   20              THE COURT:  But based on the objection which is before

09:32:33   21    me, that's the procedure we'll need to follow.

09:32:39   22    BY MR. LEVY:

09:32:39   23    Q.   And, Mr. Schurmann, you state that your wife concealed your

09:32:44   24    child from you?

09:32:51   25    A.   I didn't understand the language.  Please repeat.

| 09:32:54 | 1 | Q.   You stated that your wife concealed the child from you? |
| 09:33:01 | 2 | A.   Yes, she did, for four-and-a-half months. |
| 09:33:03 | 3 | Q.   Okay.  How many times did you travel back to Okaloosa |
| 09:33:07 | 4 | County from August of 2014 to November of 2014? |
| 09:33:12 | 5 | A.   I came only back in December. |
| 09:33:22 | 6 | Q.   Okay.  And did you speak to your son daily? |
| 09:33:25 | 7 | A.   Yes, sir, I did. |
| 09:33:27 | 8 | Q.   Okay.  And so, if I get your testimony right, earlier you |
| 09:33:32 | 9 | testified that you didn't discover she wasn't residing at the |
| 09:33:36 | 10 | residence on the envelope until you returned to Okaloosa County |
| 09:33:42 | 11 | in December? |
| 09:33:43 | 12 | A.   Yes, sir. |
| 09:33:43 | 13 | Q.   Okay.  So explain to me how she was concealing the child |
| 09:33:50 | 14 | from you. |
| 09:33:53 | 15 | A.   If you don't give the other parent the real whereabouts |
| 09:33:58 | 16 | where you live and where the child lives, this is concealment |
| 09:34:00 | 17 | of a child, period. |
| 09:34:03 | 18 | Q.   Okay.  Did you testify -- |
| 09:34:06 | 19 | A.   You may want to look up -- you may want to look up the |
| 09:34:09 | 20 | international laws reflecting to this, Mr. Levy. |
| 09:34:12 | 21 | Q.   Just respond to my question, please, sir.  Did you |
| 09:34:16 | 22 | testify -- |
| 09:34:16 | 23 | A.   I did. |
| 09:34:17 | 24 | Q.   Did you testify earlier that when you returned to Destin in |
| 09:34:22 | 25 | 2014 that you were allowed to see your child? |

| 09:34:26 | 1 | A.   Yes, I came back on the 13th, and we had family lunch |
| 09:34:32 | 2 | together, the three of us -- actually four, there was another |
| 09:34:36 | 3 | little child with us, a friend of my son, and we went to Taco |
| 09:34:41 | 4 | Bell and had a great family lunch together. |
| 09:34:43 | 5 | Q.   Okay.  And was the child permitted to stay with you at your |
| 09:34:47 | 6 | hotel? |
| 09:34:47 | 7 | A.   Yes, sir. |
| 09:34:50 | 8 | Q.   Okay.  And did you ever not permit Ms. Anqui to speak to |
| 09:34:59 | 9 | the child? |
| 09:35:00 | 10 | A.   Not permit her? |
| 09:35:05 | 11 | Q.   Did you ever -- did you ever at any time when she contacted |
| 09:35:09 | 12 | you and asked to speak to the child, did you deny her request? |
| 09:35:12 | 13 | A.   You mean during the time I was in Pennsylvania?  She had |
| 09:35:18 | 14 | the child. |
| 09:35:19 | 15 | Q.   Incorrect.  I'm referring specifically to the time at the |
| 09:35:22 | 16 | hotel when she permitted you to have the child.  You testified |
| 09:35:25 | 17 | at some point the police came? |
| 09:35:29 | 18 | A.   Oh, you mean that day when she was -- |
| 09:35:32 | 19 | MR. NORDBY:  Object to form. |
| 09:35:34 | 20 | THE COURT:  Overruled.  We just need to get the facts |
| 09:35:36 | 21 | straight about this. |
| 09:35:37 | 22 | So, Mr. Levy, restate your question.  Clarify it, if |
| 09:35:43 | 23 | you can, for him. |
| 09:35:44 | 24 | And then, Mr. Schurmann, allow him to finish his |
| 09:35:47 | 25 | question before you respond, please. |

| | | |
|---|---|---|
| 09:35:50 | 1 | **BY MR. LEVY:** |
| 09:35:51 | 2 | **Q.**   In December 2014 when the child was with you at the hotel, |
| 09:35:55 | 3 | did you at any time not permit Ms. Anqui to speak with her |
| 09:36:00 | 4 | child? |
| 09:36:00 | 5 | **A.**   Are you referring to the 15th of December, to be exact? |
| 09:36:08 | 6 | **Q.**   Okay.  So you refused her the ability to speak with the |
| 09:36:12 | 7 | child? |
| 09:36:13 | 8 | **A.**   No, sir. |
| 09:36:15 | 9 | **Q.**   Okay.  At some point did she show up at the hotel? |
| 09:36:26 | 10 | **A.**   Yes.  It was at two a.m. in the morning while D.S.S. was |
| 09:36:30 | 11 | already asleep. |
| 09:36:31 | 12 | **Q.**   And did you permit her to see the child? |
| 09:36:42 | 13 | **A.**   She knocked at my hotel room, and I said, "Jubilie, would |
| 09:36:48 | 14 | you please apologize to our son for exposing him to the |
| 09:36:52 | 15 | adultery affair.  He is emotionally and physically and |
| 09:36:57 | 16 | everything" -- he was traumatized. |
| 09:37:00 | 17 | And she said, "No, I'm not going to apologize."  And I |
| 09:37:03 | 18 | said, "Please do this for the favor of our son."  She refused, |
| 09:37:05 | 19 | and then she called the police. |
| 09:37:07 | 20 | **Q.**   Okay.  And did you at some point file a petition for |
| 09:37:19 | 21 | injunction for protection against domestic violence on behalf |
| 09:37:22 | 22 | of the minor child? |
| 09:37:24 | 23 | **A.**   Absolutely, I did, on the 17th of December 2014. |
| 09:37:29 | 24 | **Q.**   Okay.  And what were the grounds that you asserted for |
| 09:37:33 | 25 | filing that petition? |

09:37:34  1   **A.**   The line was -- you were fading out.  Please repeat your

09:37:44  2   question.

09:37:44  3   **Q.**   What were the grounds for you filing that petition for

09:37:48  4   protection against domestic violence on behalf of the minor

09:37:51  5   child?

09:37:52  6   **A.**   If you look up the original petition you will see every

09:37:55  7   detail in there.

09:38:02  8           **MR. LEVY:**  At this time, Your Honor, I'd like to go

09:38:04  9   ahead and move in Respondent's Exhibit 1, which is the Petition

09:38:07  10  for Injunction for Protection Against Domestic Violence.

09:38:11  11          **THE COURT:**  Okay.  Mr. Nordby?

09:38:13  12          **MR. NORDBY:**  No objection.

09:38:14  13          **THE COURT:**  And what is the number, the exhibit

09:38:18  14  number?

09:38:18  15          **MR. LEVY:**  It is Respondent's Exhibit 1.

09:38:21  16          **THE COURT:**  It's admitted.

09:38:21  17          (Respondent's Exhibit 1 admitted into evidence.)

09:38:21  18  **BY MR. LEVY:**

09:38:36  19  **Q.**   In that petition you alleged under oath that Ms. Anqui had

09:38:42  20  engaged in sexual intercourse on multiple occasions with her

09:38:44  21  lover in front of the minor child?

09:38:45  22  **A.**   Yes, sir, that's correct.  That's what my son told me.

09:38:51  23  **Q.**   And you also allege that she threatened to conceal, kidnap,

09:38:57  24  or abscond with the minor child?

09:38:59  25  **A.**   She did this on the 16th of December, it confirms it.

| | | |
|---|---|---|
| 09:39:03 | 1 | **Q.** On what date did she -- on what date are you saying she |
| 09:39:12 | 2 | left and absconded with the child, to your knowledge? |
| 09:39:16 | 3 | **A.** If I recall it correctly -- I have to look it up -- from |
| 09:39:19 | 4 | the 16th to the 19th of December she disappeared with the child |
| 09:39:23 | 5 | to an unknown location in Alabama and refused to return and |
| 09:39:28 | 6 | refused to give Sheriff Deputy Jamie Knox her location and her |
| 09:39:34 | 7 | whereabouts. |
| 09:39:38 | 8 | **Q.** Now, you're saying that she returned on the 19th? She |
| 09:39:44 | 9 | returned to Okaloosa County on the 19th? |
| 09:39:46 | 10 | **A.** Yes, after three days she returned with D.S.S. |
| 09:39:53 | 11 | **Q.** Do you know what date the sheriff attempted to contact her? |
| 09:39:56 | 12 | **A.** The sheriff contacted her on the 17th. I was at the |
| 09:40:04 | 13 | substation where the sheriff called me to serve her the |
| 09:40:09 | 14 | injunction. She was not there. Then Sheriff Jamie Knox called |
| 09:40:15 | 15 | the mobile phone call of Anqui and the boyfriend Tedrick, and |
| 09:40:19 | 16 | they said, "Well, we are not returning, and we don't let you |
| 09:40:23 | 17 | know where we are. Goodbye." |
| 09:40:26 | 18 | **Q.** And based on the allegations of the abuse of the minor |
| 09:40:37 | 19 | child, did you report that anywhere else? |
| 09:40:38 | 20 | **A.** Come again, sir. |
| 09:40:40 | 21 | **Q.** Did you report that anywhere else? |
| 09:40:47 | 22 | **A.** Did I report what? |
| 09:40:49 | 23 | **MR. NORDBY:** Objection, Your Honor. |
| 09:40:51 | 24 | **THE COURT:** Overruled. |
| 09:40:52 | 25 | **BY MR. LEVY:** |

09:40:53  1   **Q.**   The allegations of sexual intercourse in front of the

09:40:57  2   child.

09:40:59  3   **A.**   Whom are you referring to?  Did I report it to what, to

09:41:03  4   who?

09:41:04  5   **Q.**   Did you report it to any type of government agency?

09:41:07  6   **A.**   Well, we had that discussion before in the family court.

09:41:10  7   You know my answer by now.

09:41:14  8            **THE COURT:**  No, I don't know it.

09:41:14  9   **BY MR. LEVY:**

09:41:16  10  **Q.**   We're actually in a federal court now and the judge has not

09:41:19  11  heard this evidence.

09:41:20  12           **THE COURT:**  Mr. Schurmann, please answer the question.

09:41:22  13           **THE WITNESS:**  Okay.  No, I did not report it to any

09:41:25  14  other agency.  I filed the child protection injunction.

09:41:30  15  **BY MR. LEVY:**

09:41:31  16  **Q.**   Okay.  And do you recall what date the hearing was set for

09:41:38  17  you to present evidence on your petition for injunction?

09:41:43  18  **A.**   Yes, the 13th of December 2014.

09:41:47  19  **Q.**   Okay.  And did you proceed forward with evidence on that

09:41:55  20  date?

09:41:55  21  **A.**   My lawyer advised me to drop the injunction because it

09:41:59  22  would proceed in the family court.  I didn't like the idea, but

09:42:01  23  I followed the advice, which I considered to be wrong, of my

09:42:05  24  lawyer, Andrew Wood.

09:42:18  25           **MR. LEVY:**  And, Your Honor, at this time, I would like

| | | |
|---|---|---|
| 09:42:20 | 1 | to move into evidence Respondent's Exhibit C.  It's a copy of |
| 09:42:29 | 2 | the court order on the domestic violence injunction just saying |
| 09:42:35 | 3 | that the petition appeared at the hearing but decided to |
| 09:42:38 | 4 | voluntary dismiss the action. |
| 09:42:39 | 5 | **THE COURT:**  To be consistent, can we give it a number |
| 09:42:42 | 6 | instead of a letter? |
| 09:42:44 | 7 | **MR. LEVY:**  It was Respondent Exhibit 6 -- did I say B? |
| 09:42:50 | 8 | **THE COURT:**  Actually, we thought you said C. |
| 09:42:53 | 9 | **MR. LEVY:**  I'm sorry.  It's 6. |
| 09:42:55 | 10 | **THE COURT:**  Okay, that will be admitted. |
| 09:42:57 | 11 | (Respondent's Exhibit 6 admitted into evidence.) |
| 09:43:19 | 12 | **BY MR. LEVY:** |
| 09:43:20 | 13 | **Q.**  Mr. Schurmann, your attorney addressed that letter that you |
| 09:43:23 | 14 | wrote to Judge Polson.  Do you have a copy of that letter with |
| 09:43:26 | 15 | you? |
| 09:43:27 | 16 | **A.**  Yeah.  I believe it was in your answer somewhere as an |
| 09:43:31 | 17 | attachment. |
| 09:43:41 | 18 | **Q.**  Okay.  Do you recall in that letter stating that you wanted |
| 09:43:48 | 19 | D.S.S. -- basically immediate effect to return to his home |
| 09:43:52 | 20 | country of Germany as I requested?  Do you recall stating that |
| 09:43:56 | 21 | to Judge Polson? |
| 09:43:59 | 22 | **A.**  Well, let me explain the reason why I mentioned Germany so |
| 09:44:02 | 23 | you understand my thought behind it.  May I? |
| 09:44:08 | 24 | **Q.**  Go ahead, sir. |
| 09:44:10 | 25 | **A.**  Okay.  When I filed my counter-petition on your divorce |

09:44:17   1    petition, I knew that my wife would object to relocation.  The

09:44:21   2    reason that I put Germany in was a placeholder for knowing that

09:44:26   3    there was a refusal.  That means you're now illegally

09:44:31   4    withholding a German citizen in the United States.  Those are

09:44:36   5    criminal sanctions.  That's why I did this.

09:44:38   6         Secondly, officially I'm a resident in Spain and so is my

09:44:41   7    son.  There is more criminal sanctions, which is between two

09:44:45   8    and four years jail time.  This is not a civil case.  This is a

09:44:49   9    crime under Spanish law and so is a crime under German law.

09:44:54   10   And so therefore I put both countries in because both of it you

09:44:58   11   step into the trap and now you have to deal with the

09:45:00   12   consequences.

09:45:01   13   Q.   Where in your petition did you put Spain in and request

09:45:05   14   that the Court permit you to relocate with the child to Spain?

09:45:09   15   A.   I put it in my Hague petition.

09:45:16   16   Q.   And did you also list an address in Germany where you

09:45:20   17   intended for you and the child to reside?

09:45:23   18   A.   Yes, sir, I did.

09:45:26   19   Q.   Okay.  Well, I guess I'm confused.  How is that a request

09:45:34   20   to move to Spain?

09:45:36   21   A.   Sir, I'm a legal resident in Spain, so is my child, and so

09:45:43   22   is my wife.  I placed with the Court a test balloon to see how

09:45:48   23   you would respond and how would my wife respond, and obviously

09:45:51   24   both of you objected against the relocation, which I knew in

09:45:55   25   advance.  So you are conflicting now with German laws.  You are

| 09:46:00 | 1 | wrongfully withholding a German citizen.  Under the European |
| 09:46:05 | 2 | Convention of Human Rights you have broken so far 25 different |
| 09:46:09 | 3 | laws, and they will come and haunt you. |

**Q.**   Well, ultimately it was your understanding the Court was going to make that determination, correct?

**A.**   That is the German court and the Spanish court, not you, Mr. Levy.

**Q.**   Please just respond to my question.  You are asking the Court in that petition to permit you to relocate with the child to Germany?

**A.**   At that petition, yes, I asked the question if a German citizen and a German father would be allowed to relocate to Germany.

          **MR. LEVY:**  Judge, at this juncture, I would like to move the letter into evidence as Respondent's Exhibit 21.  It's an email dated February 27, 2015, to Judge Polson where he indicates an intent to return with the child to Germany.

          **THE COURT:**  All right.

          **MR. NORDBY:**  Object on the basis of relevance to the Hague Convention allegations.

          **THE COURT:**  Mr. Nordby, you raised the issue in your direct about his email to Judge Polson, so it's clearly fair game at this point.  Overruled.  It will be admitted, Respondent's 21.

          (Respondent's Exhibit 21 admitted into evidence.)

| | | |
|---|---|---|
| 09:47:45 | 1 | **BY MR. LEVY:** |
| 09:47:46 | 2 | **Q.**   Okay.  And have you ever represented to the Okaloosa court |
| 09:47:49 | 3 | that you were deported? |
| 09:47:53 | 4 | **A.**   Did I represented to the Okaloosa court that I what? |
| 09:47:57 | 5 | **Q.**   Have you ever made any type of court filings that you were |
| 09:48:01 | 6 | deported from the United States in February of 2015? |
| 09:48:05 | 7 | **A.**   We filed in our counter-petition to your divorce petition |
| 09:48:09 | 8 | that I'm illegally in the country and that I am subject to |
| 09:48:12 | 9 | deportation at any time, yes, sir. |
| 09:48:14 | 10 | **Q.**   Have you ever represented, though, at any time that your |
| 09:48:19 | 11 | wife forced you to get arrested which caused you to be |
| 09:48:23 | 12 | deported? |
| 09:48:25 | 13 | **A.**   I couldn't hear the question.  Please repeat it, sir. |
| 09:48:30 | 14 | **Q.**   Have you ever represented in a filing in Okaloosa County |
| 09:48:35 | 15 | that your wife caused you to be arrested which then forced you |
| 09:48:40 | 16 | to be deported, and that would have been in February of 2015? |
| 09:48:44 | 17 | **A.**   Yes, sir.  I had a wrongful arrest on the 2nd of February |
| 09:48:53 | 18 | 2015 at 8:05 a.m. at the school in Destin where I dropped off |
| 09:48:58 | 19 | my son following a court order from Judge Polson which my wife |
| 09:49:03 | 20 | under Article IV refused to execute.  She is in violation of |
| 09:49:09 | 21 | that court order. |
| 09:49:11 | 22 | **Q.**   Well, what did your wife do to violate that court order? |
| 09:49:15 | 23 | **A.**   She didn't change the paperwork at the school to allow me |
| 09:49:21 | 24 | access to drop off my son and pick him up.  That was in |
| 09:49:27 | 25 | paragraph 4, the order from Judge Polson which my wife ignored |

| 09:49:31 | 1 | and violated, that's why I got arrested, sir. |
| 09:49:34 | 2 | **Q.**   So you're representing to the Court you got arrested |
| 09:49:39 | 3 | because you didn't have proper -- a proper letter from |
| 09:49:43 | 4 | Ms. Anqui? |
| 09:49:45 | 5 | **A.**   That's correct, she didn't execute the school documents. |
| 09:49:50 | 6 | **Q.**   It had nothing to do with you causing a disturbance at the |
| 09:49:55 | 7 | school? |
| 09:49:55 | 8 | **A.**   Come again. |
| 09:49:57 | 9 | **Q.**   It had nothing to do -- the charges -- |
| 09:50:00 | 10 | **MR. LEVY:**  Let me back that up, Your Honor. |
| 09:50:03 | 11 | **THE COURT:**  Okay. |
| 09:50:03 | 12 | BY MR. LEVY: |
| 09:50:04 | 13 | **Q.**   Were you previously issued with a trespass warning at the |
| 09:50:07 | 14 | child's school? |
| 09:50:10 | 15 | **A.**   Yes.  That was the Friday before.  I believe it was the |
| 09:50:13 | 16 | 29th of January.  I have to look it up to be exact.  And I came |
| 09:50:19 | 17 | with my certified court order from Judge Polson, I showed it to |
| 09:50:26 | 18 | Deputy Sonya Shepard, which was Friday at 14:55 p.m., to pick |
| 09:50:30 | 19 | up D.S.S. according to the court order. |
| 09:50:35 | 20 | Sonya Shepard refused to recognize the court order and |
| 09:50:38 | 21 | issued me an oral trespass warning.  And I said, "Look, I will |
| 09:50:42 | 22 | come back on Monday, I will bring you another court order."  So |
| 09:50:45 | 23 | on Monday morning I followed the court order again, I dropped |
| 09:50:49 | 24 | off D.S.S., and I'm being wrongfully arrested. |
| 09:50:53 | 25 | **Q.**   Okay.  So your statement today is that you did not cause a |

| | |
|---|---|
| 09:50:57 | 1 |
| 09:51:00 | 2 |
| 09:51:06 | 3 |
| 09:51:19 | 4 |
| 09:51:21 | 5 |
| 09:51:23 | 6 |
| 09:51:26 | 7 |
| 09:51:30 | 8 |
| 09:51:33 | 9 |
| 09:51:36 | 10 |
| 09:51:39 | 11 |
| 09:51:40 | 12 |
| 09:51:42 | 13 |
| 09:51:44 | 14 |
| 09:51:51 | 15 |
| 09:51:52 | 16 |
| 09:51:53 | 17 |
| 09:51:56 | 18 |
| 09:52:22 | 19 |
| 09:52:29 | 20 |
| 09:52:31 | 21 |
| 09:52:37 | 22 |
| 09:52:39 | 23 |
| 09:52:42 | 24 |
| 09:52:42 | 25 |

1  disturbance at the school on multiple occasions?

2  **A.**   Sir, I never disturb anything in the school.  I went there

3  to pick up and drop off my child, period.

4         **MR. LEVY:**  No further questions, Your Honor.

5         **THE COURT:**  Redirect?

6         **MR. NORDBY:**  Your Honor, if I could, I'm wondering if

7  I might withdraw my scope objection to streamline the

8  presentation of evidence, if that would help, my earlier scope

9  objection, so he doesn't have to be re-called.

10         **THE COURT:**  Well, I'm going to leave that up to

11  Mr. Levy.

12         **MR. LEVY:**  At this point, I'd prefer to just address

13  him on direct.

14         **THE COURT:**  Okay.  Then redirect?

15         **MR. NORDBY:**  Briefly.

16         **THE COURT:**  Okay.

17                    **REDIRECT EXAMINATION**

18  **BY MR. NORBY:**

19  **Q.**   Mr. Schurmann, Mr. Levy asked you about an arrest at your

20  child's school.  Do you recall that testimony just now?

21  **A.**   Do I recall the testimony?

22  **Q.**   Do you recall that Mr. Levy just asked you about that, is

23  my question?

24  **A.**   Yes, yes, sir.

25  **Q.**   Okay.  How was that arrest resolved?

Stephan Schurmann - Cross/Levy                                49

09:52:46    1    A.    How was the arrest resolved?

09:52:55    2    Q.    What was the result of the arrest?  Were you convicted of

09:52:58    3    any crime?

09:52:59    4    A.    No, sir.  I was -- I was three days in jail.  The case has

09:53:05    5    been brought in front of Judge Jim Ward.  And when he looked at

09:53:11    6    the case he was shaking the head himself, and he said, "Why is

09:53:15    7    this man in jail in the first place?  He just followed the

09:53:20    8    court order.  Get him out of here immediately," and I signed a

09:53:23    9    signature bond and three days later I was released.

09:53:27   10    Q.    And at another point in his questioning Mr. Levy asked you

09:53:29   11    about the circumstances under which you left the United States.

09:53:32   12    Were you deported or did you leave the United States because

09:53:35   13    you were subject to deportation?

09:53:41   14    A.    Two reasons.  I was, first of all, subject to deportation,

09:53:44   15    which I knew I was illegal.  I had received various threats

09:53:49   16    from Deputy Sonya Shepard and from her police colleagues and

09:53:54   17    also from my wife.  And they said, "Look, if we catch you just

09:54:00   18    driving your car without a Florida driver's license, you will

09:54:02   19    go to jail again, Mr. Schurmann.  We know now you're illegal,

09:54:09   20    and we know you have no valid Florida driver's license because

09:54:12   21    you are illegal," and so the threats kept on going on before

09:54:16   22    and after my arrest.

09:54:17   23    Q.    Mr. Schurmann, Mr. Levy asked you about your request in

09:54:21   24    your divorce proceedings to return with your son -- or not to

09:54:27   25    return, but to go with your son to Germany.  Had you ever

| 09:54:31 | 1 | previously lived in Germany with your son? |

09:54:34  2  **A.**   No.  We visited Germany for business but we have never been

09:54:40  3  residents --

09:54:42  4  **Q.**   Did you consider Germany --

09:54:43  5  **A.**   -- citizenship -- (Lost transmission.)

09:54:48  6  **Q.**   I'm sorry, I interrupted you.  Please complete your answer.

09:54:51  7  **A.**   Well, if I wanted to live in Germany, that would be very

09:54:54  8  easy, because we are both German citizens.

09:54:57  9  **Q.**   But had you habitually resided in Germany with your son?

09:55:03  10  **A.**   No, sir, we never did.

09:55:05  11       **MR. NORDBY:**   Thank you.  No further questions.

09:55:08  12       **THE COURT:**   Mr. Schurmann, I have a couple of

09:55:10  13  questions I'd like to ask.  Specifically how long did you, your

09:55:17  14  wife and son live in Spain.

09:55:20  15       **THE WITNESS:**   In Spain since birth, and then until

09:55:26  16  March, April of 2010.

09:55:32  17       **THE COURT:**   And then how long -- I believe you

09:55:34  18  testified, but just so that I'm clear, how long were you in the

09:55:38  19  Philippines?

09:55:43  20       **THE WITNESS:**   That was from April, I believe, until

09:55:47  21  October.  October 13 we arrived in America on the E-2 investor

09:55:58  22  visa.

09:55:58  23       **THE COURT:**   And you would please explain slowly,

09:56:02  24  please, the purpose of your business venture in the United

09:56:10  25  States, in other words, why you were coming with your family to

09:56:13  1   the United States in 2010.

09:56:16  2         **THE WITNESS:**  Well, when I bought the master franchise

09:56:19  3   from Plaswall in the Philippines --

09:56:23  4         **THE COURT:**  Mr. Schurmann, I'm sorry.  I think a lot

09:56:26  5   of this difficulty is just due to the electronics here.  So you

09:56:30  6   bought a master franchise in the Philippines, is that what you

09:56:38  7   said?

09:56:38  8         **THE WITNESS:**  Yes, ma'am, I bought a master franchise

09:56:43  9   for a concrete construction technology under the name of

09:56:49  10  Plaswall.  And the franchise agreement was valid for two years

09:56:55  11  as my visa was valid for two years.

09:57:05  12        **THE COURT:**  What were your plans at that time in

09:57:11  13  regards to the franchise agreement?  If it had been successful,

09:57:17  14  what were your plans?

09:57:19  15        **THE WITNESS:**  Well, my plans was -- and I expressed

09:57:22  16  also in my original business plan that I set up a master

09:57:24  17  factory, which I did in Birmingham, Alabama.  And then I wanted

09:57:29  18  to sell it actually to various licensed partners or to a master

09:57:34  19  franchisee, sell it and then go back to Europe.  So that was

09:57:39  20  supposed to be like an investment opportunity where I could

09:57:42  21  maybe make a great return in the short time.  Unfortunately,

09:57:46  22  that failed.

09:57:47  23        **THE COURT:**  But when it failed, I believe you

09:57:49  24  testified earlier that you tried to set up -- was it a separate

09:57:54  25  business or to do the same thing in a different place?

| | | |
|---|---|---|
| 09:57:59 | 1 | **THE WITNESS:**  There was actually the same business.  I |
| 09:58:02 | 2 | just changed the brand because I resigned from Plaswall due to |
| 09:58:07 | 3 | he was involved in money laundering, he never supported me as a |
| 09:58:11 | 4 | franchisor, he took money from me and never showed up, so it |
| 09:58:15 | 5 | was a nightmare.  And I said I resign. |
| 09:58:18 | 6 | I changed the brand, updated the technology, made it |
| 09:58:21 | 7 | better, and then he started attacking me over the Internet, and |
| 09:58:24 | 8 | he destroyed my name, my new brand, everything.  So I lost |
| 09:58:27 | 9 | probably $750,000 in a very short time. |
| 09:58:31 | 10 | **THE COURT:**  All right.  You referenced to having hired |
| 09:58:37 | 11 | or retained an immigration lawyer in the Destin area; is that |
| 09:58:43 | 12 | right?  Did I hear that correct? |
| 09:58:46 | 13 | **THE WITNESS:**  Originally when I came to America I |
| 09:58:50 | 14 | hired a lawyer in Birmingham, Alabama.  And during the process |
| 09:58:53 | 15 | of the immigration under the E-2 visa she got her licensed |
| 09:58:58 | 16 | revoked for whatever reason, she disappeared, so she didn't |
| 09:59:02 | 17 | submit the documents properly for the immigration process.  I |
| 09:59:06 | 18 | got rejected. |
| 09:59:07 | 19 | I hired another lawyer.  I gave him another $2,500. |
| 09:59:11 | 20 | He wrote one letter to the USCIS, and I got further rejected. |
| 09:59:17 | 21 | And then I said, *I'm just tired of it, I give up.  So, look,* |
| 09:59:21 | 22 | *let's sell our equipment as fast as possible, let's go back.* |
| 09:59:28 | 23 | Unfortunately, that didn't work as planned. |
| 09:59:31 | 24 | **THE COURT:**  Okay.  So what was -- the lawyer that you |
| 09:59:33 | 25 | hired in Birmingham who lost her license, why did you hire her? |

09:59:38  1   What was she supposed to do?

09:59:43  2          **THE WITNESS:**  Well, I hired her to submit all

09:59:46  3   paperwork under the E-2 visa.  They requested so much

09:59:50  4   additional documents, like the business plan, the financial

09:59:52  5   statements, the bank accounts, et cetera, just to comply to the

09:59:55  6   rules under the E-2 visa, which were all submitted.  But the

10:00:02  7   lawyer didn't forward it, that was the problem.

10:00:03  8          **THE COURT:**  Did you have an E-2 visa or not?

10:00:07  9          **THE WITNESS:**  The visa was originally valid for two

10:00:10  10  years, and then it just got rejected because the paperwork was

10:00:13  11  not submitted in due course and it was half of it missing.  The

10:00:20  12  lady disappeared from her office.

10:00:21  13         **THE COURT:**  Right.  And so then when you retained the

10:00:24  14  immigration attorney in Okaloosa County or in Destin, you

10:00:27  15  retained that person or that attorney to do the same thing for

10:00:32  16  the same purpose?

10:00:34  17         **THE WITNESS:**  Well, I asked him -- (lost transmission)

10:00:43  18  -- the temporary E-2 because I'm trying to sell my equipment,

10:00:48  19  and I would like to rectify this and still allowed to stay for

10:00:52  20  another two years until I can disperse of my assets and then

10:00:56  21  take the remaining money and go back home.

10:00:58  22         **THE COURT:**  I'm sorry.  Again the electronics -- there

10:01:00  23  was a pause and so I did not hear the first part of your

10:01:04  24  testimony just now.

10:01:06  25         My question is:  Were you trying to apply to extend

10:01:11   1   the visa, yes or no?

10:01:16   2            THE WITNESS:  Yes, ma'am, I tried it one time.  I

10:01:18   3   tried it one time where the second immigration lawyer sent a

10:01:24   4   letter to the USCIS.  We didn't ever receive the response, so I

10:01:29   5   called him up a couple of weeks later.  He changed his

10:01:33   6   telephone numbers and disappeared, so that's another $2,500

10:01:36   7   with the second immigration lawyer.  And then I give up.

10:01:39   8            THE COURT:  So would that have been an extension --

10:01:42   9   how long would that extension have been for?  What was the

10:01:46   10  duration?

10:01:47   11           THE WITNESS:  A maximum of another two years.  If it

10:01:50   12  would have been granted, it would have been maximum of two

10:01:53   13  years, ma'am.

10:01:53   14           THE COURT:  Okay.  And then finally, Mr. Schurmann,

10:02:00   15  have you pursued any relief -- filed anything through the

10:02:04   16  German government for the relief you're seeking here?

10:02:13   17           THE WITNESS:  I couldn't hear properly.  Would you

10:02:16   18  please repeat the question, ma'am.

10:02:18   19           THE COURT:  You filed in the country of Spain through

10:02:25   20  the ministry of justice in Spain under the Hague Convention,

10:02:29   21  correct?

10:02:30   22           THE WITNESS:  Yes, ma'am.

10:02:31   23           THE COURT:  Have you done the same in Germany?

10:02:35   24           THE WITNESS:  Of course not.  I'm not resident in

10:02:37   25  Germany.

10:02:38   1          **THE COURT:**  That's what I wanted to ask.  Thank you.

10:02:40   2          First, Mr. Nordby, any follow-up questions to the

10:02:43   3   Court's questions?

10:02:44   4          **MR. NORDBY:**  Your Honor, no follow-up questions to the

10:02:46   5   Court's questions.  And I'd rest my evidentiary presentation at

10:02:50   6   this time.  I have legal arguments, but I don't know whether

10:02:54   7   Your Honor's preference is to address those here or in some

10:02:58   8   post-hearing filings.

10:02:59   9          **THE COURT:**  Well, I'd like to hear from you all here

10:03:02   10  today, but I would like to wait until all of the evidence has

10:03:06   11  been admitted.  So I don't know if Ms. Anqui has evidence.  So

10:03:10   12  I'll hear from you, but it may be at the close of all the

10:03:14   13  evidence.  Thank you.

10:03:15   14         **MR. NORDBY:**  Thank you very much.

10:03:16   15         **THE COURT:**  Mr. Levy, any follow-up questions to the

10:03:19   16  Court's questions of Mr. Schurmann?

10:03:21   17         **MR. LEVY:**  No, Your Honor.

10:03:22   18         **THE COURT:**  Mr. Schurmann, Mr. Nordby has announced

10:03:25   19  that he is going to rest, he has no more evidence to present on

10:03:29   20  your behalf.  And so now would be the opportunity for Ms. Anqui

10:03:33   21  to present evidence in support of her response to the petition.

10:03:41   22         Mr. Levy?

10:03:43   23         **MR. LEVY:**  Thank you, Your Honor.

10:03:44   24         **THE COURT:**  I tell you what, let's --

10:03:44   25         **MR. LEVY:**  Can she remain here or --

| | | |
|---|---|---|
| 10:03:49 | 1 | **THE COURT:**  She'll need to come to the witness stand. |
| 10:03:51 | 2 | But let's take a short recess.  I apologize.  Let's do that. |
| 10:03:55 | 3 | We've been in the courtroom about an hour-and-a-half.  We'll |
| 10:03:59 | 4 | take ten minutes, just long enough for everyone to stretch |
| 10:04:02 | 5 | their legs, use the restroom, get something to drink, 10 or 15 |
| 10:04:05 | 6 | minutes. |
| 10:05:21 | 7 | *(Recess taken 10:04 a.m. to 10:18 a.m.)* |
| 10:18:43 | 8 | **THE COURT:**  Mr. Levy? |
| 10:18:45 | 9 | **MR. LEVY:**  I'd like to call Mr. Schurmann as my first |
| 10:18:47 | 10 | witness. |
| 10:18:48 | 11 | **THE COURT:**  Oh, Mr. Schurmann.  Where is -- I'm sorry, |
| 10:18:49 | 12 | I should have checked.  I thought he was online before I came |
| 10:18:52 | 13 | in. |
| 10:18:53 | 14 | **MR. LEVY:**  We have concerns that, because of the time |
| 10:18:56 | 15 | difference, that they may shut his connection down. |
| 10:18:59 | 16 | **THE COURT:**  Okay.  Well, let's hope -- I guess it |
| 10:19:04 | 17 | hasn't happened yet because we still have a video.  But we |
| 10:19:08 | 18 | don't have him, so we'll have to wait just a minute and see if |
| 10:19:12 | 19 | he returns and hope that he returns. |
| 10:19:25 | 20 | Mr. Nordby, were you in the courtroom when |
| 10:19:32 | 21 | Mr. Schurmann exited the room where he is? |
| 10:19:35 | 22 | **MR. NORDBY:**  Your Honor, I will admit that I did not |
| 10:19:37 | 23 | notice he left. |
| 10:19:38 | 24 | **THE COURT:**  There he is.  Perfect.  All right, great. |
| 10:19:44 | 25 | Okay, Mr. Schurmann, we're all back and ready to |

10:19:53    1    proceed with the hearing.  Are you ready?

10:19:59    2          **MR. SCHURMANN:**  Yes, ma'am.  I just had to go quick to

10:20:02    3    the bathroom.

10:20:02    4          **THE COURT:**  Okay.  Mr. Levy is going to start with

10:20:04    5    Ms. Anqui's case, and he's going to be asking you some

10:20:08    6    additional questions on direct examination.  You're still under

10:20:11    7    oath, okay?  Do you understand?

10:20:14    8          **THE WITNESS:**  Yes, ma'am.  Yes, ma'am.

10:20:15    9          **THE COURT:**  Thank you.

10:20:15    10          Mr. Levy, you may proceed when you're ready.

10:20:18    11        **STEPHAN SCHURMANN, RESPONDENT WITNESS, PREVIOUSLY SWORN**

10:20:18    12                 **DIRECT EXAMINATION**

10:20:19    13    **BY MR. LEVY:**

10:20:20    14    **Q.**  Mr. Schurmann, you previously testified that your arrest

10:20:25    15    charges were dismissed, is that correct, that your arrest

10:20:29    16    charges as to the trespass were dismissed?

10:20:33    17    **A.**  I didn't say that, sir.

10:20:35    18    **Q.**  Okay.  Are those charges --

10:20:38    19    **A.**  I didn't say they were dismissed.

10:20:40    20    **Q.**  Are those charges still pending?

10:20:43    21    **A.**  Yes, sir.

10:20:44    22    **Q.**  Do you have any other charges pending?

10:20:48    23    **A.**  Not to my knowledge.

10:20:52    24    **Q.**  Okay.  You previously testified that you've never

10:21:03    25    physically abused your wife?

*Stephan Schurmann - Direct/Levy*                                    58

| | | |
|---|---|---|
| 10:21:06 | 1 | **A.**   That's correct, sir. |
| 10:21:07 | 2 | **Q.**   That's correct?  Has your wife ever left the house and gone |
| 10:21:19 | 3 | to a women's shelter? |
| 10:21:22 | 4 | **A.**   Well, you stated that, but I don't know if that's right or |
| 10:21:28 | 5 | wrong. |
| 10:21:29 | 6 | **Q.**   Has your wife ever told you that she went to a lady -- to a |
| 10:21:33 | 7 | women's shelter for abuse during the marriage? |
| 10:21:35 | 8 | **A.**   Again, you stated that in the divorce proceedings.  I don't |
| 10:21:42 | 9 | know if it's true or untrue.  I have no proof. |
| 10:21:44 | 10 | **Q.**   Okay.  And have you ever verbally abused your wife? |
| 10:21:59 | 11 | **MR. NORDBY:**  Your Honor, objection as to relevance to |
| 10:22:02 | 12 | the Hague Convention allegations and affirmative defenses. |
| 10:22:05 | 13 | **THE COURT:**  Overruled. |
| 10:22:09 | 14 | **BY MR. LEVY:** |
| 10:22:10 | 15 | **Q.**   Mr. Schurmann, have you ever verbally abused your wife? |
| 10:22:13 | 16 | **A.**   You mean by saying maybe wrong words? |
| 10:22:23 | 17 | **Q.**   Have you ever -- have you ever verbally disparaged her? |
| 10:22:29 | 18 | **A.**   By saying wrong words, is that what you refer to? |
| 10:22:36 | 19 | **Q.**   What is your definition of "wrong words," sir? |
| 10:22:39 | 20 | **A.**   Well, I don't know.  That's why I ask you, what is it what |
| 10:22:46 | 21 | you mean "verbally abuse"?  What is it? |
| 10:22:51 | 22 | **Q.**   Have you ever called her stupid? |
| 10:22:56 | 23 | **MR. NORDBY:**  Your Honor, objection as to relevance to |
| 10:22:58 | 24 | the Hague Convention allegations. |
| 10:23:00 | 25 | **THE COURT:**  Well, this is already something that was |

| | | |
|---|---|---|
| 10:23:02 | 1 | -- this -- I mean, are you referring to the document that |
| 10:23:09 | 2 | Mr. Schurmann sent to his wife in the letter? |
| 10:23:15 | 3 |         **MR. LEVY:**  Well, my follow-up question, Your Honor, is |
| 10:23:17 | 4 | going to be has he ever done it in front of the child, has he |
| 10:23:22 | 5 | ever verbally abused his wife or physically abused his wife in |
| 10:23:24 | 6 | front of the child. |
| 10:23:25 | 7 |         **THE COURT:**  And that's why it's relevant.  That's why |
| 10:23:28 | 8 | I overruled the objection a few moments ago, I suspected that's |
| 10:23:32 | 9 | where he was headed.  So overruled. |
| 10:23:34 | 10 | **BY MR. LEVY:** |
| 10:23:38 | 11 | **Q.**  Okay, sir, have you ever called your wife stupid? |
| 10:23:42 | 12 | **A.**  Yeah, when she wanted to feed my son with cognac prolinase, |
| 10:23:54 | 13 | I said, "How can you be so stupid?" |
| 10:23:56 | 14 | **Q.**  Okay.  And in line with "stupid," that's what I mean by |
| 10:24:00 | 15 | disparaging.  Have you ever said any other disparaging words to |
| 10:24:05 | 16 | your wife during the marriage? |
| 10:24:07 | 17 | **A.**  I don't -- I don't understand the definition of |
| 10:24:11 | 18 | "disparage." I don't know that word, sir.  I'm sorry. |
| 10:24:13 | 19 | **Q.**  Okay.  Do you know the word "stupid"? |
| 10:24:18 | 20 | **A.**  Yeah, I understand that definition, yes, sir. |
| 10:24:21 | 21 | **Q.**  Okay.  Do you know words similar? |
| 10:24:31 | 22 | **A.**  Similar to what, sir? |
| 10:24:35 | 23 | **Q.**  Words similar to stupid, have you called her words similar |
| 10:24:38 | 24 | to stupid, sir? |
| 10:24:39 | 25 | **A.**  Neglecting, not paying attention, risking the safety of our |

10:24:51  1  child, letting him almost die in the Philippines from malaria

10:24:57  2  fever, driving him around in a car without a driver's license,

10:25:00  3  I called it highly negligent, ignorant, and really stupid, yes.

10:25:06  4  Q.  So she deserved it?

10:25:11  5          MR. NORDBY:  Your Honor, objection.

10:25:12  6          THE WITNESS:  The life of our child is at risk, sir.

10:25:16  7          MR. LEVY:  Okay.  Well, let me --

10:25:17  8          THE COURT:  Excuse me, Mr. Levy.  Mr. Nordby is

10:25:20  9  standing.

10:25:21  10          MR. NORDBY:  Your Honor, just can I note an objection

10:25:24  11  as to relevance on this testimony?

10:25:26  12          THE COURT:  All right.  And this is as in front of the

10:25:29  13  child or just in general?

10:25:31  14          MR. LEVY:  That's my next follow-up.  I can't get him

10:25:34  15  to even state that he's acknowledging that he says anything

10:25:38  16  disparaging.  He says he doesn't know the word.  So I'm trying

10:25:42  17  to at least get it clear in his head what I'm trying to ask him

10:25:47  18  before I do the follow-up question, which is has he ever done

10:25:51  19  that in front of the child.

10:25:52  20          THE COURT:  I'm going to allow it.  Overruled.  You

10:25:54  21  can have a standing objection.

10:25:56  22          MR. NORDBY:  Thank you, Your Honor.

10:25:57  23          THE COURT:  All right, go ahead, Mr. Levy, please.

10:26:02  24  BY MR. LEVY:

10:26:03  25  Q.  Okay.  And so can you define "stupid" for me?

| | |
|---|---|
| 10:26:11 | 1 |
| 10:26:15 | 2 |
| 10:26:16 | 3 |
| 10:26:18 | 4 |
| 10:26:24 | 5 |
| 10:26:28 | 6 |
| 10:26:31 | 7 |
| 10:26:33 | 8 |
| 10:26:36 | 9 |
| 10:26:39 | 10 |
| 10:26:40 | 11 |
| 10:26:40 | 12 |
| 10:26:44 | 13 |
| 10:26:47 | 14 |
| 10:26:53 | 15 |
| 10:26:53 | 16 |
| 10:26:58 | 17 |
| 10:26:58 | 18 |
| 10:27:00 | 19 |
| 10:27:04 | 20 |
| 10:27:06 | 21 |
| 10:27:07 | 22 |
| 10:27:10 | 23 |
| 10:27:14 | 24 |
| 10:27:15 | 25 |

**A.**   Look it up in the dictionary.  That would be the easiest definition.

**THE COURT:**  Mr. Schurmann, we need to get through this so please try to answer the question.  And if you don't have a definition in your own mind of "stupidity" or "stupid," then just say you don't instead of the response back to have him go look it up in a dictionary.

**MR. LEVY:**  I'll just ask one question and move on, Judge.  And pardon my language, I'm going to quote him on this.

**THE COURT:**  That's fine.

**BY MR. LEVY:**

**Q.**   Now, you've called Judge Polson a "stupid bitch" in an email.  Have you ever called your wife a "stupid bitch" in front of the child?

**A.**   No, sir.

**Q.**   Okay.  And you knew what it meant when you called Judge Polson that?

**A.**   Come again, please.

**Q.**   You knew what it meant when you called Judge Polson that?  You knew what the word --

**A.**   I still don't --

**Q.**   You said you didn't know what disparage -- you knew that "stupid bitch" is a negative word to call a woman when you called Judge Polson that?

**A.**   I didn't call her that.

| 10:27:25 | 1 | **MR. LEVY:** Judge, have I already moved into evidence |
| 10:27:27 | 2 | the letter?  And I believe I have.  It's -- |
| 10:27:29 | 3 | **THE COURT:** The email, yes.  The letter we were -- |
| 10:27:33 | 4 | **MR. LEVY:** The email is 21. |
| 10:27:36 | 5 | **THE COURT:** The email is in.  The letter you were |
| 10:27:38 | 6 | going to wait until you had Mr. Schurmann examined on direct. |
| 10:27:41 | 7 | **MR. LEVY:** Right. |
| 10:27:42 | 8 | **THE COURT:** Because you sought to admit it and then it |
| 10:27:46 | 9 | was determined it was perhaps outside the scope, and so you |
| 10:27:49 | 10 | were going to pursue it on direct. |
| 10:27:51 | 11 | **MR. LEVY:** Okay.  I'll just -- I'll move on. |
| 10:27:56 | 12 | **BY MR. LEVY:** |
| 10:27:57 | 13 | **Q.** Sir, I want to reference you to a letter that you |
| 10:28:00 | 14 | acknowledged writing, which on the front of it says "Why Are |
| 10:28:06 | 15 | Women Frigid."  Do you recall writing a letter of that nature |
| 10:28:10 | 16 | to your wife? |
| 10:28:11 | 17 | **A.** I copied and pasted that from the Internet.  That's public |
| 10:28:15 | 18 | information.  I didn't wrote that.  That was a blog somewhere |
| 10:28:18 | 19 | and I referred to that, "Please read this.  Then you will |
| 10:28:21 | 20 | understand my concerns what is going on in our marriage."  That |
| 10:28:25 | 21 | was in March.  And as I said before, we reconciled later on, |
| 10:28:31 | 22 | which is evidenced by my PowerPoint presentation from 22nd of |
| 10:28:38 | 23 | -- (lost transmission) -- then we continue to live together as |
| 10:28:43 | 24 | husband and wife. |
| 10:28:45 | 25 | **Q.** When you're referring to your PowerPoint presentation, |

10:28:50  1    you're referring to what you sent your son for his birthday?

10:28:54  2    **A.**    Yeah, and I speak about our family and that Mommy and Daddy

10:28:57  3    is proud and we love you.  Just read the text, if you'll open

10:29:04  4    your eyes.

10:29:05  5    **Q.**   Please respond to my question, sir.  So you just copied and

10:29:09  6    pasted --

10:29:10  7         **MR. LEVY:**  Judge, is it okay if I just read the first

10:29:13  8    -- I'm actually going to move it into evidence at this

10:29:15  9    juncture.

10:29:16  10        **MR. NORDBY:**  Your Honor, if I could again object as to

10:29:19  11   relevance as to the letter.  I understand Mr. Levy's earlier

10:29:22  12   inquiry was as to certain statements being made in front of the

10:29:27  13   child.  I'm not sure if he's alleging that this letter was

10:29:29  14   shown or read to the child somehow that would make it relevant.

10:29:32  15        **THE COURT:**  I understood earlier that one of the

10:29:34  16   reasons that Mr. Levy was seeking to admit the letter is there

10:29:38  17   was a reference in the letter to Mr. Schurmann wanting his son

10:29:43  18   to return to Germany, his home country.

10:29:46  19        **MR. LEVY:**  Well, I believe it's just --

10:29:49  20        **THE COURT:**  Or no?

10:29:50  21        **MR. LEVY:**  He goes on to say that -- he talks about

10:29:54  22   abandoning, that he intends to abandon his wife as of the date

10:29:57  23   of this.

10:29:58  24        **THE COURT:**  So maybe it was the divorce, the

10:30:01  25   counter-petition that I was thinking of.

*Stephan Schurmann - Direct/Levy*                                    64

| | |
|---|---|
| 10:30:02 | 1 |

      **MR. NORDBY:**  Your Honor, I do not have a relevance

objection as to the aspects of the letter that talk about where

my client might want to go.  I do have objections as to the

general commentary back and forth, which I think is more the

realm of a divorce proceeding than a Hague Convention

proceeding.

      **THE COURT:**  Well, I'm going to allow it for a couple

of reasons.  One, it's been spoken of several times, both by

you and Mr. Levy.  Also, there's the affirmative defense that

Ms. Anqui has raised, which I do think raises some questions as

to mental stability.  These are his words, there's no dispute

about that.  So I'm going to admit it.

      **MR. LEVY:**  Correct, Your Honor, I'd like to move

Exhibit 20.

      **THE COURT:**  And also for the reason as far as his

intent to abandon his wife, which is referenced just now by

Mr. Levy.

      **MR. LEVY:**  And I would think, too, I'd also offer it

as credibility.  He's sitting here saying he doesn't know what

these type of words -- these negative words are, and I think

it's clear from his intent in his letter that it's meant to --

      **THE COURT:**  I'm going to admit it.  What's the number?

      **MR. LEVY:**  It is Respondent's Exhibit 20.

      (Respondent's Exhibit 20 admitted into evidence.)

**BY MR. LEVY:**

The timestamps in the left margin are:
10:30:02, 10:30:05, 10:30:08, 10:30:12, 10:30:16, 10:30:20, 10:30:20, 10:30:22, 10:30:27, 10:30:31, 10:30:36, 10:30:44, 10:30:47, 10:30:50, 10:30:51, 10:30:53, 10:31:01, 10:31:01, 10:31:04, 10:31:07, 10:31:11, 10:31:15, 10:31:18, 10:31:22, 10:31:24

Line numbers 1 through 25.

| | | |
|---|---|---|
| 10:31:25 | 1 | **Q.**   And your testimony, Mr. Schurmann, is that you reconciled |
| 10:31:28 | 2 | after this letter was written? |
| 10:31:30 | 3 | **A.**   Yes, sir, we kept living together as husband and wife, and |
| 10:31:36 | 4 | we apologized both to each other and kept moving forward. |
| 10:31:41 | 5 | **Q.**   What date -- do you recall approximately what date you |
| 10:31:45 | 6 | wrote that email or letter to your wife? |
| 10:31:50 | 7 | **A.**   I believe that was March 18, 2014, if I'm not mistaken. |
| 10:32:01 | 8 | **Q.**   Okay.  And did you cut off her finances close in time to |
| 10:32:05 | 9 | that date? |
| 10:32:06 | 10 | **A.**   We were broke.  We were running out of money, sir.  Nobody |
| 10:32:11 | 11 | had money.  We were a sinking ship. |
| 10:32:15 | 12 | **Q.**   Okay.  How many attorneys have you retained in your divorce |
| 10:32:19 | 13 | action? |
| 10:32:21 | 14 | **MR. NORDBY:**  Your Honor, objection as to relevance. |
| 10:32:23 | 15 | **MR. LEVY:**  It's just going to his credibility as to no |
| 10:32:25 | 16 | money, Your Honor. |
| 10:32:26 | 17 | **THE COURT:**  Overruled. |
| 10:32:31 | 18 | **BY MR. LEVY:** |
| 10:32:31 | 19 | **Q.**   How many attorneys have you retained -- |
| 10:32:34 | 20 | **THE COURT:**  Wait.  When was the divorce action filed? |
| 10:32:37 | 21 | **MR. LEVY:**  It was -- it was filed in December, and |
| 10:32:41 | 22 | he's -- I'll let him speak.  As I'll proffer, he's retained -- |
| 10:32:49 | 23 | **THE COURT:**  Well, I'll allow it.  There's been |
| 10:32:52 | 24 | reference to him being broke and financially -- |
| 10:32:52 | 25 | **MR. LEVY:**  I think he filed it in forma pauperis. |

| | | |
|---|---|---|
| 10:32:57 | 1 | **THE COURT:** That's fine, I'll allow it as to |
| 10:32:59 | 2 | credibility. |
| 10:33:00 | 3 | **BY MR. LEVY:** |
| 10:33:01 | 4 | **Q.** Mr. Schurmann, how many attorneys -- you mentioned a |
| 10:33:09 | 5 | Mr. Wood, correct, an attorney Mr. Wood, Andrew Wood? |
| 10:33:17 | 6 | **A.** Yes, sir. |
| 10:33:17 | 7 | **Q.** And you retained him in the injunction petition? |
| 10:33:22 | 8 | **A.** Yes, sir. |
| 10:33:22 | 9 | **Q.** Okay. And what did -- what did you pay to Mr. Wood? |
| 10:33:26 | 10 | **A.** I didn't pay him nothing. |
| 10:33:29 | 11 | **Q.** So he did it pro bono? |
| 10:33:33 | 12 | **A.** My business partner paid him because I had no money.  I |
| 10:33:41 | 13 | paid him zero. |
| 10:33:46 | 14 | **Q.** Why did your business partner pay it on your behalf? |
| 10:33:53 | 15 | **A.** Because she knew I have no money. |
| 10:34:14 | 16 | **Q.** Okay. And how long has D.S.S. lived in the United States? |
| 10:34:20 | 17 | **A.** From October 2010. |
| 10:34:28 | 18 | **Q.** Okay. And do you recall in the letter that's been marked |
| 10:34:33 | 19 | as Exhibit 20 stating something to the effect that you moved to |
| 10:34:36 | 20 | the United States for schools for D.S.S.? |
| 10:34:43 | 21 | **A.** Which letter are you referring to, sir? |
| 10:34:46 | 22 | **Q.** It was the letter you said you wrote to your wife in March. |
| 10:34:57 | 23 | **A.** Well, I don't remember every sentence.  So what are you |
| 10:34:58 | 24 | exactly referring to? |
| 10:35:02 | 25 | **THE COURT:** Would you read that portion, Mr. Levy. |

*Stephan Schurmann - Direct/Levy*

| | | |
|---|---|---|
| 10:35:07 | 1 | The letter is in evidence so -- |
| 10:35:11 | 2 | **MR. LEVY:**  Sure.  I apologize, Your Honor.  I thought |
| 10:35:37 | 3 | I had it marked. |
| 10:35:58 | 4 | **BY MR. LEVY:** |
| 10:35:58 | 5 | **Q.**  I'm going to read you the paragraph.  It says:  "Soon after |
| 10:36:01 | 6 | in my business I got the opportunity to buy a master franchise |
| 10:36:05 | 7 | for USA, and we decided to set up our factory in USA, which we |
| 10:36:10 | 8 | hoped would give D.S.S. a better educational level when he |
| 10:36:13 | 9 | would have to go to school." |
| 10:36:15 | 10 | Do you recall writing that? |
| 10:36:18 | 11 | **A.**  Yeah, which is temporary for two years, sir.  You are |
| 10:36:21 | 12 | required by law to put your child in school.  I don't want him |
| 10:36:24 | 13 | to grow up stupid. |
| 10:36:25 | 14 | **Q.**  How old -- how old was he when you first moved to the |
| 10:36:29 | 15 | United States?  Was he school age? |
| 10:36:34 | 16 | **A.**  He was -- no, he was not in school yet.  He was -- (lost |
| 10:36:43 | 17 | transmission) -- years old. |
| 10:36:46 | 18 | **THE COURT:**  How old was he? |
| 10:36:48 | 19 | **BY MR. LEVY:** |
| 10:36:49 | 20 | **Q.**  How old was he, sir? |
| 10:36:50 | 21 | **A.**  Come again. |
| 10:36:51 | 22 | **Q.**  How old was D.S.S. when you first moved to the United |
| 10:36:54 | 23 | States? |
| 10:36:55 | 24 | **A.**  Well, October 2010, so he was born in August 2008.  That |
| 10:36:59 | 25 | means two years and two months. |

| 10:37:03 | 1 | **Q.**   Okay.  So your testimony was that you didn't mean by that |
| 10:37:06 | 2 | statement in the letter that you intended to live in the United |
| 10:37:09 | 3 | States for a long period of time? |
| 10:37:13 | 4 | **A.**   No, sir.  It's a temporary E-2 business visa.  You cannot |
| 10:37:17 | 5 | stay for a long time.  Show me where I ever applied to Homeland |
| 10:37:22 | 6 | Security for a green card, permanent resident, or anything |
| 10:37:25 | 7 | alike.  It does not exist. |
| 10:37:25 | 8 | **Q.**   Well, why did you -- |
| 10:37:27 | 9 | **A.**   And by the way -- |
| 10:37:28 | 10 | **Q.**   Why did you overstay your visa? |
| 10:37:32 | 11 | **A.**   Come again. |
| 10:37:33 | 12 | **Q.**   You're saying you were only here temporarily.  Why did you |
| 10:37:36 | 13 | overstay your visa? |
| 10:37:40 | 14 | **A.**   Why did I extend my visa? |
| 10:37:42 | 15 | **Q.**   Why did you overstay the time period you were permitted to |
| 10:37:46 | 16 | be in the United States? |
| 10:37:49 | 17 | **A.**   Well, the reason was not renewed, and I had $750,000 in the |
| 10:37:53 | 18 | country, which I tried to recoup, and I tried to prolong the |
| 10:37:59 | 19 | visa one more time.  That did not work.  So we just were going |
| 10:38:03 | 20 | more down the tube instead of recouping our money.  We were |
| 10:38:07 | 21 | completely flat broke. |
| 10:38:20 | 22 | **MR. LEVY:**  I've got no further questions. |
| 10:38:22 | 23 | **THE COURT:**  Mr. Levy, would you please direct me to |
| 10:38:24 | 24 | that paragraph where you -- where Mr. Schurmann states that |
| 10:38:34 | 25 | they wanted a better education or schools for D.S.S.  Where is |

| | | |
|---|---|---|
| 10:38:37 | 1 | that?  These are not marked. |
| 10:38:38 | 2 | MR. LEVY:  Yeah, it's not numbered.  It would be the |
| 10:38:40 | 3 | second page, the very last paragraph, Your Honor. |
| 10:38:43 | 4 | THE COURT:  Oh, I see.  Thank you. |
| 10:38:46 | 5 | MR. LEVY:  And I've got no further questions for |
| 10:38:49 | 6 | Mr. Schurmann. |
| 10:38:49 | 7 | THE COURT:  Mr. Nordby, any cross? |
| 10:38:54 | 8 | MR. NORDBY:  No, Your Honor. |
| 10:38:57 | 9 | THE COURT:  Your next witness? |
| 10:38:58 | 10 | MR. LEVY:  I would like to call my client. |
| 10:39:01 | 11 | THE COURT:  Ms. Anqui, here to the witness stand, |
| 10:39:04 | 12 | please. |
| 10:39:06 | 13 | **JUBILIE ANQUI, RESPONDENT WITNESS, DULY SWORN** |
| 10:39:26 | 14 | MADAM CLERK:  Be seated. |
| 10:39:32 | 15 | MR. LEVY:  State your full name for the record. |
| 10:39:34 | 16 | THE WITNESS:  Jubilie Anqui. |
| 10:39:36 | 17 | MR. LEVY:  You can be seated. |
| 10:39:37 | 18 | MADAM CLERK:  And spell your last name for the record. |
| 10:39:41 | 19 | THE WITNESS:  A-n-q-u-i. |
| 10:39:44 | 20 | THE COURT:  All right, Mr. Levy, when you're ready. |
| 10:39:48 | 21 | **DIRECT EXAMINATION** |
| 10:39:48 | 22 | BY MR. LEVY: |
| 10:39:51 | 23 | Q.   You've heard Mr. Schurmann's testimony regarding the |
| 10:39:55 | 24 | locations where you've lived.  Are the time periods accurate? |
| 10:40:01 | 25 | When did you live in Spain? |

| 10:40:02 | 1 | **A.**   I arrive in Spain October 2007.  I got temporary residence |
| 10:40:09 | 2 | visa April 2008. |
| 10:40:16 | 3 | **Q.**   Okay.  And do you have any residency status in Spain |
| 10:40:22 | 4 | currently? |
| 10:40:23 | 5 | **A.**   No. |
| 10:40:24 | 6 | **Q.**   When was the last time you had residency status in Spain? |
| 10:40:29 | 7 | **A.**   2010. |
| 10:40:32 | 8 | **THE COURT:**  Ma'am, would you move closer to |
| 10:40:35 | 9 | microphone.  I think the chair will slide.  Thank you.  So |
| 10:40:39 | 10 | that's 2010? |
| 10:40:40 | 11 | **THE WITNESS:**  2010, yes, ma'am. |
| 10:40:45 | 12 | **BY MR. LEVY:** |
| 10:40:46 | 13 | **Q.**   Okay.  And what is your understanding why you no longer |
| 10:40:48 | 14 | have residency in Spain? |
| 10:40:50 | 15 | **A.**   The temporary residence visa for me is valid for five years |
| 10:40:56 | 16 | as long as I remain in the country continuously.  But if I |
| 10:41:00 | 17 | leave after six months, it will -- it's no longer valid. |
| 10:41:06 | 18 | **Q.**   Okay.  And why did -- what was your understanding of why |
| 10:41:19 | 19 | you moved to the Philippines in 2010? |
| 10:41:21 | 20 | **A.**   He bought a master franchise Plaswall -- that's what I |
| 10:41:28 | 21 | know -- that is located in the Philippines.  So he wanted to |
| 10:41:31 | 22 | set up the factory there and move all of us to start a new life |
| 10:41:35 | 23 | -- because we were also fighting in the Philippines -- and move |
| 10:41:39 | 24 | everything there. |
| 10:41:40 | 25 | **Q.**   So you moved all of your belongings from Spain to the |

| | | |
|---|---|---|
| 10:41:43 | 1 | Philippines? |
| 10:41:44 | 2 | **A.**   To the Philippines. |
| 10:41:45 | 3 | **Q.**   Did you ever own a house in Spain? |
| 10:41:47 | 4 | **A.**   No. |
| 10:41:48 | 5 | **Q.**   Did you ever maintain a house in Spain after you moved? |
| 10:41:52 | 6 | **A.**   No. |
| 10:41:52 | 7 | **Q.**   What ties to Spain do you have right now? |
| 10:41:58 | 8 | **A.**   None. |
| 10:41:58 | 9 | **Q.**   Do you speak Spanish? |
| 10:42:00 | 10 | **A.**   No. |
| 10:42:01 | 11 | **Q.**   Does Stephan speak Spanish? |
| 10:42:04 | 12 | **A.**   No. |
| 10:42:04 | 13 | **Q.**   Does the child speak Spanish? |
| 10:42:08 | 14 | **A.**   No. |
| 10:42:08 | 15 | **Q.**   Okay.  And what is your understanding of why you moved from |
| 10:42:19 | 16 | the Philippines to the United States with the family? |
| 10:42:23 | 17 | **A.**   Well, before we moved to the Philippines -- or when we were |
| 10:42:28 | 18 | there the purpose was to set up his business of Plaswall and to |
| 10:42:32 | 19 | buy a house for us that we're going to be staying there long |
| 10:42:36 | 20 | term in the Philippines.  But then when he met this guy from |
| 10:42:41 | 21 | Alabama which he visited him there, he said it would be |
| 10:42:44 | 22 | better -- the opportunity is better in the United States.  So |
| 10:42:46 | 23 | instead of buying the house there, he's going to move his |
| 10:42:49 | 24 | business to Alabama and build our house there as the show house |
| 10:42:55 | 25 | and at the same time would be our home here. |

| | | |
|---|---|---|
| 10:43:00 | 1 | **Q.**   Okay.  And what year did you move to the United States? |
| 10:43:06 | 2 | **A.**   2010. |
| 10:43:08 | 3 | **Q.**   Okay.  And you've resided here continuously since then? |
| 10:43:14 | 4 | **A.**   Yes. |
| 10:43:14 | 5 | **Q.**   And has the child resided continuously with you? |
| 10:43:19 | 6 | **A.**   Yes. |
| 10:43:19 | 7 | **Q.**   Okay.  And were there ever any discussions of returning |
| 10:43:34 | 8 | back to Italy? |
| 10:43:38 | 9 |            **THE COURT:**  You mean Spain? |
| 10:43:41 | 10 |            **MR. LEVY:**  There was some testimony, and I think it |
| 10:43:43 | 11 | was introduced as Exhibit 5, Your Honor -- |
| 10:43:52 | 12 |            **THE COURT:**  Okay. |
| 10:43:52 | 13 | **BY MR. LEVY:** |
| 10:43:53 | 14 | **Q.**   Do you recall any discussions about returning to Italy? |
| 10:43:56 | 15 | **A.**   The reason he wanted to go that particular year, 2013, is |
| 10:44:01 | 16 | he wanted to change his name.  And I said, "I don't want to |
| 10:44:04 | 17 | change my name."  And he said, "If I leave I cannot come back |
| 10:44:09 | 18 | for ten years, so you and D.S.S. come with me."  And I said, |
| 10:44:14 | 19 | "But that's not what we agreed." |
| 10:44:15 | 20 |      We agreed to move to the United States from the Philippines |
| 10:44:18 | 21 | to be settled here to make -- to get our residence card and to |
| 10:44:25 | 22 | be able to proceed with the plan that we had in the |
| 10:44:28 | 23 | Philippines. |
| 10:44:32 | 24 | **Q.**   Okay.  So what was your understanding of why you were |
| 10:44:36 | 25 | returning to Italy or you applied for some type of visa in |

| | | |
|---|---|---|
| 10:44:41 | 1 | Italy? |
| 10:44:42 | 2 | **A.**   He wanted -- he wanted -- he had some -- he had some people |
| 10:44:48 | 3 | posting some negative stuff of him online, and he said he could |
| 10:44:52 | 4 | no longer do his business because his name is being destroyed |
| 10:44:56 | 5 | by his people, and he wanted to change his name, and he said he |
| 10:44:59 | 6 | could do it in Europe. |
| 10:45:00 | 7 | **Q.**   Okay.  And what year was the discussions to apply for a |
| 10:45:07 | 8 | visa in Italy? |
| 10:45:08 | 9 | **A.**   2013. |
| 10:45:10 | 10 | **Q.**   Have you ever had any discussions with Stephan regarding |
| 10:45:18 | 11 | returning to Spain after 2010? |
| 10:45:21 | 12 | **A.**   No. |
| 10:45:21 | 13 | **Q.**   Have you ever had any agreements with Stephan to return to |
| 10:45:32 | 14 | Europe with the minor child? |
| 10:45:34 | 15 | **A.**   No. |
| 10:45:34 | 16 | **Q.**   Have you filed a dissolution of marriage action in Okaloosa |
| 10:45:55 | 17 | County? |
| 10:46:03 | 18 | **A.**   Yes. |
| 10:46:03 | 19 |           **MR. LEVY:**  May I briefly approach? |
| 10:46:05 | 20 |           **THE COURT:**  Yes. |
| 10:46:06 | 21 |           **MR. LEVY:**  And what I'm showing her, just for the |
| 10:46:09 | 22 | record, is the Petition for Dissolution of Marriage and other |
| 10:46:12 | 23 | Relief, Exhibit 7. |
| 10:46:18 | 24 | **BY MR. LEVY:** |
| 10:46:18 | 25 | **Q.**   And if you would, is that the petition that you filed? |

| | | |
|---|---|---|
| 10:46:26 | 1 | **A.**   Yes, sir. |
| 10:46:26 | 2 | **MR. LEVY:**  Your Honor, we'd like to move the Petition |
| 10:46:29 | 3 | for Dissolution of Marriage and Other Relief into evidence, |
| 10:46:32 | 4 | it's Respondent's Exhibit 7. |
| 10:46:35 | 5 | **THE COURT:**  All right, that will be admitted. |
| 10:46:36 | 6 | (Respondent's Exhibit 7 admitted into evidence.) |
| 10:46:45 | 7 | BY MR. LEVY: |
| 10:46:45 | 8 | **Q.**   Okay.  Do you recall what date you filed the petition for |
| 10:46:48 | 9 | dissolution of marriage? |
| 10:46:49 | 10 | **A.**   December 17th. |
| 10:46:51 | 11 | **Q.**   Okay.  And why did you file for a divorce? |
| 10:46:56 | 12 | **MR. NORDBY:**  Your Honor, objection as to relevance for |
| 10:47:00 | 13 | this proceeding, the purpose for which she filed for divorce. |
| 10:47:04 | 14 | **THE COURT:**  Overruled.  I'll allow it. |
| 10:47:07 | 15 | **THE WITNESS:**  He said he won't -- at that time D.S.S. |
| 10:47:12 | 16 | was with him.  We had been discussing the divorce already for a |
| 10:47:16 | 17 | long time even before he left, and he said he won't return |
| 10:47:19 | 18 | D.S.S. to me if I stay with my boyfriend.  And he said he won't |
| 10:47:22 | 19 | -- he wouldn't sign the divorce if I don't give him 100 percent |
| 10:47:27 | 20 | custody.  So I want the Court to determine the custody for the |
| 10:47:37 | 21 | child. |
| 10:47:40 | 22 | BY MR. LEVY: |
| 10:47:40 | 23 | **Q.**   Has your husband committed any acts of domestic abuse on |
| 10:47:43 | 24 | you in front of the child? |
| 10:47:50 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 10:47:50 | 1 | **Q.**   Okay.  And can you give me -- how many times has this |
| 10:47:55 | 2 | occurred? |
| 10:47:56 | 3 | **A.**   (Witness crying.)  On a regular basis. |
| 10:48:02 | 4 | **Q.**   Can you repeat that for the Court. |
| 10:48:04 | 5 | **THE COURT:**  I heard it.  She said "on a regular |
| 10:48:08 | 6 | basis." |
| 10:48:08 | 7 | **BY MR. LEVY:** |
| 10:48:09 | 8 | **Q.**   Now, are you talking about physical abuse? |
| 10:48:11 | 9 | **A.**   Physical, yes. |
| 10:48:15 | 10 | **Q.**   Okay.  Can you -- can you give me a date and time of one |
| 10:48:21 | 11 | time that that's occurred. |
| 10:48:25 | 12 | **A.**   He would -- when D.S.S. is awake or when D.S.S. is there he |
| 10:48:29 | 13 | would just push me or just throw something in my face.  But |
| 10:48:33 | 14 | when he's sleeping he will drag me from bed and he would put |
| 10:48:37 | 15 | his hand on my neck and he would drag me to the living room and |
| 10:48:42 | 16 | he said that I cannot sleep in there, and just throw stuff in |
| 10:48:47 | 17 | my face. |
| 10:48:51 | 18 | **Q.**   Okay.  And has Mr. Schurmann been verbally abusive to you |
| 10:48:55 | 19 | in front of D.S.S.? |
| 10:48:58 | 20 | **A.**   Yes, yes.  He would call me names even in front of D.S.S. |
| 10:49:02 | 21 | and I asked him many times not to do it in front of D.S.S., but |
| 10:49:05 | 22 | he keeps on doing it.  He said, "I want him to understand what |
| 10:49:08 | 23 | kind of mother you are so when he grows up he will hate you." |
| 10:49:15 | 24 | He would call me all the names in front of him. |
| 10:49:25 | 25 | **Q.**   Okay.  And at some point did you ask the Court to set forth |

| | | |
|---|---|---|
| 10:49:35 | 1 | a temporary custody schedule between you and Mr. Schurmann? |
| 10:49:40 | 2 | A.   Yes. |
| 10:49:57 | 3 | MR. LEVY:  May I approach one more time, Your Honor? |
| 10:50:01 | 4 | THE COURT:  Yes. |
| 10:50:09 | 5 | MR. LEVY:  And what I'm showing her for the record is |
| 10:50:12 | 6 | Respondent's Exhibit 14. |
| 10:50:18 | 7 | BY MR. LEVY: |
| 10:50:18 | 8 | Q.   If you would, just review that.  Is that the order that -- |
| 10:50:28 | 9 | the temporary order that was entered in your divorce case? |
| 10:50:32 | 10 | A.   Yes. |
| 10:50:32 | 11 | MR. LEVY:  I'd like to move Respondent's Exhibit 14 |
| 10:50:37 | 12 | into evidence. |
| 10:50:38 | 13 | THE COURT:  14 will be admitted. |
| 10:50:40 | 14 | (Respondent's Exhibit 14 admitted into evidence.) |
| 10:50:44 | 15 | BY MR. LEVY: |
| 10:50:45 | 16 | Q.   And did the order provide for Mr. Schurmann to have |
| 10:50:47 | 17 | visitation with his son? |
| 10:50:49 | 18 | A.   Yes. |
| 10:50:49 | 19 | Q.   And were there any concerns when Mr. Schurmann was |
| 10:50:59 | 20 | exercising his visitation? |
| 10:51:01 | 21 | A.   Yes. |
| 10:51:01 | 22 | Q.   Can you tell the Court? |
| 10:51:03 | 23 | A.   He tried to -- he tried to leave the country with the |
| 10:51:08 | 24 | child. |
| 10:51:12 | 25 | Q.   And I'm sorry, I didn't understand you.  Can you repeat |

10:51:17   1    your answer.

10:51:20   2    A.    You said was there any concern when he was exercising his

10:51:24   3    visitation?

10:51:25   4    Q.    Correct, yes.

10:51:26   5    A.    When D.S.S. comes home from him after his visitation,

10:51:31   6    D.S.S. cries and tells me "Daddy is so mad at you, and he said

10:51:37   7    you're a stupid girl and you're a whore."  First he said

10:51:41   8    "you're a horse," that's what he get, a horse.

10:51:46   9          And then he said, "I told him you're not, and he said to me

10:51:49   10   that one day when you grow up you will just hate your mother,

10:51:54   11   and that she almost killed you," and D.S.S. was crying, and he

10:52:00   12   said, "I told Daddy you're not like that, but he said you are."

10:52:05   13         And he cried and told me, "He's angry, and he says a lot of

10:52:13   14   mean things to you, and he showed me the text that he is

10:52:16   15   sending to you."

10:52:17   16   Q.    Was the child visibly upset when he returned from his

10:52:22   17   visits with his father?

10:52:28   18   A.    Yes.

10:52:28   19   Q.    Did you at any point attempt to restrict his visitation?

10:52:35   20   A.    I asked for a supervised visitation.  I think that was in

10:52:43   21   first part.  But when he tried to file another motion he was no

10:52:47   22   longer in the country, so there's no need for that -- to file

10:52:51   23   another one to restrict the visitation.

10:52:53   24   Q.    Okay.  And how many times has Mr. Schurmann contacted

10:53:07   25   D.S.S. since he testified he left the country sometime in

*Jubilie Anqui - Direct/Levy* 78

10:53:13  1   February of 2015?

10:53:15  2   **A.**   Whenever he left February 20, his last call was

10:53:24  3   February 25.

10:53:27  4   **Q.**   Have you tried -- have you restricted his access to the

10:53:30  5   child in any way?

10:53:31  6   **A.**   No.

10:53:31  7   **Q.**   Have you changed your phone number?

10:53:33  8   **A.**   No.

10:53:33  9   **Q.**   Has he made any type of written communication to the child?

10:53:41  10  **A.**   No.

10:53:41  11  **Q.**   Has he sent you any emails to forward to the child?

10:53:48  12  **A.**   No.

10:53:48  13  **Q.**   According to the temporary order, Exhibit 14, Mr. Schurmann

10:54:01  14  was obligated to pay you temporary support; is that correct?

10:54:04  15  **A.**   Yes.

10:54:04  16  **Q.**   And how much was that per month?

10:54:05  17  **A.**   The Court ordered him temporary for $500 started

10:54:12  18  February 1.  And he paid twice $500 from that date until today,

10:54:16  19  so he paid February and he paid April only.

10:54:19  20  **Q.**   Okay.  And when he left in August of 2014 to go to

10:54:28  21  Pennsylvania, did he pay any support to D.S.S.?

10:54:34  22  **A.**   No.  He only sent a $50 gift card for Wal-Mart on his

10:54:40  23  birthday, that's it.

10:54:43  24  **Q.**   And did you ever reconcile with Mr. Schurmann after he

10:54:53  25  wrote you that letter back in March of 2014?

| | | |
|---|---|---|
| 10:54:57 | 1 | **A.**   Well, we agreed to remain friends, that I stay -- me and |
| 10:55:01 | 2 | D.S.S. would stay there until we were able to find a one |
| 10:55:04 | 3 | bedroom for us which we could move in the same community.  We |
| 10:55:08 | 4 | didn't sleep -- I slept with D.S.S., I slept on the floor from |
| 10:55:13 | 5 | March until he left.  He doesn't want me to sleep in the |
| 10:55:18 | 6 | bedroom, and he doesn't want me to sleep on the couch either, |
| 10:55:21 | 7 | so I was sleeping with D.S.S.  And D.S.S. doesn't want me to |
| 10:55:26 | 8 | sleep on the ground, so D.S.S. came out on the ground and sleep |
| 10:55:28 | 9 | with me on the ground, and I keep on putting him back in his |
| 10:55:34 | 10 | twin bed.  So that was -- I was just there inside until time to |
| 10:55:38 | 11 | -- he said he was going to get us an apartment but he didn't. |
| 10:55:40 | 12 |         **THE COURT:**  Can you establish the time frame, clear |
| 10:55:42 | 13 | that up for me, please. |
| 10:55:44 | 14 | **BY MR. LEVY:** |
| 10:55:45 | 15 | **Q.**   What time frame did you no longer stay in the same marital |
| 10:55:50 | 16 | bed with -- |
| 10:55:51 | 17 | **A.**   From March. |
| 10:55:52 | 18 | **Q.**   So it was March? |
| 10:55:53 | 19 | **A.**   2014. |
| 10:55:55 | 20 | **Q.**   So close in time to when that letter that was sent to you? |
| 10:55:58 | 21 | **A.**   Yes. |
| 10:55:58 | 22 | **Q.**   The letter that's been previously referred to? |
| 10:56:01 | 23 | **A.**   Yes.  That's the time where he -- if I sleep in our bed, he |
| 10:56:05 | 24 | will drag me out of the bed.  So I -- |
| 10:56:09 | 25 | **Q.**   Now, when you say you had an agreement, was the agreement |

| 10:56:12 | 1 | for everyone to stay in the United States? |
| 10:56:15 | 2 | **A.**   Yes.   He said -- he said that he just need his business up |
| 10:56:20 | 3 | and running, and once he reaches that $500,000 requirement to |
| 10:56:26 | 4 | change our status through his business that we can change our |
| 10:56:30 | 5 | status and become a legal resident. |
| 10:56:43 | 6 | **Q.**   And how old is the child now? |
| 10:56:46 | 7 | **A.**   He's going to be 7 in August. |
| 10:56:50 | 8 | **Q.**   Okay.   And did he attend school in the United States last |
| 10:56:58 | 9 | year? |
| 10:56:58 | 10 | **A.**   Yes. |
| 10:56:58 | 11 | **Q.**   What grade? |
| 10:56:59 | 12 | **A.**   He'll be second grade this fall.   He started VPK here in |
| 10:57:07 | 13 | Destin. |
| 10:57:07 | 14 | **Q.**   Is he involved in any activities outside of school? |
| 10:57:11 | 15 | **A.**   Yes.   He played soccer since he was four.   He attended |
| 10:57:14 | 16 | jujitsu for a year.   And we attend church activities for kids, |
| 10:57:20 | 17 | and also he attends church. |
| 10:57:29 | 18 | **Q.**   And how many languages does D.S.S. speak? |
| 10:57:32 | 19 | **A.**   He only speaks, writes, and reads English. |
| 10:57:40 | 20 | **Q.**   Does D.S.S. have any friends in Destin? |
| 10:57:45 | 21 | **A.**   All his friends are here. |
| 10:57:47 | 22 | **Q.**   Does he have any friends in Spain? |
| 10:57:53 | 23 | **A.**   No. |
| 10:57:53 | 24 | **Q.**   Have you even returned to Spain on a vacation at any time |
| 10:58:00 | 25 | since you left Spain in 2010? |

10:58:03    1    **A.**    No.

10:58:03    2    **Q.**    Now, you heard Mr. Schurmann testify that some belongings

10:58:12    3    were left in Spain?

10:58:14    4    **A.**    No, we never own anything in Spain.  We moved from -- we

10:58:18    5    lived at three residences in Spain and it's all furnished.  The

10:58:24    6    only thing we bought when we were there is a car, which he

10:58:26    7    sold, a TV, a dryer, and some things where to put the towel,

10:58:30    8    which we sold and then we moved to the Philippines.

10:58:34    9    **Q.**    And how many times did Mr. Schurmann discuss Spain with you

10:58:41    10    after you left?

10:58:42    11    **A.**    None.

10:58:43    12    **Q.**    Okay.  And there was -- Mr. Schurmann testified to some

10:59:06    13    allegations he made in the domestic violence injunction on

10:59:10    14    behalf of D.S.S. that was filed in December of 2014.  He had

10:59:18    15    stated that sexual intercourse was conducted in front of the

10:59:23    16    child.  Have you ever done that?

10:59:25    17    **A.**    No.

10:59:25    18    **Q.**    Have those claims ever been investigated?

10:59:31    19    **A.**    Yes.

10:59:31    20    **Q.**    And who investigated those?

10:59:34    21    **A.**    Ms. Sheryl Knight and Ms. Christina Fernandez from the DCF.

10:59:40    22    **Q.**    And how many times were they investigated?

10:59:43    23    **A.**    Twice, and they interviewed D.S.S. twice.

10:59:46    24    **Q.**    And to your knowledge, have they ever made any findings of

10:59:49    25    abuse?

| | | |
|---|---|---|
| 10:59:50 | 1 | **A.**   No. |
| 10:59:58 | 2 | **MR. LEVY:**  No further questions, Your Honor. |
| 11:00:01 | 3 | **THE COURT:**  All right.  Mr. Nordby? |
| 11:00:05 | 4 | **CROSS-EXAMINATION** |
| 11:00:05 | 5 | **BY MR. NORBY:** |
| 11:00:14 | 6 | **Q.**   Good afternoon, Ms. Anqui.  Just a few questions.  I'd |
| 11:00:19 | 7 | first like to ask you some questions about your immigration |
| 11:00:22 | 8 | status.  Do you currently have any legal immigration status in |
| 11:00:26 | 9 | this country? |
| 11:00:27 | 10 | **A.**   No. |
| 11:00:27 | 11 | **Q.**   Does your son? |
| 11:00:28 | 12 | **A.**   No. |
| 11:00:28 | 13 | **Q.**   Have you ever applied for permanent residence or any legal |
| 11:00:34 | 14 | status in the United States other than the E-2 investor visa |
| 11:00:40 | 15 | that you came over here on? |
| 11:00:42 | 16 | **A.**   I just spoke to an immigration lawyer to see what can I -- |
| 11:00:44 | 17 | to see my options, but not -- they said wait until -- until I |
| 11:00:50 | 18 | get divorced and maybe we can address my status -- our status. |
| 11:00:56 | 19 | **Q.**   At this point, though, you have not taken those steps? |
| 11:01:00 | 20 | **A.**   No. |
| 11:01:01 | 21 | **Q.**   While your husband was in Pennsylvania, he maintained |
| 11:01:06 | 22 | regular contact with your son; is that right? |
| 11:01:09 | 23 | **A.**   Yes, sir. |
| 11:01:09 | 24 | **Q.**   You stated in your response to the petition that your |
| 11:01:14 | 25 | husband had abandoned you and the minor child when he was in |

11:01:18   1   Pennsylvania.

11:01:20   2   **A.**   Yes.

11:01:20   3   **Q.**   In what way did he abandon you if he maintained regular

11:01:23   4   contact with the child?

11:01:24   5   **A.**   He left us in the apartment with unpaid bills and I -- and

11:01:29   6   then I asked him what's going to happen to us, and he said,

11:01:33   7   "Well, I have no money.  You figure it out."

11:01:35   8   **Q.**   Was it your understanding that he had no money?

11:01:38   9   **A.**   He's -- that's what he said, he had no money.

11:01:44   10   **Q.**   After your husband returned from Pennsylvania, he picked up

11:01:51   11   your child at school from time to time; is that correct?

11:01:54   12   **A.**   After -- when he got here, I bring D.S.S. to him to his

11:02:03   13   hotel.  And I think Monday -- he got his Saturday, so Monday he

11:02:14   14   brought D.S.S. to school.

11:02:15   15   **Q.**   And was Mr. Schurmann's testimony earlier that your family

11:02:18   16   has lived in three separate cities over two states since coming

11:02:22   17   to the United States, was that correct?

11:02:24   18   **A.**   Three separate cities, yes, Birmingham, Alabaster, and

11:02:30   19   Destin.

11:02:31   20   **Q.**   In your state court divorce proceedings, did you file a

11:02:35   21   document seeking to move with the child to the state of Utah?

11:02:42   22   **A.**   Yes.  That was April.

11:02:43   23   **Q.**   That was April of this year?

11:02:45   24   **A.**   April this year.

11:02:46   25   **Q.**   Do you have any family in Utah?

| 11:02:48 | 1 | **A.** No. |
| 11:02:49 | 2 | **Q.** Do you have any friends in Utah? |
| 11:02:51 | 3 | **A.** No. |
| 11:02:51 | 4 | **Q.** Does D.S.S. have any friends in Utah? |
| 11:02:55 | 5 | **A.** No. |
| 11:02:56 | 6 | **Q.** His sports teams and his church that he currently attends |
| 11:03:02 | 7 | in Destin aren't in Utah, correct? |
| 11:03:05 | 8 | **A.** Are not in Utah? |
| 11:03:07 | 9 | **Q.** That's right.  Are they -- |
| 11:03:12 | 10 | **A.** I'm sorry. |
| 11:03:13 | 11 | **Q.** Let me rephrase.  Are they in Utah? |
| 11:03:16 | 12 | **A.** They're not in Utah. |
| 11:03:18 | 13 | **Q.** Do you have any connections at all to Utah? |
| 11:03:21 | 14 | **A.** No. |
| 11:03:21 | 15 | **Q.** Your divorce petitions don't allege any harm to your child, |
| 11:03:31 | 16 | do they? |
| 11:03:32 | 17 | **A.** No. |
| 11:03:37 | 18 | **Q.** And you did request shared custody of your child between |
| 11:03:40 | 19 | you and your husband? |
| 11:03:41 | 20 | **A.** Did I request -- |
| 11:03:43 | 21 | **Q.** Shared parental responsibility, shared custody? |
| 11:03:47 | 22 | **A.** I remember sole parental responsibility. |
| 11:03:52 | 23 | **Q.** So your divorce petitions did not request any shared |
| 11:03:55 | 24 | custody between you and your husband? |
| 11:03:56 | 25 | **A.** I don't remember. |

11:04:00  1   **Q.**   You have not claimed today that your husband has physically

11:04:05  2   abused your son in any way, are you?

11:04:08  3   **A.**   Physical, no.

11:04:09  4   **Q.**   You didn't claim that in your divorce petition and you

11:04:13  5   didn't claim it in your response to this Hague petition either;

11:04:17  6   is that correct?

11:04:17  7   **A.**   For physical abuse to my son?

11:04:20  8   **Q.**   Yes.

11:04:20  9   **A.**   No.

11:04:21  10  **Q.**   The incidents that you mentioned in response to your

11:04:29  11  attorney's questioning of violence, did you ever report any of

11:04:33  12  those to law enforcement?

11:04:35  13  **A.**   The last time when I did that he started to choke me if I

11:04:41  14  call the police.  He said, "They're just going to deport you if

11:04:44  15  you call for help because you're not a legal here."

11:04:48  16  **Q.**   Did you report any of those after he left the country?

11:04:52  17  **A.**   I -- I went to the shelter house is the only help I asked.

11:05:18  18  **Q.**   Are you claiming that your -- that you and your son were

11:05:22  19  habitual residents of the Philippines in this action or of the

11:05:26  20  United States?

11:05:27  21  **A.**   United States.

11:05:32  22          **MR. NORDBY:**  No further questions.

11:05:33  23          **THE COURT:**  Redirect?

11:05:37  24                        **REDIRECT EXAMINATION**

11:05:38  25  **BY MR. LEVY:**

| | | |
|---|---|---|
| 11:05:51 | 1 | Q.   In regards to the Petition for Dissolution of Marriage and |
| 11:05:54 | 2 | Other Relief that's already been admitted, Ms. Anqui -- |
| 11:06:03 | 3 | MR. LEVY:   May I approach and just refresh her |
| 11:06:05 | 4 | recollection as to what her allegations were in the petition? |
| 11:06:08 | 5 | THE COURT:   Yes. |
| 11:06:25 | 6 | BY MR. LEVY: |
| 11:06:25 | 7 | Q.   Actually, if you would, would you read into the record 12 |
| 11:06:28 | 8 | through 14. |
| 11:06:31 | 9 | A.   12 through 14? |
| 11:06:33 | 10 | Q.   Yes, paragraph 12 through paragraph 14. |
| 11:06:37 | 11 | A.   "12:  The wife request that the Court establish a parenting |
| 11:06:40 | 12 | plan that provides she has sole parental responsibility. |
| 11:06:46 | 13 | Shared parental responsibility would be detrimental to the |
| 11:06:49 | 14 | minor child for the reasons noted below in paragraph 14. |
| 11:06:53 | 15 | "13:  Furthermore, the wife requests that the Courts |
| 11:06:58 | 16 | establish a parenting plan that provides the minor child |
| 11:07:01 | 17 | resides primarily with the wife during the school year with the |
| 11:07:06 | 18 | husband receiving visitation that the Court deems is in the |
| 11:07:10 | 19 | best interest of the child. |
| 11:07:12 | 20 | "14:  A parenting plan that provides that the wife have |
| 11:07:19 | 21 | majority timeshare is in the best interest of the minor child |
| 11:07:23 | 22 | based on the following: |
| 11:07:26 | 23 | "A.   Throughout the course of the marriage the wife has |
| 11:07:29 | 24 | been the primary caretaker of the minor child.  The husband's |
| 11:07:33 | 25 | involvement has been limited due to his work and travel |

| 11:07:36 | 1 | schedule. |

"B.  The husband left the wife and the minor child on around August 1, 2014, and has provided no financial support to them since then.

"C.  The husband has committed acts of domestic violence towards the wife and she fears him.

"D.  The husband is verbally and mentally abusive towards the wife.

"E.  The husband has moved the family to different geographic locations every few years, and the wife expects that the husband's pattern of moving to continue in the future, thus the wife can provide a more stable environment for the minor child.

"F.  The husband has threatened to take the child from the jurisdiction of the Court and keep the child from the wife."

Q.  And did the husband ever follow through with his threats to take the child?

A.  Yes.

Q.  And when did he do that?

A.  December.

MR. NORDBY:  Objection, Your Honor, as beyond the scope of my cross.

THE COURT:  I'll allow you to recross.

Go ahead.

MR. LEVY:  I'll go ahead and just -- no further

| 11:09:03 | 1 | questions, Your Honor. |

11:09:03  1   questions, Your Honor.

11:09:04  2        THE COURT:  Do you wish to follow-up to that question?

11:09:07  3        MR. NORDBY:  No, Your Honor.

11:09:08  4        THE COURT:  Ms. Anqui, you discussed your state of

11:09:16  5   affairs with your husband in Spain at the time you all made the

11:09:23  6   decision to leave and travel to the Philippines, and you said

11:09:27  7   you did not own a home, you had lived in three different rental

11:09:33  8   properties, all furnished?

11:09:36  9        THE WITNESS:  Yes, Your Honor.

11:09:36  10        THE COURT:  And then I heard you -- I thought I heard

11:09:39  11   you say that your husband sold your vehicle.

11:09:42  12        THE WITNESS:  Yes, Your Honor.

11:09:43  13        THE COURT:  When did he do that?  Before you left or

11:09:46  14   after you left?

11:09:47  15        THE WITNESS:  Before we left.  We sold everything

11:09:50  16   before we left Spain.

11:09:51  17        THE COURT:  Was there anything left behind in Spain

11:09:56  18   that you can speak of that connected you, your son, your

11:10:00  19   husband to Spain?

11:10:01  20        THE WITNESS:  No.

11:10:02  21        THE COURT:  Family?

11:10:03  22        THE WITNESS:  No, we have no family there.

11:10:05  23        THE COURT:  Employment?

11:10:08  24        THE WITNESS:  No.

11:10:09  25        THE COURT:  Your husband was a legal resident of

| | | |
|---|---|---|
| 11:10:16 | 1 | Spain, correct? |
| 11:10:18 | 2 | **THE WITNESS:**  At that time? |
| 11:10:19 | 3 | **THE COURT:**  Right. |
| 11:10:20 | 4 | **THE WITNESS:**  At that time, yes. |
| 11:10:21 | 5 | **THE COURT:**  Did that change? |
| 11:10:23 | 6 | **THE WITNESS:**  It changed.  Even if you're a European |
| 11:10:26 | 7 | citizen but if you leave the country, after six months you no |
| 11:10:30 | 8 | longer have the residence. |
| 11:10:31 | 9 | **THE COURT:**  So that was the same status that you |
| 11:10:33 | 10 | described for you was the same for him? |
| 11:10:36 | 11 | **THE WITNESS:**  Yes, Your Honor. |
| 11:10:39 | 12 | **THE COURT:**  Would that be the same for your son then? |
| 11:10:41 | 13 | **THE WITNESS:**  Yes, Your Honor. |
| 11:10:42 | 14 | **THE COURT:**  All right.  That's all I have. |
| 11:10:49 | 15 | Any follow-up, Mr. Levy? |
| 11:10:52 | 16 | **MR. LEVY:**  No, Judge. |
| 11:10:54 | 17 | **THE COURT:**  Mr. Nordby? |
| 11:10:58 | 18 | **MR. NORDBY:**  No, Your Honor. |
| 11:10:59 | 19 | **THE COURT:**  All right, ma'am, you may step down. |
| 11:11:02 | 20 | **(Witness excused.)** |
| 11:11:03 | 21 | Any further evidence, Mr. Levy? |
| 11:11:05 | 22 | **MR. LEVY:**  No, Judge.  At this time we rest. |
| 11:11:08 | 23 | **THE COURT:**  Okay.  Any rebuttal? |
| 11:11:12 | 24 | **MR. NORDBY:**  Your Honor, no evidentiary rebuttal.  I'd |
| 11:11:14 | 25 | like the opportunity at the appropriate time to argue some law. |

11:11:17   1        **THE COURT:**  That will be now.  So we'll go ahead and
11:11:21   2   move into your closing arguments now.  And time is of the
11:11:24   3   essence in these cases so we will hear argument, you know, oral
11:11:29   4   argument as opposed to written argument.
11:11:34   5        So, from the lectern, Mr. Nordby, when you're ready.
11:11:40   6        **MR. NORDBY:**  Your Honor, Petitioner submits that the
11:12:13   7   verified petition for the return of the minor child pursuant to
11:12:16   8   the Hague Convention in federal statutes should be granted and
11:12:20   9   that the minor child here should be returned to Spain as the
11:12:23  10   country of habitual residence.
11:12:26  11        The case law on habitual residence is fairly uniform
11:12:33  12   that a place that the child resides where the child is not
11:12:38  13   legally permitted to reside cannot be the child's habitual
11:12:42  14   residence.
11:12:43  15        I think the case *In re: Cabrera*, which is found at 323
11:12:50  16   F. Supp. 2d 1303, Southern District of Florida case from 2004,
11:12:58  17   may be most similar to the facts we have here.
11:13:01  18        In that case, a child was born and lived the first few
11:13:05  19   years in Argentina, came to the United States on a tourist visa
11:13:10  20   and overstayed that visa, and the petition was brought to
11:13:13  21   return the child to Argentina.
11:13:16  22        That case stands for the fact that the habitual
11:13:18  23   residence of a young child cannot be shifted without mutual
11:13:22  24   agreement of the parents.  The father in that case consented to
11:13:25  25   the child visiting the United States but not residing

11:13:30  1    permanently.

11:13:31  2         We have similar facts here.  The parents of the child

11:13:33  3    here came to the United States on a temporary investor visa,

11:13:39  4    not any sort of visa that could lead to permanent residence.

11:13:42  5         That case also suggested that, considering the child's

11:13:45  6    current immigration status and frequent moves, it was difficult

11:13:48  7    to find that the child had any settled purposes or habitual

11:13:53  8    residence in the United States.  And the quote says that, "Any

11:13:56  9    stability that she may enjoy in the United States is

11:13:59  10   significantly undermined by the respondent's uncertain

11:14:02  11   immigration status."

11:14:03  12        And other cases have echoed that same reasoning.  The

11:14:11  13   *Kijowska* case from the Seventh Circuit, an opinion by Judge

11:14:17  14   Posner, says that, "As an illegal alien, she can be arrested

11:14:22  15   and deported at any time, her link to this country was

11:14:26  16   particularly tenuous."

11:14:26  17        And other cases stand for the fact that the degree of

11:14:29  18   settled purpose required to establish habitual residency in the

11:14:33  19   United States cannot be satisfied by someone who is illegally

11:14:36  20   in this country or who has remained in this country illegally.

11:14:41  21        **THE COURT:**  So that issue goes to the habitual

11:14:46  22   residence and the intent as to the habitual residence, not the

11:14:52  23   acclimatization of the child in the new country, if you will?

11:14:58  24        **MR. NORDBY:**  Yes, Your Honor.  And that's actually a

11:15:00  25   very important point that I'd like to address now.  The

| | | |
|---|---|---|
| 11:15:03 | 1 | affirmative defense under Article 12 of the Hague Convention |
| 11:15:06 | 2 | for a well-settled child only applies in cases where the Hague |
| 11:15:10 | 3 | petition is filed more than one year after the wrongful removal |
| 11:15:14 | 4 | or wrongful retention.  So Article 12 says that when a petition |
| 11:15:19 | 5 | is filed more than one year after the wrongful |
| 11:15:22 | 6 | removal/retention and the child has become well settled in the |
| 11:15:26 | 7 | new country, an affirmative defense can be found that would |
| 11:15:31 | 8 | prohibit removal to the country of habitual residence. |
| 11:15:33 | 9 | That's simply not the case here.  The wrongful |
| 11:15:38 | 10 | retention that we're alleging -- or that the petition alleges |
| 11:15:42 | 11 | took place in December of 2014 when the custody proceedings |
| 11:15:45 | 12 | were filed in the state courts and the Petitioner became aware |
| 11:15:50 | 13 | that the Respondent would seek to retain custody of the child |
| 11:15:54 | 14 | here in the United States without any legal immigration status. |
| 11:15:59 | 15 | The Hague petition here was filed within months.  And |
| 11:16:03 | 16 | in fact, the petition to the Central Minister in Spain was |
| 11:16:08 | 17 | filed -- I believe it was two or three months after the |
| 11:16:11 | 18 | wrongful retention. |
| 11:16:12 | 19 | So the well-settled child affirmative defense is |
| 11:16:16 | 20 | completely inapplicable here because the petition was not filed |
| 11:16:20 | 21 | outside of that one year time from the wrongful retention. |
| 11:16:24 | 22 | As to the other affirmative defense that's been raised |
| 11:16:27 | 23 | in the response, the grave risk of harm to the child, there's |
| 11:16:32 | 24 | no grave risk of harm to the child under the circumstances here |
| 11:16:38 | 25 | and given the evidence that's been presented here. |

| | |
|---|---|
| 11:16:41 | 1 |
| 11:16:46 | 2 |
| 11:16:51 | 3 |
| 11:16:56 | 4 |
| 11:16:59 | 5 |
| 11:17:03 | 6 |
| 11:17:08 | 7 |
| 11:17:10 | 8 |
| 11:17:15 | 9 |
| 11:17:19 | 10 |
| 11:17:19 | 11 |
| 11:17:36 | 12 |
| 11:17:46 | 13 |
| 11:17:46 | 14 |
| 11:17:47 | 15 |
| 11:17:48 | 16 |
| 11:17:52 | 17 |
| 11:17:56 | 18 |
| 11:17:59 | 19 |
| 11:18:04 | 20 |
| 11:18:08 | 21 |
| 11:18:11 | 22 |
| 11:18:16 | 23 |
| 11:18:22 | 24 |
| 11:18:25 | 25 |

It's the Respondent's burden to prove grave risk of harm to the child by clear and convincing evidence, and that exception must be narrowly construed.  We cited in our memorandum in support of the petition the case *Miller vs. Miller*, a Fourth Circuit case from 2000, that says that the grave risk exception must be narrowly construed.  And the exception requires evaluation of the grave risk of physical harm to the child, psychological harm to the child, or if the return would otherwise place the children in an intolerable situation.

The Federal Register notice, 51 Federal Register 10494, page 10510 from 1986 lays out a public notice on the Hague International Child Abduction Convention's legal analysis.

And I'll quote from it, and this has been quoted in cases as well.  "Even a serious risk of harm short of grave risk does not rise to the level of prospective harm that the Article 13(b) exception recognizes as a reason for not returning a wrongfully removed or retained child.  Cases that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent abuse.  Conversely, evidence of real but sporadic abuse or isolated incidents of physical abuse or even some limited incidents aimed at persons other than the child at issue have not been found sufficient to support

| | | |
|---|---|---|
| 11:18:29 | 1 | application of the grave risk exception." |
| 11:18:31 | 2 | So the point of this exception is that the grave risk |
| 11:18:37 | 3 | to the child exception is not intended as a substitute for the |
| 11:18:41 | 4 | best interests of the child standard that's used in custody |
| 11:18:45 | 5 | disputes. |
| 11:18:46 | 6 | Those sorts of considerations are appropriately |
| 11:18:49 | 7 | considered by the family law courts in the country of habitual |
| 11:18:54 | 8 | residence rather than as the exception to the Hague |
| 11:18:58 | 9 | Convention's return standard. |
| 11:18:59 | 10 | **THE COURT:** So, Mr. Nordby, point me to your strongest |
| 11:19:04 | 11 | evidence of your position -- Mr. Schurmann's position that |
| 11:19:10 | 12 | there was not a shared mutual intent to abandon Spain as the |
| 11:19:16 | 13 | child's habitual residence. |
| 11:19:23 | 14 | **MR. NORDBY:** Your Honor, a couple of things there. |
| 11:19:25 | 15 | The first one is that my client presented testimony that he |
| 11:19:28 | 16 | left belongings in Spain in the garage of a friend to be |
| 11:19:31 | 17 | available upon his return.  So from an evidentiary perspective, |
| 11:19:35 | 18 | we think that's highly relevant. |
| 11:19:38 | 19 | The other is that the departure from Spain was |
| 11:19:42 | 20 | exclusively on temporary nonpermanent visas for a particular |
| 11:19:46 | 21 | term of years.  So at the conclusion of those visas, the last |
| 11:19:52 | 22 | habitual residence where the family was legally present was |
| 11:19:56 | 23 | Spain. |
| 11:19:57 | 24 | **THE COURT:** But clearly, I mean, based even on |
| 11:20:00 | 25 | Mr. Schurmann's own testimony, it was the intent to apply to |

| | | |
|---|---|---|
| 11:20:06 | 1 | extend those visas.  I mean, it was their intent to stay.  I |
| 11:20:10 | 2 | don't have any evidence of the exact time frame that the couple |
| 11:20:15 | 3 | intended to stay in the United States, but clearly it wasn't |
| 11:20:20 | 4 | just for two years. |
| 11:20:22 | 5 | There's evidence in Mr. Schurmann's own hand that he |
| 11:20:28 | 6 | wanted his son to have a better opportunity at education.  The |
| 11:20:32 | 7 | child was only two at the time that they left Spain, so |
| 11:20:36 | 8 | presumably that would be another four years.  He admitted that |
| 11:20:40 | 9 | he applied to -- and tried twice to extend the investor visa |
| 11:20:47 | 10 | so -- |
| 11:20:49 | 11 | MR. NORDBY:  Your Honor, I accept that.  But I believe |
| 11:20:53 | 12 | my client's testimony was that his intent upon coming to the |
| 11:20:57 | 13 | United States on the E-2 investor visa was to establish a |
| 11:21:01 | 14 | company and to sell it for a profit and then leave the country. |
| 11:21:04 | 15 | Those plans, unfortunately, did not work out from a |
| 11:21:07 | 16 | business perspective.  He lost a great deal of money, |
| 11:21:11 | 17 | overstayed the visa, there's no disputing that, and was |
| 11:21:14 | 18 | attempting to recoup some of those losses to salvage sale of |
| 11:21:18 | 19 | equipment, sale of the business in some way before leaving the |
| 11:21:22 | 20 | country and calling it a complete loss. |
| 11:21:25 | 21 | THE COURT:  The only evidence I guess that I heard -- |
| 11:21:29 | 22 | or some evidence that I heard was from Ms. Anqui as to the |
| 11:21:35 | 23 | legal resident status in Spain for both of them and that after |
| 11:21:43 | 24 | being away from Spain for greater than six months that they no |
| 11:21:50 | 25 | longer had legal resident status there. |

11:21:54    1          MR. NORDBY:  Your Honor, I don't know one way or the

11:21:56    2    other whether that's an accurate statement of European

11:22:00    3    immigration law.  I don't know whether Mr. Schurmann or

11:22:04    4    Ms. Anqui is competent to testify as to that.

11:22:06    5          THE COURT:  Well, that's the evidence before me,

11:22:09    6    unchallenged.

11:22:10    7          MR. NORDBY:  Well, as to -- I understand.  And if

11:22:12    8    there's a desire for supplemental briefing on that issue, we

11:22:16    9    can certainly do that.  But the testimony of the lay witness as

11:22:19   10    to the legal effect, I'd suggest, is by itself insufficient.

11:22:23   11    But there are --

11:22:24   12          THE COURT:  Well, I think she can certainly testify as

11:22:27   13    to her knowledge of her own legal resident status.  And I

11:22:32   14    suppose as far as his, it would be based on her opinion as to

11:22:36   15    what she knew about her own and their similar circumstances.

11:22:41   16          MR. NORDBY:  Your Honor -- and I don't have reason to

11:22:44   17    doubt her statement as to herself.  What I'm not aware of is

11:22:47   18    whether the legal effect might be different for an EU citizen,

11:22:51   19    a German citizen, as Mr. Schurmann and as their son is, whether

11:22:55   20    the legal resident status in another EU country may be

11:22:59   21    different than it would be for a non-EU citizen.  I don't know

11:23:03   22    the answer to that legal question.

11:23:06   23          MR. SCHURMANN:  Your Honor, I know the answer to it.

11:23:09   24    May I say it, please?

11:23:09   25          THE COURT:  No, you may not.  The case is closed.

11:23:14    1    There is no more evidence, Mr. Schurmann.

11:23:17    2        Anything else?

11:23:21    3        **MR. NORDBY:**  If I could just have one moment, Your

11:23:23    4    Honor?

11:23:24    5        **THE COURT:**  Yes.

11:24:00    6        **MR. NORDBY:**  Just touching again on two legal points,

11:24:03    7    Your Honor.  One of the other aspects that the courts have

11:24:08    8    looked at in determining whether there's a grave risk of harm

11:24:11    9    are the circumstances in the country of habitual residence, in

11:24:15   10    this case in Spain.

11:24:16   11        Certainly this is not the case where Spain is a

11:24:20   12    war-torn country or a third world country where the child would

11:24:25   13    be placed into danger simply by being sent to that country.

11:24:29   14    And we, of course, would be willing to make whatever

11:24:32   15    arrangements we would need with the State Department to ensure

11:24:38   16    safe transfer would be granted.

11:24:40   17        And finally, on the question of habitual residence,

11:24:50   18    let me just quote from the *Alonzo vs. Claudino* case from the

11:24:54   19    Middle District of North Carolina, which I believe is a case we

11:24:56   20    cited in our memorandum, it's 2007 Westlaw 475340.

11:25:01   21        It said, "It is impossible to be settled when you're

11:25:04   22    subject to arrest and deportation at any time."

11:25:07   23        We believe the current illegal immigration status of

11:25:11   24    both Ms. Anqui and of the child rebuts a claim of habitual

11:25:16   25    residence in the United States.  The well-settled child

11:25:20   1   exception does not apply here because the petition was filed

11:25:24   2   within one year after the wrongful retention, and that there's

11:25:28   3   not sufficient evidence by a clear convincing standard of a

11:25:32   4   grave risk of harm to the child based on the record here.

11:25:34   5        **THE COURT:**  Let me ask a question about that.  So this

11:25:41   6   issue of the illegal immigration -- or the immigration status

11:25:45   7   and the questionable immigration status for both Ms. Anqui and

11:25:49   8   the son, are you suggesting that that goes to the well-settled

11:26:02   9   sort of environment for the child, or are you suggesting that

11:26:08   10  goes to the initial question of whether the retention was

11:26:15   11  wrongful because the habitual residence is Spain?

11:26:19   12       My reason for ask is, if I was to find, based on the

11:26:22   13  evidence before me and the law, that there was no shared mutual

11:26:28   14  intent to maintain Spain as the child's habitual residence,

11:26:34   15  what would your argument be then as to the questionable nature

11:26:39   16  of the immigration status of the mother and the child?

11:26:42   17       **MR. NORDBY:**  Well, Your Honor, the cases have said

11:26:45   18  that habitual residence isn't quite like domicile but it's like

11:26:49   19  domicile in that you only have one at a time.  And if you've

11:26:53   20  come to the United States on a temporary visa, by the nature of

11:26:58   21  that there's no intent to remain indefinitely in the United

11:27:02   22  States.

11:27:02   23       **THE COURT:**  No, I disagree.  I mean, there could --

11:27:04   24  and I'm not suggesting what my finding is going to be here, but

11:27:07   25  you could have a situation where a family decided we are moving

| | | |
|---|---|---|
| 11:27:13 | 1 | to X country, we're on a temporary status, but we're going to |
| 11:27:20 | 2 | do everything we can to make that permanent, and we never, by |
| 11:27:25 | 3 | the way, intend to return to the former country, no matter |
| 11:27:29 | 4 | what.  We may go to a different country, but we're never going |
| 11:27:33 | 5 | back to that one.  So I don't see how that would change the |
| 11:27:36 | 6 | analysis. |
| 11:27:38 | 7 | MR. NORDBY:  Your Honor, there are also some cases |
| 11:27:40 | 8 | suggesting that habitual residence inquiry must be |
| 11:27:45 | 9 | backward-looking rather than forward-looking.  It's not as to |
| 11:27:47 | 10 | what the parties might want to do in the future, it's where |
| 11:27:51 | 11 | they have been habitually. |
| 11:27:52 | 12 | THE COURT:  Well, it's what their intent was when they |
| 11:27:55 | 13 | left Spain, because there's no question they left Spain.  So |
| 11:27:58 | 14 | it's what was their intent at the time they packed themselves |
| 11:28:01 | 15 | up, including their son, and moved to the Philippines, what was |
| 11:28:06 | 16 | their intent at that time. |
| 11:28:09 | 17 | MR. NORDBY:  Right.  And we'd suggest that the |
| 11:28:11 | 18 | evidence that's been presented suggests that they were coming |
| 11:28:14 | 19 | to the United States ultimately on a temporary investor visa |
| 11:28:18 | 20 | and then intended to return. |
| 11:28:21 | 21 | THE COURT:  Right, but back to my original question, |
| 11:28:24 | 22 | and that was your focus on the questionable immigration status |
| 11:28:28 | 23 | of the mother and the son.  I'm wondering what your point is or |
| 11:28:36 | 24 | what your position is as to where that comes into the analysis |
| 11:28:39 | 25 | for the Court.  That's my question. |

| | | |
|---|---|---|
| 11:28:45 | 1 | **MR. NORDBY:** Sure. Your Honor, I think the cases have |
| 11:28:47 | 2 | looked at that under the habitual residence prong of the prima |
| 11:28:51 | 3 | facie case rather than as an affirmative defense. |
| 11:28:54 | 4 | **THE COURT:** So if you leave a country and have no |
| 11:28:57 | 5 | intention of ever returning, right, and you end up in another |
| 11:29:01 | 6 | country where your visa expires, you're suggesting to me that |
| 11:29:07 | 7 | the case law says that, even though the parties' intent was to |
| 11:29:12 | 8 | abandon that country and never return to it, that that child |
| 11:29:16 | 9 | needs to go back to that country because of the questionable |
| 11:29:19 | 10 | immigration status of the child? |
| 11:29:20 | 11 | **MR. NORDBY:** Your Honor, I think the question has come |
| 11:29:23 | 12 | up more frequently in the wrongful removal cases than the |
| 11:29:27 | 13 | wrongful retention cases. |
| 11:29:29 | 14 | **THE COURT:** We have retention here, though. |
| 11:29:31 | 15 | **MR. NORDBY:** We have a wrongful retention case here. |
| 11:29:34 | 16 | But I would suggest that the habitual residence has to be |
| 11:29:36 | 17 | looked at and that the immigration status goes to the habitual |
| 11:29:38 | 18 | residence rather than the well-settled child. |
| 11:29:43 | 19 | Again, the *Cabrera* case from the Southern District, I |
| 11:29:48 | 20 | believe, looked at it under that prong, that the habitual |
| 11:29:50 | 21 | residence of the young child cannot be shifted without mutual |
| 11:29:54 | 22 | agreement. And the record here does not establish that there |
| 11:29:57 | 23 | was a mutual agreement to shift the habitual residence to the |
| 11:30:04 | 24 | United States. |
| 11:30:04 | 25 | **THE COURT:** Thank you, Mr. Nordby. |

11:30:05    1          **MR. NORDBY:**  Thank you, Your Honor.

11:30:07    2          **THE COURT:**  All right, Mr. Levy.

11:30:08    3          **MR. LEVY:**  Thank you, Judge.  I would disagree with

11:30:15    4    Mr. Nordby's assessment that there wasn't a mutual intent.

11:30:22    5    Although Mr. Schurmann didn't testify explicitly, and denied

11:30:26    6    it, if you look at the evidence as a whole, he was never

11:30:30    7    consistent.

11:30:33    8          He filed -- he didn't challenge jurisdiction when my

11:30:38    9    client went to a state court and sought a divorce and sought

11:30:41   10    for the parental custody rights to be settled.  He appeared, he

11:30:46   11    filed a UCCJ, he filed a counter-petition.  And in that

11:30:50   12    counter-petition he didn't request to go back to Spain.  He

11:30:53   13    requested to go back to Germany with the child, and even

11:30:55   14    represented that he had a job in Germany that was going to pay

11:30:59   15    him six figures.

11:31:00   16          And if you look at the evidence, he not only said it

11:31:04   17    once, he said it twice.  He wrote an email, a derogatory email

11:31:09   18    to Judge Polson in which he said, you know, "Release my child

11:31:13   19    to me to Germany or else I'm going to run a smear campaign."

11:31:18   20    And so once again he was asking for the child to be returned to

11:31:21   21    Germany.

11:31:22   22          The whole purpose of the Hague Act is to prevent the

11:31:26   23    kind of gamesmanship that sort of Mr. Schurmann is engaging in.

11:31:31   24    Initially he filed a petition for domestic violence.  He got

11:31:35   25    the child based on circumstances which he ultimately later

11:31:39  1   dismissed when it came to hearing.  But in the interim he even

11:31:43  2   acknowledged that he tried to take the child out of the country

11:31:47  3   right there and then, no process, just go ahead and remove the

11:31:50  4   child and against court order.

11:31:55  5        And so when that failed, then he went ahead and he

11:31:59  6   participated in the divorce action.  And then he got a ruling

11:32:03  7   that wasn't favorable to him.  The judge entered an order and

11:32:07  8   gave Ms. Anqui primary time with the child.

11:32:13  9        And so -- and I think this is very key.  I know he's

11:32:19  10  made allegations and possibly in his petition but there was

11:32:23  11  certainly no evidence.  He voluntarily left the United States.

11:32:26  12  He wasn't deported.  He had a custody order in place where he

11:32:30  13  saw his child.

11:32:32  14       There's an ongoing judicial proceeding that's going to

11:32:34  15  settle the rights as to whether he gets the child or she gets

11:32:40  16  the child.  He voluntarily took himself out of that situation,

11:32:43  17  went to another country, and he picked a country which they

11:32:47  18  have no ties to.

11:32:48  19       They lived there in rentals.  He said he went -- moved

11:32:54  20  to the Philippines even before they came to the United States

11:32:56  21  and he purchased a business in the Philippines and then moved

11:33:00  22  it to the United States and tried to stay in the United States.

11:33:07  23       And I've got a case here, it's *Dalsgaard v. Montoya*

11:33:17  24  and it's a Middle District case.

11:33:21  25       **THE COURT:**  Do you have a cite?

| | | |
|---|---|---|
| 11:33:22 | 1 | **MR. LEVY:**  It doesn't look like it was a published |
| 11:33:25 | 2 | opinion because I'm looking for it and all I see is the 2011 |
| 11:33:29 | 3 | Westlaw. |
| 11:33:30 | 4 | **THE COURT:**  That's okay, give me the Westlaw cite. |
| 11:33:33 | 5 | **MR. LEVY:**  2011 Westlaw 50372 -- my eyes are so bad, I |
| 11:33:44 | 6 | apologize, either 23 or 33 is the last two digits, but it's |
| 11:33:52 | 7 | *Dalsgaard v. Montoya*. |
| 11:34:02 | 8 | And they talk about habitual residence in there, and |
| 11:34:04 | 9 | they talk about it as the place where the child has been |
| 11:34:07 | 10 | physically present for an amount of time sufficient for |
| 11:34:12 | 11 | acclimatization and which has a degree of settled purpose from |
| 11:34:17 | 12 | the child's perspective. |
| 11:34:18 | 13 | The child is in school.  The child has been here.  The |
| 11:34:22 | 14 | child speaks English, doesn't speak any foreign languages.  I |
| 11:34:26 | 15 | don't see how, you know, the father can now come in here and |
| 11:34:31 | 16 | try and say it's rational that the child has always remained a |
| 11:34:35 | 17 | citizen of Europe and that there was this agreement, which |
| 11:34:38 | 18 | clearly my client contests.  She says there was never any type |
| 11:34:42 | 19 | of an agreement for them to return to Spain. |
| 11:34:44 | 20 | I don't -- I don't see how they can say it's a |
| 11:34:47 | 21 | wrongful retention.  He just -- they both ended up abandoning |
| 11:34:53 | 22 | Spain and coming here. |
| 11:34:56 | 23 | And I don't have the case -- I thought I had pulled |
| 11:35:00 | 24 | it -- and I don't want to misrepresent it, but I do remember |
| 11:35:05 | 25 | reading a case yesterday evening -- and I apologize because I |

| 11:35:08 | 1 | kind of had to -- I was rushed on to this case with other stuff |

kind of had to -- I was rushed on to this case with other stuff
going on.  But it talked about immigration status not being all
that relevant from a habitual residence perspective as long as
there was no imminent threat of deportation.  And I thought I
had printed the case and brought it in but I had not.

        **THE COURT:**  This was a Hague --

        **MR. LEVY:**  Hague Convention case where they had talked
about the status.  And I know there's different prongs, and so
I don't want to misrepresent it, that's why I wanted to review
it.  But that's my recollection of what the finding was.

        And so what we have here is just a situation where he
decided not to litigate his rights in this country.  I think
they both filed UCCJA affidavits and said, "This is the home
state of the child.  The circuit court in Okaloosa County can
make a custody decision."

        And then she made a temporary custody decision not to
Mr. Schurmann's liking, and he went ahead and went to Europe
and then filed this instant action.

        And I think there's also been some evidence as to
abuse.  I think if you look at the letters and then you see his
characterizations --

        **THE COURT:**  Do I have the affidavits?  Were they a
part of the exhibits?

        **MR. LEVY:**  They were.  I don't know if I moved them
into evidence, but I think I did attach at least her affidavit,

| | | |
|---|---|---|
| 11:36:38 | 1 | but probably both affidavits. |
| 11:36:40 | 2 | THE COURT: I want to make sure I've got both. |
| 11:36:43 | 3 | MR. LEVY: And the Court made explicit findings that |
| 11:36:46 | 4 | it had jurisdiction over the subject matter and parties in its |
| 11:36:51 | 5 | orders. And that's never been challenged. They've never -- |
| 11:36:55 | 6 | well, actually, I take that back, Judge. |
| 11:37:01 | 7 | At this point, I don't think -- I think Mr. Schurmann |
| 11:37:04 | 8 | is running pro se and is filing pro se motions, a lot of pro se |
| 11:37:10 | 9 | motions in that case. |
| 11:37:10 | 10 | THE COURT: So you're saying there is not an affidavit |
| 11:37:13 | 11 | from Mr. -- |
| 11:37:14 | 12 | MR. LEVY: No, there is a UCCJA -- when he was |
| 11:37:17 | 13 | represented by counsel, Travis Johnson, they filed a UCCJA |
| 11:37:23 | 14 | affidavit. I don't believe I moved it into evidence, but it is |
| 11:37:25 | 15 | in the record of Okaloosa County Clerk of Court where they're |
| 11:37:32 | 16 | asserting Florida is the home state, and that's when he's |
| 11:37:36 | 17 | requesting for the court to permit him to relocate with the |
| 11:37:41 | 18 | child to Germany. |
| 11:37:54 | 19 | THE COURT: Okay. |
| 11:37:54 | 20 | MR. LEVY: And so I think when you look at the |
| 11:37:56 | 21 | evidence I think you do -- as far as see the demeanor of client |
| 11:38:00 | 22 | in reference to Mr. Schurmann's behavior. And she had also |
| 11:38:02 | 23 | indicated that she was about to move her supervised visitation |
| 11:38:07 | 24 | because every time the child was coming back from the time with |
| 11:38:09 | 25 | the father he was psychologically shaken up and very unhappy. |

| | | |
|---|---|---|
| 11:38:16 | 1 | **THE COURT:**  All right.  Thank you. |
| 11:38:21 | 2 | **MR. LEVY:**  That's all I have. |
| 11:38:22 | 3 | **THE COURT:**  Thank you.  All right.  Well, as I said, |
| 11:38:25 | 4 | time is of the essence in these cases, both as a practical |
| 11:38:30 | 5 | matter and also as set forth in the statute.  So we will |
| 11:38:35 | 6 | endeavor to get a written decision out to you hopefully |
| 11:38:40 | 7 | sometime in the next couple of weeks.  It won't be today or |
| 11:38:46 | 8 | tomorrow but sometime in the next couple of weeks. |
| 11:38:49 | 9 | Thank you very much for your presentations. |
| 11:38:51 | 10 | Mr. Schurmann, thank you for going to the lengths that |
| 11:38:53 | 11 | you went to to appear by videoconference. |
| 11:39:00 | 12 | **MR. SCHURMANN:**  Your Honor, may I give my final |
| 11:39:02 | 13 | statement, please? |
| 11:39:02 | 14 | **THE COURT:**  No, sir.  Your attorney has given your |
| 11:39:05 | 15 | final statement on your behalf. |
| 11:39:07 | 16 | So we will be in recess.  And again, I'll have an |
| 11:39:10 | 17 | order out just as quickly as I can.  Thank you. |
| 11:39:14 | 18 | **MR. SCHURMANN:**  Your Honor -- |
| | 19 | *(Proceedings concluded at 11:39 a.m.)* |
| | 20 | -------------------- |
| | 21 | *I certify that the foregoing is a correct transcript from the* |
| | | *record of proceedings in the above-entitled matter.  Any* |
| | 22 | *redaction of personal data identifiers pursuant to the Judicial* |
| | | *Conference Policy on Privacy are noted within the transcript.* |
| | 23 | |
| | | *Donna L Boland* |
| | 24 | _____          *1-13-2017* |
| | | *Donna L. Boland, RPR, FCRR*          *Date* |
| | 25 | *Official Court Reporter* |

## INDEX

                                                              PAGE

**WITNESS FOR THE PETITIONER:**

*STEPHAN SCHURMANN*
   Direct Examination by Mr. Nordby                              6
   Cross-Examination by Mr. Levy                                32
   Redirect Examination by Mr. Nordby                           48

**WITNESSES FOR THE RESPONDENT:**

*STEPHAN SCHURMANN*
   Direct Examination by Mr. Levy                               57

*JUBILIE ANQUI*
   Direct Examination by Mr. Levy                               69
   Cross-Examination by Mr. Nordby                              82
   Redirect Examination by Mr. Levy                             85


**CERTIFICATE OF REPORTER**                                    106


### PETITIONER EXHIBITS

**NO.:**                                                   RECEIVED

        4:   Limited Power of Attorney                         21
        5:   Application for Schengen visa                     20
        7:   Letter from son to Petitioner 10/7/14             24
        8:   PowerPoint Printout from Petitioner to Son        23

### RESPONDENT EXHIBITS

        1:   Domestic Violence Petition for Injunction         40
        6:   DVI Court Order                                   43
        7:   Petitioner for DOM                                74
       12:   Counter-Petition Dissolution of Marriage          35
       14:   Temporary Order in Divorce Case                   76
       20:   Letter "Why Are Women Frigid"                     64
       21:   Email from Petitioner to Judge Polson             45